**BRYAN CAVE LLP**
Sharon Z. Weiss (State Bar No. 169446)
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
Telephone: (310) 576-2100 / Facsimile: (310) 576-2200
E-mail: sharon.weiss@bryancave.com

**BAKER DONELSON BEARMAN,**
**CALDWELL & BERKOWITZ, PC**
E. Franklin Childress, Jr. (TN Bar 07040) - Admitted *Pro Hac Vice*
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone: (901) 577-2147 / Facsimile: (901) 577-0845
E-mail:  fchildress@bakerdonelson.com

Attorneys for Radians Wareham Holding, Inc., Radians, Inc.
and Safety Supply Corporation

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>ICPW LIQUIDATION CORPORATION, a California corporation, and ICPW LIQUIDATION CORPORATION, a Nevada corporation,<br><br>    Debtors and Debtors in Possession. | Case No. 1:17-bk-12408-MB<br><br>Jointly Administered with 1:17-bk-12409-MB<br><br>Chapter 11<br><br>Adv. Proc. No. 1:17-ap-01101-MB |
| OFFICIAL COMMITTEE OF EQUITY HOLDERS OF ICPW LIQUIDATION CORPORATION, a Nevada corporation,<br><br>                        Plaintiff,<br><br>v.<br><br>RADIANS WAREHAM HOLDING, INC., RADIANS, INC. and SAFETY SUPPLY CORPORATION,<br><br>                        Defendants. | **DEFENDANTS' REPLY TO PLAINTIFF OFFICIAL COMMITTEE OF EQUITY HOLDERS OPPOSITION TO MOTION TO DISMISS**<br><br>**HEARING DATE:**<br>Date:    February 12, 2018<br>Time:    2:30 PM<br>Place:   Courtroom "303"<br>             21041 Burbank Blvd.<br>             Woodland Hills, CA |

MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................... 1

II.   THE EQUITY COMMITTEE CONFIRMS IT IS STANDING IN THE SHOES OF
      THE DEBTORS ....................................................................................................... 2

III.  THE ALLEGED WRONGFUL ACTS OCCURRED PRE-PETITION, AND
      THEREFORE ARE SUBJECT TO THE RELEASES ......................................... 3

IV.   CASES CITED BY THE EQUITY COMMITTEE DO NOT UNDERMINE THE
      EFFECTIVENESS OF THE RELEASES. ............................................................ 5

V.    THE EQUITY COMMITTEE HAS NO CLAIM FOR BREACH OF THE
      COVENANT OF GOOD FAITH AND FAIR DEALING ................................... 7

      A.   Defendants Did Not Declare An Anticipatory Breach; Defendants Only Acted
           On An Actual Default ................................................................................... 8

      B.   There Is Not Independent Claim for Lack of Good Faith .......................... 9

      C.   There Is No Allegation That the Radians Defendants Acted Outside Of Their
           Legal Remedies ........................................................................................... 10

      D.   There Is No Question That the Debtors' Fraud Created the Default Under the
           Loan; It Was Not Any Action by the Defendants ..................................... 10

VI.   THE EQUITY COMMITTEE FAILS TO REBUT THE RADIANS DEFENDANTS'
      UNJUST ENRICHMENT ARGUMENT ............................................................ 11

VII.  THE EQUITY COMMITTEE CANNOT PURSUE A CLAIM FOR DURESS AS A
      MATTER OF LAW .............................................................................................. 12

      A.   Duress under Texas Law ............................................................................ 13

      B.   Overview Of The Farah Decision .............................................................. 14

      C.   RWHI Did Not Make a Threat ................................................................... 17

      D.   The Equity Committee is Second Guessing Management ......................... 21

      E.   There Was No Conspiracy .......................................................................... 22

VIII. CONCLUSION ..................................................................................................... 24

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Absolute Resource Corp.*,
    76 F. Supp. 2d 723 (N.D. Tex. 1999) ............................................................................9

*Affiliated Capital Corp. v. Commercial Fed. Bank*,
    834 S.W.2d 521 (Tex. Ct. App. 1992) ..........................................................................10

*In re Am. Sweeteners, Inc.*,
    248 B.R. 271 (Bankr. E.D. Pa. 2000) ............................................................................5

*American Bank of Waco v. Waco Automotive*,
    818 S.W.2d 163 (Tex. Ct. App. 1991) .........................................................................8, 9

*Bank of China v. Huang (In re Huang)*,
    275 F.3d 1173 (9th Cir.2002) ........................................................................................5

*Brown v. AVEMCO Investment Corporation*,
    603 F.2d 1367 (9th Cir. 1979) .....................................................................................8, 9

*Casstevens v. Smith*,
    269 S.W.3d 222 (Tex. Ct. App. 2008) ..........................................................................11

*Continental Ins. Co. v. Thorpe Insulation Co.*,
    671 F3d 1011 (9th Cir. 2012) .........................................................................................5

*In re Dublin Secs.*,
    133 F.3d 377 (6th Cir. 1997) ..........................................................................................5

*English v. Fisher*,
    660 S.W.2d 521 (Tex. 1983) .........................................................................................10

*First Texas Savings Association of Dallas v. Dicker Center, Inc.*,
    631 S.W.2d 179 (Tex. Ct. App. 1982) ..........................................................................22

*First Union National Bank v. Richmont Capital Partners I, L.P.*,
    168 S.W.3d 917 (Tex. Ct. App. 2005) ..........................................................................11

*Hedged-Investments v. H Buchanan H*,
    84 F.3d 1285 (1996) ........................................................................................................4

*Helton v. Clements*,
    832 F.2d 332 (5th Cir. 1987) .......................................................................................3, 4

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995) ...........................................................................................5

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

*In re Home & Hearth Plano Parkway, L.P.*,
  320 B.R. 596 (N.D. Tex. Bankr. 2004) ...................................................................7

*In re Intervention Energy Holdings*,
  553 B.R. 258 (Bankr. D. Del. 2016) ......................................................................5

*Lehman-Menley v. Boston Old Colony Ins. Co.*,
  No. A-05-CA-1054 LY, 2006 WL 2167258 (W.D. Tex. July 31, 2006) ...................3

*Lubbock Beverage Co. v. Miller Brewing Co.*,
  No. CIV.A.5:01-CV-124-C, 2002 WL 31011266 (N.D. Tex. June 4, 2002)..............9

*Murray v. San Jacinto Agency, Inc.*,
  800 S.W.2d 826 (Tex. 1990) ...............................................................................3, 4

*Nance v. Resolution Trust Corp.*,
  803 S.W.2d 323 (Tex. Ct. App. 1990) ..................................................................7

*Northern Nat. Gas Co. v. Conoco, Inc.*,
  986 S.W.2d 603 (Tex. 1998) .................................................................................9

*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*,
  267 F.3d 340 (3d Cir.2001) ...............................................................................2, 5

*In re Pembroke Development Corp.*,
  124 B.R. 398 (Bankr. S.D.Fla. 1991) ....................................................................6

*Prutzman v. Wells Fargo Bank, N.A.*,
  No. H–12–3565, 2013 WL 4063309 (S.D. Tex. Aug. 12, 2013) ........................3, 4

*Sanders v. Republic National Bank of Dallas*,
  389 S.W.2d 551 (1965) ........................................................................................17

*Shearson Lehman Hutton, Inc. v. Wagoner*,
  944 F.2d 114 (2d Cir.1991) ..................................................................................5

*In re Silverman Laces, Inc.*,
  2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002) ......................................................6

*South Plains Switching, Ltd. Co. v. BNSF Ry. Co.*,
  255 S.W.3d 690 (Tex. Ct. App. 2008) ..................................................................7

*State National Bank of El Paso v. Farah Manufacturing Company, Inc.*,
  678 S.W.2d 661 (Tex. Ct. App. 1984) ...........................................................*passim*

*Texas Valla Real Estate I, Inc. v. City of Houston*,
  No. 14-10-00496-CV, 2011 WL 4449652 (Tex. App. Sept. 27, 2011) ....................4

*Whatley v. Nat'l Bank of Commerce*,
  555 S.W.2d 500 (Tex. Ct. Civ. App. 1977)............................................................3

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**Statutes**

11 U.S.C. § 548(d)(2)(A) ................................................................................................6

28 U.S.C. § 158(c)(2) ...................................................................................................11

Tex. Bus. Com. Code § 1.203 .........................................................................................9

Tex. Bus. Com. Code § 1.309 ....................................................................................7, 8

U.S. Bankruptcy Code Chapter 11 ...........................................................................20, 21

**Rules**

Fed. R. Civ. P. 12(b)(6) ...............................................................................................13

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

The Equity Committee correctly admits, as it must, that it may only pursue claims against Defendants Radians Wareham Holding, Inc., Radians, Inc. and Safety Supply Corporation (collectively the "Radians Defendants") in the shoes of the Debtors.[1] That may be the only legally correct statement in the Equity Committee's opposition.

The Equity Committee's opposition is replete with incorrect legal principles and misstatements of the relevant case law.  Rather than directly deal with the points raised in the Motion to Dismiss, the Equity Committee tries to misdirect this Court with irrelevant facts and inapplicable cases.   In truth, the Court should grant the Radians Defendants' Motion to Dismiss because:

1) The Equity Committee, standing in the shoes of the Debtors, is bound by the releases executed by the Debtors both before bankruptcy and after.  All of the alleged bad acts occurred prior to the Debtors' execution of at least three separate releases and the Debtors' knowing and voluntary waiver of their defenses while they were represented by highly competent counsel.  The Equity Committee's claims that the releases are not operative are incorrect.  Under Texas law, the releases include any potential claim that pre-dates the release, which includes all of the complained actions at issue here.  Moreover, the Equity Committee may not hide behind inapplicable cases dealing with certain blocking rights, which prohibit the filing of a bankruptcy petition or provide a pre-petition waiver of bankruptcy-related rights, to argue that a valid release under state law does not apply to it.

2) The Equity Committee has not alleged facts that, as a matter of law, give rise to any type of lender liability claim, including claims of duress, breach of good faith and fair dealing, and unjust enrichment.  While the Radians Defendants acknowledge the existence of a tort claim for duress under Texas state law, that claim only exists when a lender threatens to act outside of its contractual rights.  The facts which the Equity Committee alleges are entirely different than the facts of *Farah*, the prevailing case regarding duress under Texas law.  In *Farah*, the lender

---

[1]    Debtors are Ironclad Performance Wear Corporation, a California corporation ("ICPWA CA") and Ironclad Performance Wear Corporation, a Nevada corporation ("ICPWA NV", collectively with ICPW CA, the "ICPW Entities" or the "Debtors").

USA01\11412250.1

1

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

threatened actions that were not allowed in the contract.  In this case, the Equity Committee complains that Radians Wareham Holding, Inc. ("RWHI") failed to forebear from its contractual remedies when it acted within the scope of the contract.  There is, consequently, no duress as a matter of law.

3) The Radian Defendants cannot be liable for breach of the implied duty of good faith and faith dealing.  Such a claim does not exist between a commercial lender and a borrower.  Instead of addressing that issue, the Equity Committee argues that the Radians Defendants may be liable for a violation of good faith and fair dealing for an "at will" acceleration of an anticipatory breach.  As the Equity Committee admits, RWHI did not declare an anticipatory breach.  Rather, the Debtors were in default, and RWHI was exercising its contractual remedies.  Since RWHI was only exercising its contractual rights, there can be no breach of any duty of good faith or fair dealing.

4) Nor can the Radians Defendants be liable for unjust enrichment.  As noted below, the Equity Committee's claims fail on both procedural and substantive grounds.

5) The Equity Committee should not be permitted to raise for the first time in their Opposition claims outside the Complaint, including claims for conspiracy and fraudulent transfer, and it is too late to bring those claims now.  The Radians Defendants respectfully request that the Court strike any claims that were not timely made by the December 4, 2017 deadline.

## II.    THE EQUITY COMMITTEE CONFIRMS IT IS STANDING IN THE SHOES OF THE DEBTORS

The Equity Committee has acknowledged that the only claims it is pursuing are "claims on behalf of the Debtors' Estates."  *See* Opposition, ¶57.  As such, the Equity Committee stands in the shoes of the ICPW Entities, and while the Equity Committee is granted standing to bring any cause of action the Debtors may have against RWHI, it is also subject to the same defenses which could be pled against the ICPW Entities.[2]  Thus, this Court must resolve the question of whether the ICPW Entities could obtain the relief that the Equity Committee now seeks.  The answer is no.

---

[2]      *See e.g. Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356-57 (3d Cir.2001) ("[t]here is no 'innocent successor' exception available to a bankruptcy trustee in a case in which the defendant successfully could have mounted an *in pari delicto* defense against the debtor.").

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

### III.    THE ALLEGED WRONGFUL ACTS OCCURRED PRE-PETITION, AND THEREFORE ARE SUBJECT TO THE RELEASES

The Equity Committee attempts to confuse the Court as to when the alleged misconduct accrued, and as a consequence, the scope of the release.  *See* Opposition, ¶53.  Under Texas law, a cause of action *accrues* when the alleged wrongful act occurs. *See Whatley v. Nat'l Bank of Commerce*, 555 S.W.2d 500, 506 (Tex. Ct. Civ. App. 1977); *see also Lehman-Menley v. Boston Old Colony Ins. Co.*, No. A-05-CA-1054 LY, 2006 WL 2167258, at *4 (W.D. Tex. July 31, 2006) (a claim is generally considered to have accrued when a situation arises that enables a person to seek judicial relief).  In other words, the action accrues "from the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Helton v. Clements*, 832 F.2d 332, 334–35 (5th Cir. 1987).   The occurrence of the purported wrongful act causes the legal injury under Texas law, "even if the injury is not immediately discovered, and even if all damages have not yet occurred." *See Prutzman v. Wells Fargo Bank, N.A.*, No. H–12–3565, 2013 WL 4063309, at *3 (S.D. Tex. Aug. 12, 2013) (holding that the legal injury for all of the homeowner's claims occurred on the date he closed on his home equity loan); *see e.g. Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990) ("The fact that damage may continue to occur for an extended period ... does not prevent [the] limitations [period] from starting to run.").

The Equity Committee's Complaint alleges that "[RWHI's] actions in accelerating the loan, agreeing only to unworkable one-week forbearances and sweeping ICPW's bank accounts, were strictly for [RWHI's] own commercial advantage. [RWHI's] actions were unjust, oppressive and in bad faith."  Complaint, ¶25.  Similarly, the Equity Committee's Duress Claim contains similar wrongful allegations that the "improper use of the Loan Agreement's acceleration and sweeping provisions for [RWHI's] own commercial advantage over the ICPW [E]ntities, now known as ICPW Liquidation Corporation, a California corporation and ICPW Liquidation Corporation, a Nevada corporation."  Complaint, ¶31.  And again, in the Breach of Covenant of Good Faith and Fair Dealing Claim, the Equity Committee asserts "[RWHI's] actions deprived ICPW of the benefits of the Loan Agreement, improperly invoking the acceleration and sweeping provisions,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1   and contrary to the standards of conduct established while Capital One held the loan, for [RWHI's]

2   own commercial advantage over the ICPW [E]ntities. [RWHI's] actions were unjust, oppressive

3   and designed to further [RWHI's] own economic interests at the expense of the ICPW entities."

4   Complaint, ¶38.  The Unjust Enrichment Claim also references the same pre-petition conduct that

5   "[RWHI's] wrongful actions include using the acceleration and sweeping provisions of the Loan

6   Agreement."  Complaint, ¶43.

7       All these alleged wrongful acts occurred <u>pre-petition</u>.  [*See* July 26, 2017 Demand Letter,

8   Childress Decl., Ex. 12; August 24, 2017 Alleged Sweeping of Accounts, Complaint, ¶24].  As a

9   matter of law, the ICPW Entities became aware of the alleged wrongful injury when the loan was

10  accelerated on July 26, 2017 because, at the latest, the ICPW Entities had sufficient information at

11  that time to know that they might have been injured.  *See* Childress Decl., Ex. 12; *see also Helton,*

12  832 F.2d 332; *Prutzman*, 2013 WL 4063309; *Murray*, 800 S.W.2d 826.

13      Because the alleged wrongful acts arose pre-petition, these claims are barred by the

14  Debtors' pre-petition releases.  The Equity Committee relies on *Texas Valla Real Estate I, Inc. v.*

15  *City of Houston*, No. 14-10-00496-CV, 2011 WL 4449652, at *5 (Tex. App. Sept. 27, 2011).

16  *Texas Valla* is not applicable to the facts in this case.  Texas Valla had no contractual relationship

17  with the City.  *Id.* at *2.  Texas Valla foreclosed its lien on certain real property; subsequently, the

18  City refused to provide water/sewer services for the property unless the previous owners'

19  water/sewer improvement bills were paid in full.  *Id.* at *1.  Texas Valla paid the amount under

20  "duress"; however, it did not bring an action against the City until after the statute of limitations

21  had lapsed.  *Id.* at *1-5.  The Equity Committee may not circumvent the breath of the release by

22  claiming that the injury "resulted from ICPW being forced to file for bankruptcy and ultimately

23  surrender ownership of ICPW's assets in an auction overseen by the Court" [Opposition, ¶51] and

24  the post-petition payment of the Break-up Fee [Opposition, ¶52].  Those facts are simply a

25  consequence of the ICPW Entities' default resulting from its own admitted fraud on their lender,

26  investors and other creditors.

27      Moreover, the Equity Committee cannot insulate itself from the post-petition release by

28  claiming that the DIP Order expressly protected it.  *See, e.g,. Hedged-Investments,* 84 F.3d at

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

1  1285-86; *see also Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc*., 267

2  F.3d 340, 357-358 (3d Cir. 2001); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093-94 (2d

3  Cir. 1995); *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir.1991); *In re*

4  *Dublin Secs.*, 133 F.3d 377, 380 (6th Cir. 1997).  As reflected above, the Equity Committee may

5  only assert the rights of the ICPW Entities subject to all available defenses.  The carve-out

6  provided for in the Final DIP Order did not, and cannot, confer any greater rights than those of the

7  Debtors.

8  **IV.    CASES CITED BY THE EQUITY COMMITTEE DO NOT UNDERMINE THE**

9  **EFFECTIVENESS OF THE RELEASES.**

10         While acknowledging that the Equity Committee's standing is derived from the Debtors'

11  Estates, the Equity Committee claims that courts refuse to hold that a debtor's prepetition release

12  (or prepetition waivers or agreements) is binding on a committee that was not a party to or

13  objected to the debtor's release, waiver or agreement.  *See* Opposition, ¶41.  The Equity

14  Committee misinterprets cases which do not enforce certain limited types of pre-petition waivers

15  and misses the distinction between a waiver of a right that only arises once a bankruptcy case is

16  filed, like the automatic stay, verses a waiver of rights that exists in a non-bankruptcy context, like

17  a release.  None of the authorities which the Equity Committee cites holds that pre-petition

18  releases of claims (or even post-petition releases of claims) are void.[3]  In fact, *In re Am.*

19  *Sweeteners, Inc.*, 248 B.R. 271 (Bankr. E.D. Pa. 2000), which is cited in the Equity Committee's

20  Opposition, involved a discovery dispute over whether certain documents which pre-dated the

21  release were discoverable.  *Id.* at 271, 281.  The court held that although the release barred any

22  claims relating to pre-release conduct, it did not preclude discovery of facts arising during that

23  period to the extent they were relevant to the remaining, non-released claims.  *Id.* at 281.  As a

24  result, the Equity Committee's claim that it is not bound by the Debtors' releases is misplaced.

25  _____

[3]         The case law cited include the enforceability of certain blocking rights which prohibit the filing of a

26  bankruptcy petition.  *See In re Intervention Energy Holdings*, 553 B.R. 258, 263 (Bankr. D. Del. 2016); *Continental Ins. Co. v. Thorpe Insulation Co.*, 671 F3d 1011 (9th Cir. 2012) (enforceability of arbitration clause); *Bank of China v.*

27  *Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir.2002) (Court held that "[i]t is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code.").  In *Huang*, a prepetition settlement agreement provided

28  that the debtor would not file for bankruptcy and that a debt was not dischargeable in bankruptcy. *Id.*

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

1    Nor are the releases voidable under the fraudulent transfer claim asserted.  First, the Equity

2    Committee did not plead a fraudulent transfer in its Complaint, and it is too late to do so now.

3    Second, the Equity Committee claims the fraudulent transfer occurred "when [RWHI] started

4    sweeping ICPW's bank accounts leaving ICPW with no cash whatsoever except for whatever

5    amount [RWHI] extended ICPW, ICPW had only an 'unreasonably small capital.'"  Opposition,

6    ¶50.  The Equity Committee continues to argue, "there should be little dispute that both the pre-

7    August 24th forbearance agreements and releases, and the post-August 24th transactions, provided

8    ICPW with less than reasonably equivalent value."  Opposition, ¶50.

9    These arguments ignore the nature and purpose of forbearance agreements.  A lender

10   provides reasonably equivalent value by agreeing to forebear on its otherwise actionable rights and

11   remedies.  In exchange, the borrower agrees to provide new consideration.  In other words,

12   forbearance constitutes "reasonably equivalent value" under § 548(d)(2)(A).  *See In re Silverman*

13   *Laces, Inc.*, 2002 WL 31412465, *5-6 (S.D.N.Y. Oct. 24, 2002) (holding that the debtor received

14   "reasonably equivalent value" when the creditor waived its rights to pursue legal remedies for

15   default and agreed to extend debtor's obligations in return for a security interest in debtor's

16   inventory, i.e., securing the antecedent debt); *In re Pembroke Development Corp.*, 124 B.R. 398,

17   400-01 (Bankr. S.D.Fla. 1991) ("In the case at hand, part of the consideration given by the creditor

18   for the execution of the Modification Agreement was its forbearance of foreclosure on a loan.").

19   Moreover, the lender does not need a separate exchange for value to enforce the rights

20   agreed upon between the parties when the loan was originated.  The Equity Committee's attempt

21   to isolate certain actions in a vacuum, and claim there is no value in exchange, cannot be the basis

22   for a fraudulent transfer.  Indeed, to the extent the Equity Committee is trying to claim it should

23   recover the break-up fee, the Court specifically found that the DIP Agreement was "fair and

24   reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment

25   consistent with their fiduciary duties and constitute reasonably equivalent value and fair." [*See*

26   Childress Decl., Ex. 3- Bankr. Dkt #31 (Interim DIP Order), ¶H; Bankr. Childress Decl., Ex. 6-

27   Dkt #70 (Second Interim DIP Order), ¶H; Childress Decl., Ex. 8 - Bankr. Dkt 87, ¶J (Final DIP

28   Order).]  The Court further clarified that the DIP Agreement, and related interim orders approving

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1  the DIP Agreement, did not "impair or prejudice the rights of any creditor, future trustee or

2  shareholder to challenge the validity, perfection or enforceability of the Lender's pre-petition liens,

3  and the release of claims set forth in Section 11.13 of the DIP Agreement does not apply to any

4  party other than the Debtors and their estates." [*See* Childress Decl., Ex. 3- Bankr. Dkt #31, ¶ii;

5  Childress Decl., Ex. 6- Bankr. Dkt #70, ¶ii.]  Because the Equity Committee is not seeking to

6  challenge the validity, perfection or enforceability of RWHI's pre-petition lien, but instead asserts

7  causes of action which solely belong to the bankruptcy estates, the release contained in Section

8  11.13 of the DIP Agreement is applicable.  As a result, the Complaint must be dismissed without

9  leave to amend, and the objection to RWHI's proof of claim denied.

10  **V.      THE EQUITY COMMITTEE HAS NO CLAIM FOR BREACH OF THE**

11  **COVENANT OF GOOD FAITH AND FAIR DEALING**

12       The Equity Committee's Opposition ignores the well-settled Texas law cited by the

13  Radians Defendants which holds that "there is no general duty of good faith and fair dealing in

14  ordinary arm's length commercial transactions."  *South Plains Switching, Ltd. Co. v. BNSF Ry.*

15  *Co.*, 255 S.W.3d 690, 702 (Tex. Ct. App. 2008).  More specifically for purposes of this case, "the

16  lender-borrower relationship . . . is not a 'special relationship' that would justify reading such a

17  duty into the contract."  *Nance v. Resolution Trust Corp.*, 803 S.W.2d 323, 333 (Tex. Ct. App.

18  1990); *see In re Home & Hearth Plano Parkway, L.P.*, 320 B.R. 596, 610 n.9 (N.D. Tex. Bankr.

19  2004) ("[U]nder Texas law, there is no implied covenant of good faith and fair dealing in the

20  lender-borrower relationship, and the Debtor has not pointed to any contractual language expressly

21  creating one.").

22       The Equity Committee avoids this established precedent, arguing that it nonetheless can

23  bring a claim for breach of the implied covenant of good faith and fair dealing because Section

24  1.309 of the Texas Business and Commercial Code "expressly imposes a duty of good faith on the

25  lender considering the exercise of acceleration rights or rights to additional collateral."

26  Opposition, p. 13.  This argument fails for, at least, four reasons:  First, Section 1.309 does not

27  apply to the facts at issue in this case.  Second, even if there is an obligation under Section 1.309,

28  such an obligation does not give rise to a stand-alone claim for a breach of contract.  Third, Texas

law is clear that there can be no breach of the duty of good faith when a party acts in conformity with the terms of the contract.  As Radians Defendants previously explained in their Motion to Dismiss, the Equity Committee cannot point to any provision of the contract that RWHI failed to honor.  Fourth, in view of the Equity Committee's own admissions in the Complaint regarding the events of default that occurred when ICPW Entities' accounting fraud and false financial statements came to light [Complaint, ¶16], the Equity Committee has no valid claim that RWHI's exercise of its acceleration rights was in bad faith.

A.    <u>Defendants Did Not Declare An Anticipatory Breach; Defendants Only Acted On An Actual Default</u>

Section 1.309 only applies to a term "providing that one party or that party's successor in interest may accelerate payment or performance or require collateral or additional collateral '**at will**' or when the party '**deems itself insecure**,' or words of similar import." Tex. Bus. & Com. Code § 1.309 (emphasis added).  Section 1.309 then explains that despite such open-ended language, this type of term "means that the party has power to do so only if that party in good faith believes that the prospect of payment or performance is impaired." *Id.*  The comment to this section explains that its purpose is to address "the effect to be given to a **clause that seemingly grants the power to accelerate at the whim and caprice of one party**.  This section is intended to make clear that despite language that might be so construed and which further might be held to make the agreement void as against public policy or to make the contract illusory or too indefinite for enforcement, the option is to be exercised only in the good faith belief that the prospect of payment or performance is impaired." Tex. Bus. & Com. Code § 1.309, comment (emphasis added).

The Equity Committee misapplies *Brown v. AVEMCO Investment Corporation*, 603 F.2d 1367 (9th Cir. 1979), and *American Bank of Waco v. Waco Automotive*, 818 S.W.2d 163 (Tex. Ct. App. 1991), arguing that those cases control here.  Opposition, p. 13.  Yet the facts of both of those cases were very different from the facts here.  The promissory note at issue in *American Bank of Waco* had a provision that allowed the bank to declare a default when it "in good faith deems itself insecure for any reason whatsoever." *American Bank of Waco*, 818 S.W.2d at 171.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

1    That type of language is not at issue with RWHI's demand.  The question in *American Bank of*

2    *Waco* was whether the bank made a proper determination of insecurity pursuant to the above

3    provision.  *Id.*  Again, this case concerns an entirely different set of facts and distinct contractual

4    language.  In *Brown*, the loan agreement at issue allowed the lender to accelerate payment when

5    the debtor entered into a lease without the lender's consent.  *Brown*, 603 F.2d at 1378-79.  The

6    Ninth Circuit was concerned that the option to accelerate based on a lease "could be used by [the

7    lender] as a sword for commercial gain rather than as a shield against security impairment,"

8    concluding that the U.C.C. "requires more than a good faith belief that a **technical breach**

9    occurred."  *Id.* at 1379 (emphasis added).  RWHI's demand involved much more than a mere

10   "technical breach"—there can be no question that ICPW's falsified financial statements are a

11   material default.

12          B.      There Is Not Independent Claim for Lack of Good Faith

13          The Texas courts have held that there is no independent cause of action for failure to act in

14   good faith.  The case law is clear, both addressing the common law and in the analogous context

15   of Section 1.203 of the Texas Business and Commerce Code, that there is no stand-alone claim for

16   breach of the covenant of good faith and fair dealing.  *See, e.g.*, *In re Absolute Resource Corp.*, 76

17   F. Supp. 2d 723, 734 (N.D. Tex. 1999) (dismissing a claim for breach of the duty of good faith and

18   fair dealing and holding that there is no such duty between a lender and borrower, and that there is

19   no independent cause of action for failure to act in good faith under Section 1.203); *Northern Nat.*

20   *Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 606-07 (Tex. 1998) (collecting cases for holding that

21   Section 1.203's good-faith standard does not create an independent cause of action); *Lubbock*

22   *Beverage Co. v. Miller Brewing Co.*, No. CIV.A.5:01-CV-124-C, 2002 WL 31011266, at *15

23   (N.D. Tex. June 4, 2002) (citing the Uniform Commercial Code comment and explaining that "the

24   doctrine of good faith merely directs a court towards interpreting contracts within the commercial

25   context in which they are created, performed, and enforced, and does not create a separate duty of

26   fairness and reasonableness which can be independently breached") (quoting Tex. Bus. & Com.

27   Code § 1.203, comment).  The Equity Committee's stand-alone claim for "breach of good faith and

28   fair dealing" must thus be dismissed because it is not tied to any breach of contract claim.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

C.    There Is No Allegation That the Radians Defendants Acted Outside Of Their Legal Remedies

Even assuming that the Equity Committee could bring an independent cause of action for breach of the duty of good faith, there is no bad faith when a party acts in conformity with the contract's terms.  The Complaint does not identify any provision of the Loan Agreement that RWHI failed to honor.  Texas courts hold that "[t]here can be no breach of the duty of good faith merely by a party's acting in strict accordance with the terms of a contract."  *Affiliated Capital Corp. v. Commercial Fed. Bank*, 834 S.W.2d 521, 527 (Tex. Ct. App. 1992) (citing *English v. Fisher*, 660 S.W.2d 521, 522 (Tex. 1983)).  The *Affiliated Capital* case was dispute over a construction loan between a joint venture and a bank.  *Affiliated Capital*, 834 S.W.2d at 523.  Under the terms of the loan, the bank had the right to refuse prepayment prior to a specific date.  *Id.*  The joint venture attempted to prepay prior to that date, and the bank refused the payment.  *Id.*  The joint venture then claimed that the bank's proffered reason for its inability to accept prepayment was false, and that the bank not acted in good faith.  *Id.* at 527.  The Court rejected the argument since the bank acted in accord with the agreement.  *Id.* ("[W]hen acting in accord with the Note as written, the reason given is irrelevant.").  RWHI adhered to the terms of the Loan Agreement and other agreements between the parties, and nowhere does the Complaint allege to the contrary.  Therefore, the claim for breach of good faith is deficient as a matter of law.

D.    There Is No Question That the Debtors' Fraud Created the Default Under the Loan; It Was Not Any Action by the Defendants

As detailed more thoroughly below regarding duress, the Equity Committee can have no valid claim that RWHI improperly exercised its acceleration rights or did so in bad faith.  As the Equity Committee admitted in the Complaint, ICPW submitted false financials.  Complaint, ¶16.  ICPW's Form 8-K,[4] the Forbearance and Modification Agreements in which ICPW admitted that it had defaulted under the Loan Agreement [Childress Decl. Ex. 1, pp. 137-170], and the allegations in the Complaint admitting that ICPW was in default [Complaint, ¶¶16, 19] all demonstrate that RWHI complied with the Loan Agreement when it invoked the acceleration and sweeping

---

[4]    The June 29, 2017 Form 8-K is publicly available at https://seekingalpha.com/filing/3618141.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1   provisions pursuant to the Loan Agreement.  Thus, the Equity Committee's own allegations

2   require dismissal of the cause of action for breach of the covenant of good faith and fair dealing.

3   **VI.    THE EQUITY COMMITTEE FAILS TO REBUT THE RADIANS DEFENDANTS'**

4   **UNJUST ENRICHMENT ARGUMENT**

5        In its Opposition, the Equity Committee again sidesteps the Radians Defendants'

6   arguments, claiming instead that all it needs to allege to bring a viable unjust enrichment claim is

7   that RWHI engaged in duress or took undue advantage.  Opposition, p. 14, ¶35.  The Equity

8   Committee misses the point.  In its Complaint, the Equity Committee asserts that RWHI was

9   unjustly enriched in procuring pre-payment and break-up fees because the ICPW Entities acted

10  under duress when agreeing to the terms governing these fees.  Complaint, ¶¶43-44.  As

11  established in the Radians Defendants' Motion to Dismiss, the Equity Committee's unjust

12  enrichment claim is both procedurally and substantively defective.  This claim should be

13  dismissed as a matter of law.

14       At the outset, the Equity Committee's Opposition does not rebut the Radians Defendants'

15  contention that the Equity Committee waived any right to object to the pre-payment and break-up

16  fees awarded in the Order Approving the Sale of Debtor's Assets [Childress Decl., Ex. 9 - Bankr.

17  Dkt #177] after the Committee failed to timely appeal the Order.  *See* Fed. R. Bank. P. 8002(a);

18  *see* 28 U.S.C. § 158(c)(2).  Notably, the Bankruptcy Court explicitly held that the break-up fee

19  was reasonable and appropriate.  [Bankr. Dkt #77 at 3) ("The $500,000 break-up fee . . . is

20  reasonable and appropriate under the circumstances of these cases . . . .").  Recovery for unjust

21  enrichment requires that the profit be "'unjust' under principles of equity."  *Casstevens v. Smith*,

22  269 S.W.3d 222, 230 (Tex. Ct. App. 2008).  Here, equity dictates not that RWHI relinquish fees

23  earned and already deemed reasonable, but rather that the Equity Committee's procedurally

24  defective and meritless claim be dismissed.

25       Substantively, the Equity Committee's Unjust Enrichment Claim is fundamentally flawed.

26  In support of its claim, the Equity Committee relies on *First Union National Bank v. Richmont*

27  *Capital Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. Ct. App. 2005), for the proposition that an

28  unjust enrichment claim lies where "one party has obtained a benefit from another by fraud,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

1    duress, or the taking of an undue advantage."[5]  Opposition p. 14, ¶35.  The Equity Committee,

2    however, omits the paragraph following the above-cited quotations from *First Union Nat. Bank*,

3    which provides:

> The unjust enrichment doctrine applies the principles of restitution to
> disputes which are **not** governed by a contract between the contending
> parties.  **Unjust enrichment claims are based on quasi-contract and are
> predicated on the absence of an express contract controlling the
> circumstances.  Generally, when a valid, express contract covers the
> subject matter of the parties' dispute, there can be no recovery under a
> quasi-contract theory because parties should be bound by their express
> agreements.**

*Id.* (citations omitted) (emphasis added).  The prepetition relationship between the ICPW Entities

and RWHI was governed by mutually agreed upon, express agreements which, upon the default,

provided RWHI the right to accelerate payment and sweep the ICPW Entities' accounts and which,

upon the happening of certain events, provided RWHI payment of certain fees. [Childress Decl.

Ex. 1– Bankr. Dkt #6, pp. 48-49, § 11.1 (Loan Agreement); Childress Decl. Ex. 1 – Bankr. Dkt #6,

pp. 136-146, § 7.7 (Forbearance and Modification Agreement dated August 1, 2017).]

Significantly, the Equity Committee does not allege that any of these agreements were

breached or were otherwise invalid.  Thus, the Equity Committee's claim is based entirely on what

it claims to be RWHI's unjust conduct in performing the express terms of the parties' agreements.

Under Texas law, "when a valid, express contract covers the subject matter of the parties' dispute,

there can be no recovery under a quasi-contract." *Id.*  The Equity Committee's Unjust Enrichment

Claim, therefore, fails as a matter of law.

## VII.    THE EQUITY COMMITTEE CANNOT PURSUE A CLAIM FOR DURESS AS A MATTER OF LAW

In the Opposition, the Equity Committee argues for seven (7) pages that its four (4)

paragraphs Duress Claim states a valid claim for which relief can be granted.  In doing so, the

Equity Committee relies on factual contentions that are not stated in paragraphs 31 to 34 of the

---

[5]    As discussed more fully below, the Equity Committee has also failed to state a claim for duress or undue
advantage.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1    Complaint[6] and misinterprets the holding in *State National Bank of El Paso v. Farah*

2    *Manufacturing Company, Inc.*, 678 S.W.2d 661 (Tex. Ct. App. 1984).  When the Court examines

3    the actual allegations and the discussion of the tort of duress in *Farah,* the Court will recognize

4    that facts and circumstances which gave rise to the claim for duress in *Farah* are not remotely the

5    same as those alleged in the present case.

6        As the Court knows, the crucial inquiry in a motion to dismiss for failure to state a claim

7    under Rule 12(b)(6) involves the examination of the actual allegations of the complaint (including

8    the referenced documents) and the applicable law.  Here, the parties agree that Texas law applies

9    to the tort of duress.

10       A.    Duress under Texas Law

11       The first required element for duress under Texas law is "a threat to do some act which the

12   party threatening has no legal right to do."  *Farah,* 678 S.W.2d at 685.  There is simply no threat

13   alleged in Complaint to support a claim of duress.  Without a threat, a Court cannot consider

14   whether the threat was to do something that "the party threatening has no legal right to do."

15       In the Complaint, the Equity Committee alleges that RWHI purchased of the ICPW loan

16   from Capital One with money wired by Radians, Inc. and then declared a default and demanded

17   payment in full.  Complaint, ¶¶20-12.

18           1) On July 25, 2017, Radians Wareham Holding, Inc. purchased the ICPW
             Loan from Capital One (¶21).
19           2) Radians, Inc. wired the purchase money to Capital One (¶21).
             3) On July 26, 2017, counsel for Radians[7] sent ICPW a letter declaring
20           ICPW in default due to the previously disclosed misstated financial reports,
             accelerating the loan and demanding immediate payment of outstanding
21           balance of $3,688,195.22 (¶22).

22       Based on the purchase of the ICPW loan and the subsequent demand, the Equity

23   Committee contends that it has asserted a claim for duress.  Complaint, ¶¶30-34.  The Equity

24   Committee specifically argues as follows in paragraph 25 of its Opposition.

25   ───────────────────
     [6]     The Equity Committee apparently does so based upon the adoption of paragraphs 1 to 29 in paragraph 30 of
26   the Complaint.

27   [7]     Despite the Equity Committee's attempt to combine RWHI, Radians, Inc., and  Safety Supply Corporation
     into a single conspiratorial entity, the letter came solely from counsel for RWHI as holder of the note. [Childress
28   Decl., Ex. 12.]

1) Radians [Wareham Holding, Inc.][8] improperly accelerated the loan under the terms of the Loan Agreement (¶31).

2) Radians [Wareham Holding, Inc.] improperly swept ICPW's accounts under the terms of the Loan Agreement (¶31).

3) Radians [Wareham Holding, Inc.] undertook the improper actions for its own commercial advantage over the ICPW entities (¶31).

4) Radians [Wareham Holding, Inc.]'s actions were unjust, oppressive and designed to further Radians [Wareham Holding, Inc.]'s own economic interests at the expense of the ICPW entities (¶31).

5) Radians [Wareham Holding, Inc.]'s actions were not in good faith (¶32).

6) Radians [Wareham Holding, Inc.]'s improper actions forced the ICPW entities to file petitions for bankruptcy protection (¶32).

7) Radians [Wareham Holding, Inc.]'s improper actions ultimately forced ICPW to surrender its business and assets (¶32).

8) Radians [Wareham Holding, Inc.]'s improper actions proximately caused injury to the estates of ICPW CA and ICPW NV  because they lost the opportunity to obtain financing or achieve strategic transactions on terms more favorable than those resulting from the auction process (¶33).

9) As a result of Radians' [Wareham Holding, Inc.]'s improper actions, the estates of ICPW CA and ICPW NV have suffered damage (¶34).

Opposition, ¶25.  A comparison of the Equity Committee's description of its allegations in its Opposition and the actual allegations in the Complaint shows that the arguments in the Opposition are not supported by well-pled factual allegations.  In any event, the allegations in the Complaint fail to state a viable claim for duress.

In essence, the Equity Committee is taking the untenable position that RWHI used duress when, as purchaser, owner and holder of a defaulted loan, it demanded payment from the borrowers.  That contention is absurd, and an examination of the *Farah* opinion indicates that "a threat to do some act which the party threatening has no legal right to do" is a prerequisite for a claim of duress under Texas law.

B.    Overview Of The *Farah* Decision

In *Farah*, the Texas Court of Appeals issued a lengthy opinion in which a group of banks (the "Lender Group") had exercised improper control over their borrower, Farah Manufacturing Company, Inc. ("FMC"), based on a management change clause.  The Court in the first paragraph of the Opinion describes the case as follows:

---

[8]    While the Equity Committee uses the name "Radians" which it has defined as Radians Wareham Holding, Inc., Radians, Inc., and  Safety Supply Corporation, each of the allegedly improper actions was undertaken by Radians Wareham Holding, Inc. as owner of the ICPW Loan.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

1    This case centers around a management change clause contained in a
2    $22,000,000.00 loan agreement.  The jury found Appellant bank, acting
     alone or in conspiracy with any of the other lenders, committed acts of
     fraud, duress and interference, proximately resulting in damages to
3    Appellee, and set damages at $18,947,348.77.  We reform and affirm.

4    678 S.W.2d at 666-67.

5        The crucial management change clause was found in Section 6.1(g) of the February 14,

6    1977, loan agreement.  The management change clause could result in an event of default if there

7    was:

8        Any change in the office of President and Chief Executive Officer of Farah
         [Manufacturing Company, Inc.] or any other change in the executive
9        management of Farah [Manufacturing Company, Inc.] which any two
         Banks shall consider, for any reason, whatsoever, to be adverse to the
10       interests of the Banks.

11   *Id.* at 667.

12       In 1976, William F. Farah ("Farah") had been removed as the President and CEO of FMC.

13   In March, 1977, Farah sought to return to management of the company, but the Lender Group did

14   not want Farah involved in management.  The Court described the testimony of various parties

15   about the Lender Group's options and actions if Farah returned to management.

16       [U]nder the management change clause, when it became apparent that Farah
         was about to regain control of FMC, which was unacceptable to the banks,
17       that the banks had two legitimate options.  They could attempt to call the
         loan or elect not to and live with Farah as CEO.  Instead, [FMC] maintains,
18       **the banks chose a third option and unlawfully prevented Farah's
         election and installed directors and officers to keep Farah out of
19       management.**  The claim is made that the "hand picked minions"
         mismanaged the company and stripped it of valuable assets for unnecessary
20       loan prepayments.

21   *Id.* at 668 (emphasis added).  The Court summarized the Lender Group's options and actions as

22   follows:

23       The lenders analyzed the ramifications of FMC's bankruptcy, should a
         default be declared, and their exposure to liability for changes in FMC
24       management.  According to the testimony of [the president] of State
         National, the lenders felt that their only legitimate options, should Farah
25       become CEO, were to either call the loan or let Farah hold office
         unmolested.  [The president] testified that neither choice was acceptable to
26       the banks.  They were adverse to the bankruptcy of FMC.  As FMC was not
         otherwise in default on the loan at the time, State National was unwilling to
27       put El Paso's largest private employer into bankruptcy.

28   *Id.* at 671.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1    The Lender Group's actions were outside the contract because they elected to undertake an

2  illegitimate middle ground.  They sent a letter dated March 22, 1977, in which they stated that

3  they would not waive a default based on the management clause if Farah were elected CEO.

4  However, they would waive the clause if others were elected CEO.  *Id*. at 672.

5    As a result of the Lender Group's actions, between March 22, 1997 and January, 1978,

6  FMC's board of directors and management was extremely conflicted.  During that period, FMC

7  lost money, and its financial condition became critical.  *Id*. at 672-79.  After Farah's return as CEO

8  in early 1978, FMC's financial condition improved, the loan was restructured, and by July, 1979,

9  FMC had refinanced its indebtedness and paid off the loan.  *Id*. at 680.  FMC then sued the Lender

10  Group for the losses which it had incurred during the period when the Lender Group had coerced

11  Farah's preclusion from management.

12    In *Farah*, the decisive factor was the lending group's improper exercise of control over the

13  management of FMC.  The *Farah* Court listed eight (8) elements to and limitations upon a cause

14  of action for duress.

15      1)  There [must be] a threat to do some act which the party threatening has no
        legal right to do.

16      2)  Such threat must be of such character as to destroy the free agency of the
        party to whom it is directed. It must overcome his will and cause him to do

17          that which he would not otherwise do, and which he was not legally bound
        to do.

18      3)  The restraint caused by such threat must be imminent.

19      4)  It must be such that the person to whom it is directed has no present means
        of protection.

20      5)  Where a demand made is wrongful or unlawful, and it is necessary for the
        party making such demand to resort to the courts to enforce same, there is

21          no duress, for the one upon whom demand is made has adequate means of
        protection, and there is no imminent restraint....

22      6)  [W]here the party making such demand has, or is supposed to have, the
        power to injure the business or property interests of the one upon whom
        such demand is made, without resort to the courts to enforce the demand,

23          and threatens to do an act which would cause such injury, and which he has
        no right to do, and thereby induces a compliance with his demand,

24      7)  [A]gainst the will of such party through fear of injury to his business or
        property interests, such threats amount to duress,

25      8)  If it appears that the party making such demand and threat ought not in
        good conscience to retain the benefit received by reason thereof.

26  *Id*. at 685.  The Court then noted:

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

> It has been held that threatening to do that which a party has a legal right to do cannot form the basis of a claim of duress by business compulsion. The vice arises only when he employs extortive measures, or when, lacking good faith, he makes improper demands.

*Id.* (*citing Sanders v. Republic National Bank of Dallas*).

### C.   RWHI Did Not Make a Threat

Unlike the lending group in *Farah*, RWHI did not threaten to take any action which RWHI, as holder of the ICPW loan, did not have a right to take. [*See* Element 1 of a claim for duress under *Farah*, 678 S.W.2d at 685.] In fact, RWHI did not actually make any threat, and it did not seek to coerce the ICPW Entities to take certain actions or refrain from taking certain actions.

After purchasing the ICPW loan from Capital One, counsel for RWHI sent the July 26, 2017 letter. [Childress Decl., Ex 12.] In the July 26, 2017 letter, counsel advised ICPW of the following:

- RWHI had purchased the ICPW loan from Capital One, National Association;
- Counsel's firm had been retained by RWHI to proceed with collection efforts as to the ICPW loan;
- An event of default under the terms of the Loan Agreement as to ICPW loan had occurred in the form of the false financial information provided to the lender as outlined in the Form 8-K which ICPW Nevada had filed with the Security and Exchange Commission on July 6, 2017;
- RWHI demanded payment of the outstanding balance owed on the ICPW loan; and
- Radians also was ceasing advances on the ICPW loan pursuant to Section 2.2 of the Loan Agreement.

RWHI, however, did not demand payment in full by a specific date. None of the statements in the July 26, 2017 letter were threats.

As the Equity Committee admits in its Complaint, on July 26, 2017, there was a significant default under the terms of the Loan Agreement.[9] Under the terms of the Loan Agreement, RWHI had the right to demand payment in full based on the default arising from the provision of

---

[9]   ICPW had other problems at that point [late June, 2017], however. In April and May, 2017, ICPW's board of directors had received anonymous reports of accounting irregularities at ICPW, resulting in certain revenue figures being inflated in ICPW's financial statements. After an investigation confirmed the irregularities, on or about July 6, 2017, ICPW filed a Form 8-K Report, dated June 29, 2017, disclosing the discovery of the irregularities, the termination of ICPW CA's CEO and CFO, and the appointment of new individuals to those positions. Complaint, ¶16.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1   materially false financial statements.[10]  Additionally, under Section 2.2 of the Loan Agreement,

2   RWHI had the right to terminate advances on the revolving line of credit.

3        Despite RWHI's right to demand payment under the Loan Agreement, on August 1, 2017,

4   within five (5) days of the demand, the ICPW Entities and RWHI entered into the Forbearance and

5   Modification Agreement.  [Childress Decl., Ex. 1, at pp. 137-47]  In the Forbearance and

6   Modification Agreement, RWHI and the Borrowers make certain recitals which further undermine

7   the Equity Committee's duress claim.

8        D.  The balance owing on the Note as of July 26, 2017, is an amount of
     $3,688,195.22 (the "Obligations").  Interest continues to accrued on the
9     Obligations from and after July 26, 2017, as provided in the Note.
     E.  By letter of July 26, 2017 (the "July 26 Letter"), Borrowers were
10    notified by [RWHI] of the occurrence of Events of Default (as defined in
     the Loan Agreement) under the terms of the Loan Documents and as a
11    result thereof acceleration and demand for immediate payment of the
     Obligations.
12    F.  By letter of August 1, 2017, as inducement to enter into this Agreement,
     [RWHI] notified Borrowers that without waiving the occurrence of Events
13    of Default, the July 26 Letter was rescinded as of July 26, 2017.
     G.  As a result of the occurrence of Events of Default, [RWHI] has certain
14    rights and remedies under the Loan Documents.  Borrowers have requested
     that [RWHI] forbear in the exercise of its remedies under the Loan
15    Documents for a period of time specified herein [to allow them] to satisfy
     the Obligations in full and for [RWHI] to advance additional funds under
16    the Note.
     H.  [RWHI] is willing to forbear from the exercise of its rights and remedies
17    under the Loan Documents as a result of the occurrence of Events of
     Default and to advance additional funds under the Note, but only on the
18    terms and conditions set forth herein.

19   [Childress Decl., Ex. 1, at pp. 137-47.]

20        Based on the foregoing recitals, the obvious question is what was RWHI attempting to

21   force the ICPW Entities to do.  In the paragraph 1 of the Forbearance and Modification

22

23

24   [10]      In the Complaint, the Equity Committee speculates that Capital One would have also waived the default
     arising from the provision of materially false financial statements because it had waived financial covenant defaults
25   when the Borrowers had experienced financial difficulties in the past.  *Complaint* at ¶19.  The Equity Committee
     expands on that argument in the Opposition when it states "[t]hus, Capital One had demonstrated, and ICPW had
26   come to expect, Capital One was willing to work with ICPW through operating or financial difficulties."  *See*
     Opposition, p. 4, ln 7-8, *citing* Complaint, ¶¶18-19.  The Equity Committee fails to note that any action or inaction by
27   Capital One was *before* the false financial reports were disclosed in the 8-K dated June 29, 2017.  The Equity
     Committee, however, does not contend that Capital One wrongfully sold the ICPW loan, or that RWHI was bound by
28   Capital One's course of conduct.  The ICPW Entities knew the risk when it borrowed money from Capital One that
     Capital One might sell the loan to a party who may strictly enforce the contractual remedies.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1    Agreement, the Borrowers admit that "the foregoing 'Recitals' are true, correct and complete."

2    RWHI also agreed to advance an additional $250,000.00 to the ICPW Entities.  [*Id.* at ¶10.]

3         On August 14, 2017, the Borrowers and RWHI entered into the Forbearance Agreement.

4    [Childress Decl., Ex. 1, at pp. 148-58.]  The parties' recitals again undermine a claim of duress.

5    
6         D.  The balance owing on the Note as of August 14, 2017, is an amount of
         $3,977,268.09[11] (the "Obligations").  Interest continues to accrued on the
         Obligations from and after August 14, 2017, as provided in the Note.

7         E.  By letter of July 26, 2017 (the "July 26 Letter"), Borrowers were
8         notified by [RWHI] of the occurrence of Events of Default (as defined in
         the Loan Agreement) under the terms of the Loan Documents and as a
         result thereof acceleration and demand for immediate payment of the
9         Obligations.

10        F.  By letter of August 1, 2017, as inducement to enter into this Agreement,
         [RWHI] notified Borrowers that without waiving the occurrence of Events
         of Default, the July 26 Letter was rescinded as of July 26, 2017.

11        G.  Effective as of August 1, 2017, Borrowers and [RWHI] entered that
12        certain Forbearance and Modification Agreement providing for a
         Forbearance Period to allow Borrowers a period of time to satisfy the
         Obligations in full, during which time period Radians agreed not to seek
13        collection of the Obligations, except on the occurrence of a Terminable
         Event as defined in the Forbearance and Modification Agreement.  The
14        Forbearance and Modification Agreement further provided for modification
         of the Second Amended and Restated Revolving Line of Credit Note and
15        Loan Agreement as provided therein.

16        H.  Under the terms of the Forbearance and Modification Agreement, the
         Forbearance Period expired on the Forbearance Termination Date of August
         7, 2017, as Borrowers had failed to satisfy the Obligation on or before the
17        Forbearance Termination Date.

18        I.  The Forbearance and Modification Agreement further provided that upon
         the occurrence of the Forbearance Termination Date, [RWHI] may exercise
         and all rights and remedies available to Lender provided in the Loan
19        Documents or the Forbearance and Modification Agreement.

20        J.  By letter of August 9, 2017 (the "August 9 Letter"), Borrowers were
         notified by [RWHI] of the occurrence of Events of Default (as defined in
21        the Loan Agreement) under the terms of the Loan Documents and as a
         result thereof acceleration and demand for immediate payment of the
         Obligations.

22        K.  By letter of August 15, 2017, [RWHI] notified Borrowers that without
         waiving the occurrence of Events of Default, the August 9 Letter was
23        rescinded as of August 9, 2017.

24        L.  As a result of the occurrence of Events of Default, [RWHI] has certain
         rights and remedies under the Loan Documents.  Borrowers have requested
         that [RWHI] forbear in the exercise of its remedies under the Loan
25        Documents for a period of time specified herein [to allow them] to satisfy
         the Obligations in full and for [RWHI] to advance additional funds under
26        the Note.

27        M.  [RWHI] is willing to forbear from the exercise of its rights and
         remedies under the Loan Documents as a result of the occurrence of Events

---

[11]    The balance owed on the ICPW loan increased by $289,072.87 between July 26, 2017, and August 14, 2017.

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

of Default and to advance additional funds under the Note, but only on the terms and conditions set forth herein.

[Childress Decl., Ex. 1, at pp. 148-58.]

Once again, there is no threat other than a demand for payment in the rescinded August 9 letter, and RWHI was not attempting to force the Borrowers to do anything.  RWHI was clearly forbearing from collection activity and not attempting to force the ICPW Entities into bankruptcy as the Equity Committee contends.

On August 25, 2017, the Borrowers and RWHI entered into the Second Forbearance Agreement (which is actually the third forbearance agreement between the parties).  [Childress Decl., Ex. 1, pp. 159-170.]  The parties' recitals further undermine a claim of duress.

Recitals E through K are the same as those in the Forbearance Agreement.  The new recitals begin with L.

> L.  Effective as of August 14, 2017, Borrowers and [RWHI] entered into that certain Forbearance Agreement (the "Forbearance Agreement") providing for a Forbearance Period to allow Borrowers a period of time to satisfy the Obligations in full, during which time period Radians agreed not to seek collection of the Obligations, except on the occurrence of a Terminable Event as defined in the Forbearance Agreement.
> M.  Under the terms of the Forbearance Agreement, the Forbearance Period expired on the Forbearance Termination Date of August 21, 2017, as Borrowers had failed to satisfy the Obligation on or before the Forbearance Termination Date.
> N.  By letter of August 24, 2017 (the "August 24 Letter"), Borrowers were notified by [RWHI] of the occurrence of Events of Default (as defined in the Loan Agreement) under the terms of the Loan Documents and as a result thereof acceleration and demand for immediate payment of the Obligations.
> O.  As a result of the occurrence of Events of Default, [RWHI] has certain rights and remedies under the Loan Documents.  Borrowers have requested that [RWHI] forbear in the exercise of its remedies under the Loan Documents for a period of time specified herein to satisfy the Obligations in full.
> P.  In connection with the execution of the Forbearance and Modification Agreement, Borrowers and [RWHI] entered into that certain Deposit Account Control Agreement (the "DACA"). In accordance with the terms of the Loan Agreement and the DACA, [RWHI] provided the required "Notice of Exclusive Control" to Capital One, National Association (the "Bank") on August 24, 2017, and has exercised its rights as provided in the Loan Agreement and DACA.
> Q.  Borrowers have notified [RWHI] of their intent to initiate the filing of voluntary cases (the "Bankruptcy Cases") under Chapter 11 of the Bankruptcy Code in the United States  Bankruptcy Court for the Central District of California on or before Friday, September 1, 2017.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

20

MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

R.  Upon the anticipated filing of the Bankruptcy Cases, Borrowers have requested that [RWHI] provide to Borrowers certain debtor in possession financing ("DIP Financing") and consent to the Borrowers' use of cash collateral.  Borrowers and [RWHI] have negotiated and executed a Letter of Intent that sets forth the terms of the DIP Financing and cash collateral consent and the terms under which Radians will served as a stalking horse bidder for the purchase of the Borrowers' assets (excluding cash and causes of action against third parties).  A copy of the executed Letter of Intent is attached hereto as Exhibit "1")

S.  [RWHI] is willing to further forbear from the exercise of its rights and remedies under the Loan Documents as a result of the occurrence of Events of Default, but only on the terms and conditions set forth herein.

[Childress Decl., Ex. 1, at pp. 159-70.]  The ICPW Entities actually filed their Petitions under Chapter 11 of the United States Bankruptcy Code on September 8, 2017.

D.    The Equity Committee is Second Guessing Management

The reality is that the ICPW Entities' new management was faced with an untenable financial situation.  The Equity Committee admits as much in the Complaint.

- ICPW's business was struggling prior to July, 2017 resulting in waivers of covenant defaults in November, 2016, February, 2017 and April, 2017 (¶19);
- In April and May, 2017, ICPW's board received anonymous reports of accounting irregularities (¶16);
- On July 6, 2017, ICPW filed the Form 8-K (¶16);
- ICPW CA contemporaneously terminated its CEO and CFO and appointed a new CEO and CFO (¶16);
- After these events, Capital One wanted out of the credit relationship (¶18);
- As of July 26, 2017, ICPW had $300,000.00 in cash and owed $3,688,195.22 on the ICPW loan (¶22); and
- Between August 21 and 25, 2017, the Borrowers' management elected to file for bankruptcy protection and auction the businesses. (*See* the Second Forbearance Agreement).

The Equity Committee claims that the ICPW Entities filed bankruptcy because of the actions of RWHI, Radians, Inc. and Safety Supply Company, but the management of the ICPW Entities has never made that claim.[12]  The management of the Borrowers had to deal with the untenable

---

[12]    The Equity Committee asserts that actions of others, not Radians Defendants, were the cause of the bankruptcy filing as set forth in its adversary complaint initiated against Jeffery Cordes and William Aisenberg (Adv. Pro. 1:18-ap-01011-MB).  In that action, the Equity Committee asserts,

The Committee's actual damages have been significant in terms of the costs of investigating, restating, and disclosing Ironclad's misreported and fabricated sales and earnings; the substantial loss in the value of Ironclad's stock; the losses from the selloff of assets; and the enormous costs of the bankruptcy itself—all of which were caused by Cordes's and Aisenberg's actions.

financial situation that they inherited on or about June 29, 2017.  Complaint, ¶16.  RWHI, did not cause that untenable financial condition.

As the *Farah* Court noted:

> It seems to be a settled principal of law that economic duress may be claimed only when the party against whom it is claimed was responsible for claimant's financial distress….  A charge of economic duress or business compulsion *must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim, or in his fear of what a third person might do* ….

*Farah*, 678 S.W.2d at 687 (citing *First Texas Savings Association of Dallas v. Dicker Center, Inc.*, 631 S.W.2d 179, 181 (Tex. Ct. App. 1982) (emphasis original).

The Equity Committee's efforts to second guess management and claim duress against the Radians Defendants fails as a matter of law.  Initially, the Equity Committee cannot establish that RWHI threatened to take any action which it did not have a right to take.  Additionally, RWHI did not cause the ICPW Entities' financial problems.  As documented in the Complaint, those problems existed prior to RWHI purchasing the ICPW loan.  Additionally, on three (3) occasions, RWHI agreed to forbear from any collection activity against the Borrowers and continue in a lending relationship into and after the bankruptcies were filed.  As a result, the Court should grant the Motion as to the duress claim because as, a matter of law, it is deficient and does not state a claim on which relief can be granted.

E.    There Was No Conspiracy

For the first time in its Opposition, the Equity Committee contends that RWHI, Radians, Inc. and Safety Supply Company engaged in coordinated misconduct or were co-conspirators.

---

(Adversary Complaint, ¶114.)

> Ironclad's business and property were injured directly by Cordes's and Aisenberg's racketeering activity, which caused it to incur professional costs in connection with the investigation, correction, and restatement of its financials, triggered violations of creditor debt covenants, and resulted in the filing of a voluntary bankruptcy proceeding and consequent sale of Ironclad's business.

(Adversary Complaint, ¶122.)

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

1  Opposition, p. 8, ¶18.  The Equity Committee did not plead that the Radians Defendants were

2  engaged in a conspiracy as to the Duress Claim (or any other claim) in the Complaint.

3       As to Safety Supply Corporation, the Equity Committee alleges in the Complaint that

4  RWHI and Radians, Inc. are its direct or indirect subsidiaries.  Complaint, ¶¶4-5.  The only other

5  allegation in the Complaint to which the Equity Committee cites in the Opposition is that Safety

6  Supply Corporation was "prepared to make a public announcement in June 2017 of [an] offer to

7  buy all of ICPW NV shares at 27.5 cents/share."  Opposition,  p.8, ¶18 *citing* Complaint, ¶15.  As

8  to Radians, Inc., the only allegation is that it wired the funds to Capital One to fund RWHI's

9  purchase of the ICPW loan.  Opposition, p.8, ¶18 *citing* Complaint, ¶15.  Those two allegations do

10  not support a claim for conspiracy even if the Equity Committee had brought such a cause of

11  action.  As previously demonstrated, all of the actions after RWHI's purchase of the ICPW loan

12  were taken by RWHI.

13       The Equity Committee has a more fundamental problem as to the claims against Safety

14  Supply Corporation and Radians, Inc.  In paragraph 3 of the Complaint, the Equity Committee

15  cites paragraph kk of the Final DIP Order as granting it standing on behalf of the Debtor's estates

16  to file this action.  The Equity Committee quotes from paragraph kk to show that it has standing to

17  take the following actions:

18         [O]bject to, challenge, or seek to avoid the amount, validity, or
19         enforceability of the Pre-Bankruptcy Secured Debt (or any portion thereof)
       or any of the liens and security interests created under the Pre-Bankruptcy
20         Secured Debt and **to bring any other claim that they have against**
       **Radians [Wareham Holding, Inc.] individually or on behalf of the**
21         **Debtors' Estates [.]**

22  (Complaint, ¶3 with bracketed material in original text.)

23       Under paragraph kk of the Final DIP Order, the Equity Committee does not have authority

24  or standing to file claims on behalf of the Debtors' Estates against either Safety Supply

25  Corporation or Radians, Inc.  That lack of standing is logical as neither party was involved in the

26  actions as to the ICPW loan and did not file claims in either of the Estates.  As a result, for that

27  additional reason, the claim for duress against Safety Supply Corporation or Radians, Inc. should

28  be dismissed.

23

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

1    **VIII.   CONCLUSION**

2          There are no legal grounds to support the alleged claims against the Defendants.  The

3    Plaintiff's claims are subject to RWHI's defenses, the most prominent is the several releases

4    executed by the Debtor before it filed for bankruptcy and after.  The Equity Committee's attempts

5    to circumvent the releases are misplaced.  Moreover, the Plaintiff fails to allege facts that RWHI

6    committed duress, breached the implied convenient of good faith and fair dealing, or is liable for

7    unjust enrichment.  There is no allegation in the Complaint that RWHI acted beyond its

8    contractual remedies.  Rather, the Plaintiff complains that RWHI refused to forebear from

9    exercising its remedies.  As a matter of law, the Plaintiff may not recover for these types of actions

10   and the Court should grant the Motion to Dismiss.

11   Dated:  February 5, 2018                         **BRYAN CAVE LLP**

12

13                                                     By:  */s/Sharon Z. Weiss*
                                                       Sharon Z. Weiss
14                                                     Attorneys for Radians Wareham Holding, Inc.,
                                                       Radians, Inc. and Safety Supply Corporation

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Bryan Cave LLP, 120 Broadway, Suite 300, Santa Monica, CA 90401-2386

A true and correct copy of the foregoing document entitled: **DEFENDANTS' REPLY TO PLAINTIFF OFFICIAL COMMITTEE OF EQUITY HOLDERS OPPOSITION TO MOTION TO DISMISS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On February 5, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Tania M Moyron on behalf of Plaintiff c/o Tania Moyron Official Committee of Equity Holders of ICPW Liquidation Corporation, a Nevada corporation
tania.moyron@dentons.com, chris.omeara@dentons.com

☐  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On February 5, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Martin R. Barash
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342 / Courtroom 303
Woodland Hills, CA 91367

☐  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 5, 2018 | Raul Morales | /s/ Raul Morales |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
USA01\11412276.1

**F 9013-3.1.PROOF.SERVICE**