# EXHIBIT 1

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 2 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 1
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 18 of 309

**Execution Copy**

## REVOLVING LOAN AND SECURITY AGREEMENT

This **REVOLVING LOAN AND SECURITY AGREEMENT** (this "Agreement") is made as of November 28, 2014, by and among **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California"), **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("Ironclad Nevada", and, collectively with Ironclad California, "Borrower"), and **CAPITAL ONE, N.A.** ("Bank").

WHEREAS, Borrower has requested that Bank provide Borrower with a revolving credit facility; and

WHEREAS, Bank is willing to provide such revolving credit facility to Borrower upon the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises herein contained and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1
## DEFINITION OF TERMS

**1.1    Definitions.** As used in this Agreement, all exhibits and schedules hereto and in any note, certificate, report, or other Security Documents made or delivered pursuant to this Agreement, the following terms have the meanings assigned to them in this Section or in the Section or recital referred to below:

"Account" and "Account Receivable" includes accounts, accounts receivable, notes, notes receivable, rental agreements and other rights to collect rent, contract rights, drafts, acceptances, instruments, chattel paper, general intangibles, and other forms of obligation or rights to payment and receivables, whether or not yet earned by performance, including state and federal tax refunds.

"Account Debtor" means the party who is obligated on or under any Account or contract right.

"Affiliate" of a Person means any Person controlling, controlled by or under common control with, such Person.

"Agreement" means this Revolving Loan and Security Agreement, including the Schedules and Exhibits hereto, as the same may be modified, amended, renewed, extended, or restated from time to time.

"Audits" has the meaning set forth in Section 8.

"Borrowing Base" means an amount equal to up to eighty percent (80%) of the value of Borrower's Eligible Accounts, plus up to fifty percent (50%) of the value of Borrower's Eligible

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 3 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 2
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 19 of 309

Inventory, plus up to thirty-five percent (35%) of the value of Borrower's Eligible In-Transit Inventory, minus the Borrowing Base Reserve; provided, however, that the portion of the Borrowing Base attributable to the sum of Borrower's Eligible Inventory plus Borrower's Eligible In-Transit Inventory shall not exceed fifty percent (50%) of the Revolving Line Limit; provided, further, that in no event shall the Borrowing Base exceed the Revolving Line Limit.

"Borrowing Base Reserve" means, (i) initially, $500,000.00, and (ii) once Borrower's EBITDAS exceeds $1,000,000 on a trailing twelve-month basis, $0.00.

"Business Day" means any day other than a Saturday, Sunday, or day on which banks are authorized to be closed under the laws of the State of Texas.

"Change in Control" means a transfer of ownership or control of Stock in a Person equal to or greater than fifty percent (50%).

"Code" means the Internal Revenue Code of 1986, as amended, and all regulations promulgated and rulings issued thereunder.

"Collateral" means any and all personal or intangible property of Borrower in which Bank acquired, now has, or by this Agreement or any other agreement acquires, or hereafter acquires a security interest or other rights or interests as security for the Indebtedness, including, without limitation, Borrower's obligations under this Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § et seq.), as amended from time to time, and any successor statute.

"Constituent Documents" means, with respect to any Person, its partnership agreements, limited liability company agreements, articles of organization, regulations, articles or certificate of incorporation, bylaws, organizational documents, trust agreement, or such other document as may govern such Person's formation, organization, and management.

"Debt Service Coverage Ratio" means, with respect to Borrower and its subsidiaries, the ratio of (a) EBITDAS to (b) the sum of the current portion of the Indebtedness, plus interest expense, plus all Subordinated Debt payments, calculated in accordance with GAAP.

"Debtor Laws" means all applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, receivership, insolvency, reorganization, or similar laws from time to time in effect affecting the rights of creditors generally.

"Distributions" means, with respect to any Stock issued by any Person, (a) the retirement, redemption, purchase, or other acquisition for value of such Stock by such Person, (b) the declaration or payment of any dividend or distribution on or with respect to such Stock by such Person, and (c) any other payment or distribution of any kind by such Person with respect to such Stock.

"Dominion Account" has the meaning set forth in Section 9.1.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 4 of 112

Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 3
of 49

Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 20 of 309

"EBITDAS" means, as of any applicable date of determination and as determined in accordance with GAAP, the net income of Borrower for the twelve (12)-month period then ended, plus (a) interest expense, tax expense, depreciation and amortization expenses, and stock option expenses for the same period, excluding (b) (i) any extraordinary gain or loss, and any interest income from Affiliates of the Borrower for the same period, and also excluding (ii) gains or losses resulting from changes of market values of any interest rate Hedge Agreement to which Borrower is a party.

"Eligible Account" means an Account of Borrower which meets each of the following requirements:

(a)    it arises from the sale of goods or from services rendered, such goods have been shipped or delivered to the Account Debtor under such Account and such services have been fully performed and have been accepted by the Account Debtor, and the Borrower's full right to payment for all sums due from such Account Debtor with respect to such Account has been earned and then be due and payable;

(b)    it is a valid and legally enforceable obligation of the Account Debtor thereunder according to its express terms, and is not subject to any offset, counterclaim, cross-claim, or other defense on the part of such Account Debtor denying liability thereunder in whole or in part;

(c)    it is not subject to any Lien, security interest or similar adverse rights or interests whatsoever other than the security interest in favor of Bank hereunder;

(d)    it is evidenced by an invoice, dated the date of shipment (in the case of goods sold or leased) or the date of performance (in the case of services rendered) and having payment terms acceptable to the Bank;

(e)    it is not owing by an Account Debtor whose obligations the Bank, acting in its sole discretion, has notified the Borrower are not deemed to constitute an Eligible Account;

(f)    it is not due from an Affiliated corporation or entity, subsidiary corporation or entity, parent corporation or entity, stockholder, officer, director or employee of Borrower or any such Affiliate, subsidiary, or parent corporation or entity; or any individual or entity Affiliated or related to any of the foregoing, whether by blood, marriage, or otherwise;

(g)    it is not due from an individual consumer;

(h)    it does not constitute retainages, progress billings, or deferred payments under a contract not fully performed;

(i)    it is not evidenced by an instrument, promissory note or chattel paper;

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 5 of 112
Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 4
of 49
Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 21 of 309

(j)     it does not constitute, in whole or in part, interest or finance charges on outstanding balances;

(k)     it is an Account with respect to which no return, repossession, rejection, cancellation, repudiation, or bankruptcy has occurred or has been threatened;

(l)     it is an Account with respect to which Borrower continues to be in full conformity with the representations, warranties, and covenants of Borrower made with respect thereto;

(m)     it is not subject to any sales terms, trial terms, sales-or-return terms, consignment terms, guaranteed sales performance or warranties or representations relating to minimum sales volume, C.O.D. terms, cash terms, or similar terms or conditions;

(n)     it is not owed by an Account Debtor that is not an individual residing in the United States or a corporation or partnership organized and validly existing under the laws of a state within the United States, unless payment is secured by a letter of credit acceptable to Bank;

(o)     it is not an Account subject, in whole or in part, to any "bill and hold" or similar arrangement pursuant to which the invoice is delivered prior to the actual delivery of the sold or leased goods or the performance of the services;

(p)     it is not an Account with respect to which (i) sixty (60) days or more has passed since the invoice due date, if the invoice due date is less than or equal to ninety (90) days from the date of the invoice, (ii) one hundred and fifty (150) days or more has passed since the date of the invoice, if the invoice due date is greater than ninety (90) days from the date of the invoice, or (iii) sixty (60) days or more has passed since the invoice due date, if the Account Debtor is AutoZone, Inc., Balkamp, Inc., or Pep Boys, Inc.;

(q)     it is not owed by any Account Debtor with respect to which fifty percent (50%) or more of its total Accounts owing to the Borrower remain unpaid after (i) sixty (60) days from the relevant invoice due date, if the invoice due date is less than or equal to ninety (90) days from the date of the invoice, (ii) one hundred and fifty (150) days from the relevant invoice due date, if the invoice due date is greater than ninety (90) days from the date of the invoice, or (iii) sixty (60) days from the relevant invoice due date, if the Account Debtor is AutoZone, Inc.;

(r)     it is not an Account owed by an Account Debtor whose account balance exceeds twenty-five percent (25%) of the total of Borrower's aggregate Accounts Receivable, except to the extent of such Eligible Accounts of such Account Debtor that do not exceed twenty-five percent (25%) of the total of Borrower's aggregate Accounts

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 6 of 112

Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 5
of 49

Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 22 of 309

Receivable, or except as expressly permitted from time to time by Bank exercising its reasonable credit judgment;

(s)   it is not an Account as to which Borrower or any other party to such Account is in default in the performance or observance of any of the terms thereof;

(t)   it is not an Account in which the Account Debtor is the United States of America or any department, agencies, or instrumentality thereof, unless Borrower assigns its rights to payment of such Account to Bank, in form and substance satisfactory to Bank, and so as to comply with all requirements of the law;

(u)   it is not an Account that Bank exercising its reasonable credit judgment, has deemed to be unacceptable;

(v)   it is not a contra Account;

(w)   it is not an "On Credit Hold" Account; and

(z)   it is not an Account that has had a net positive credit balance for more than sixty (60) days.

"Eligible In Transit Inventory" means Inventory that would otherwise constitute Eligible Inventory except for the fact that it is in transit, and that has been produced, is in transit to one of Borrower's places of business, and is fully insured against loss or damage while in transit.

"Eligible Inventory" means Inventory of Borrower meeting each of the following requirements:

(a)   it is not subject to special marketing conditions or marketability limitations judged by the Bank, in its sole discretion, to be unacceptable;

(b)   it is not Work in Progress, parts, supplies, nor does it include any Packaging and Supplies, marketing materials, promotional items, private label inventory, or inventory subject to patents, trademarks or licenses owned by a third party;

(c)   it is not materials or supplies used or to be used, or consumed or to be consumed in the normal course of business of Borrower;

(d)   it is new and unused;

(e)   it is owned by Borrower and is not subject to any lien or security interest whatsoever, other than the security interest granted to Bank hereunder;

(f)   it is held for sale in the normal and ordinary course of Borrower's business;

REVOLVING LOAN AND SECURITY AGREEMENT – Page 5
1932304

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 7 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 6
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 23 of 309

(g)    it is located at one of Borrower's places of business in the United States and is not in transit;

(h)    it is not of a type of inventory that is subject to any recall, class action litigation, governmental action, order, inquiry or investigation;

(i)    it is not located on any leased premises unless Bank has a signed landlord subordination agreement from the relevant landlord in form and substance acceptable to Bank;

(j)    it is not on consignment and no warehouse receipt or document of title is or has been issued in respect of such Inventory;

(k)    it is not expired, opened, discontinued, obsolete or damaged inventory; and

(l)    it is not inventory or of a class of inventory which is considered by Bank, exercising its reasonable credit judgment, to be "slow moving" or "excess inventory" based, in part, upon whether the inventory or class of inventory exceeds a one (1) year supply based on recent sales or usage based on a rolling twelve (12) months.

The value of all Eligible Inventory shall be determined on the basis of any and all factors and criteria as the Bank, in its sole discretion, and without reference to any standards of reasonableness shall deem appropriate, including, without limitation, that unless the Bank shall determine that some other basis is more appropriate, such value shall be determined on the basis of the lower of cost or market value, net of all handling charges, taxes, assessments, and interest and finance charges.

"Environmental Laws" means any Legal Requirement pertaining to air, emissions, water discharge, noise emissions, solid or liquid waste disposal, hazardous waste or materials, industrial hygiene, or other environmental, health, or safety matters or conditions on, under or about real property or any portion thereof, and similar laws of any Governmental Authority having jurisdiction over real property as such Legal Requirement may be amended or supplemented from time to time, and regulations promulgated and rulings issued pursuant to such laws.

"Equipment" means any "equipment" as such term is defined in Section 9.102(33) of the UCC, now owned or hereafter acquired by Borrower and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, leasehold improvements, vehicles and computers and other electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"Event of Default" has the meaning set forth in Section 10.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 8 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 7
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 24 of 309

"Excluded Swap Obligation" means, with respect to any guarantor of a Swap Obligation, including the grant of a security interest to secure the guaranty of such Swap Obligation, any Swap Obligation if, and to the extent that, such Swap Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations there under at the time the guaranty or grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Swap Obligation or security interest is or becomes illegal.

"GAAP" means those generally accepted accounting principles and practices, applied on a consistent basis, which are recognized as such by the American Institute of Certified Public Accountants acting through its Accounting Principles Board and the Financial Accounting Standards Board and/or their respective successors and which are applicable in the circumstances as of the date in question.

"General Intangibles" means any "general intangibles" as such term is defined in Section 9.102(42) of the UCC, now owned or hereafter created or acquired by Borrower, and in any event shall include, without limitation, all choses in action, causes of action, corporation or other business records, deposit accounts, Intellectual Property inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, rights to royalties, blueprints, drawings, confidential information, catalogs, sales literature, video tapes, consulting agreements, employment agreements, customer lists, tax refund claims, computer programs, insurance policies, deposits with insurers, all claims under guaranties, security interests or other security held by or granted to Borrower to secure payment of any of the Accounts by an Account Debtor, all rights to indemnification and all other intangible property of every kind and nature (other than Accounts).

"Governmental Authority" means, with respect to any Person, any government (or any political subdivision or jurisdiction thereof), court, bureau, agency, or other governmental authority having jurisdiction over such Person or any of its business, operations, or properties.

"Governmental Authorization" means any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"Guaranty" of any Person means any contract or understanding of such Person pursuant to which such Person guarantees, or in effect guarantees, any Liabilities of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, including agreements to insure the holder of the Liabilities of the Primary Obligor against loss in respect thereof.

"Hazardous Material" means any hazardous, toxic, or dangerous waste, substance, or material defined as such in or for the purpose of any Environmental Law.

REVOLVING LOAN AND SECURITY AGREEMENT – Page 7
1932304

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 9 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 8
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 25 of 309

"Hedge Agreement" means (a) any agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, credit derivative transaction, forward rate agreement, commodity swap, commodity option, forward commodity contract, equity or equity index swap or option, forward bond or forward bond price or forward bond index transaction, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, cap agreement, floor agreement, collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, spot contract, or any other similar agreement (including any option to enter into any of the foregoing), whether or not such agreement is governed by or subject to any master agreement, (b) any and all agreements of any kind, and any and all related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement, or (c) any combination of the foregoing.

"Indebtedness" means all present and future indebtedness, obligations, and Liabilities and all renewals and extensions thereof, or any part thereof, now or hereafter owed to Bank by Borrower and its Affiliates, whether arising pursuant to any of the Security Documents, or otherwise, and all renewals and extensions thereof, together with all interest accruing thereon and reasonable costs, expenses, and attorneys' fees incurred in the enforcement or collection thereof.

"Intellectual Property" means all trademarks, tradenames, trade-dress, operating manuals, software, copyrights, patents and applications owned, licensed or used by Borrower or its subsidiaries.

"Inventory" means any "inventory" as such term is defined in Section 9.102(48) of the UCC, wherever located, now owned or hereafter acquired by Borrower and, in any event, shall include, without limitation, all and related merchandise and other personal property now owned or hereafter acquired by Borrower that are held for sale or lease, or are furnished or to be furnished under a contract of service or are raw materials, work in process, or materials or supplies used or to be used, or consumed or to be consumed, in Borrower's business, and all shipping and packaging materials relating to any of the foregoing.

"Investment" in any Person means any investment, whether by means of Stock purchase, loan, advance, extension of credit, capital contribution, or otherwise, in or to such Person, the Guaranty of any Liabilities of such Person, or the subordination of any claim against such Person to other Liabilities of such Person.

"Legal Requirement" means any federal, state, local, municipal, foreign, international, multi-national, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty as in effect on the date in question.

"Liabilities" means (without duplication), with respect to any Person, all indebtedness, obligations, and liabilities of such Person, including, without limitation, (a) all "liabilities" which would be reflected on a balance sheet of such Person, (b) all obligations of such Person in respect of any guaranty, letter of credit, or bankers' acceptance, (c) all obligations of such Person in

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 10 of 112
Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 9
of 49
Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 26 of 309

respect of any capital lease, (d) all obligations, indebtedness, and liabilities secured by any lien or any security interest on any property or assets of such Person, and (e) any obligation to redeem or repurchase any of such Person's Stock.

"Lien" means any lien, mortgage, security interest, tax lien, pledge, encumbrance, conditional sale or title retention arrangement, or any other interest in property designed to secure the repayment of Liabilities, whether arising by agreement or under any statute or law, or otherwise.

"Loan Account" means a record maintained by Bank setting forth all borrowings, charges, expenses, payments, credits and debits of Borrower.

"Lockbox" has the meaning set forth in Section 9.1.

"Lockbox Agreement" has the meaning set forth in Section 9.1.

"Material Adverse Effect" means any material adverse changes in, or effect upon, (a) the validity, performance, or enforceability of any Security Documents, (b) the financial condition or business operations of Borrower and Guarantors, taken as a whole, or (c) the ability of Borrower to fulfill its obligations under the Security Documents.

"Maturity Date" means November 30, 2016.

"Maximum Rate" means the highest non-usurious rate of interest (if any) permitted from day to day by applicable law.

"Overadvance" has the meaning set forth in Section 2.4.

"Overline" has the meaning set forth in Section 2.4.

"Packaging and Supplies" means boxes, labels, cartons pallets, etc., which are not Inventory, but are listed or tracked within Borrower's inventory system.

"Person" means an individual, corporation, joint venture, general or limited partnership, limited liability company, trust, unincorporated organization, or government, or any agency or political subdivision thereof.

"Permitted Liens" means (a) Liens imposed by mandatory provisions of law such as for materialmen's, mechanic's, warehousemen's, and other Liens of a similar nature arising in the ordinary course of Borrower's business, securing a Liability not yet due and liens of Landlord's arising pursuant to the terms of real property leases for which a Landlord's Waiver has been obtained, (b) Liens for taxes imposed upon a Person or upon such Person's income, profits, or property, if the same are not yet due and payable or if the same are being contested in good faith and as to which adequate reserves are maintained in accordance with GAAP, (c) good faith deposits in connection with leases, real estate bids or contracts (other than contracts involving the borrowing of money), pledges or deposits to secure (or in lieu of) surety, stay, appeal, or

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10    Page 11 of 112
Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1    Page 10
of 49
Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document      Page 27 of 309

customs bonds and deposits to secure the payment of taxes, assessments, customs, duties, or other similar charges, (d) encumbrances consisting of zoning restrictions, easements, or other restrictions on the use of real property, (e) purchase money security interests that Bank has consented to in writing, (f) Liens held by Bank, (g) the interests of lessors under operating leases which are subordinate to Bank, (h) Liens set forth on Schedule 7.5 hereto.

"Potential Default" means the occurrence of any event which in and of itself would be an Event of Default with passage of time or giving of notice or both.

"Proceeds" means all forms of payment received by or due to Borrower from the collection of Accounts or sale, lease, exchange, collection, or other disposition of inventory or other property constituting Collateral hereunder and any and all claims against any third party for loss or damage to any Collateral, including insurance claims, and further, without limiting the generality of the foregoing, Proceeds shall include all Accounts, checks, cash, money orders, drafts, chattel paper, instruments, notes, or other documents evidencing payment obligations to Borrower for sale or exchange of Collateral.

"Properties" means all of a Person's property of every kind and character, personal, intangible and mixed.

"Qualified ECP Guarantor" means at any time, a corporation, partnership, proprietorship, organization, trust or other entity with total assets exceeding $10,000,000.00.

"Revolving Line" means a line of credit in favor of Borrower in the maximum amount of the Revolving Line Limit.

"Revolving Line Limit" means Six Million and No/100 Dollars ($6,000,000.00), except as provided in Section 2.6.

"Revolving Loan" means the revolving credit facility made or to be made hereunder to Borrower by Bank pursuant to Section 2.1.

"Revolving Note" means the Revolving Line of Credit Note, dated the date hereof, evidencing the Revolving Loan executed by Borrower and delivered to the Bank pursuant to the terms of this Agreement in the maximum principal amount of $6,000,000.00, together with any renewals, extensions, or modifications thereof.

"Security Documents" means this Agreement, the Revolving Note, any Specified Hedge Agreement, the closing documents set forth on Exhibit "C" attached hereto, and any agreements, documents (and with respect to this Agreement, and such other agreements and documents, any renewals, extensions, amendments, or supplements thereto), or certificates at any time executed or delivered pursuant to the terms of this Agreement.

"Specified Hedge Agreement" means any Hedge Agreement entered into by the Borrower and Bank related to interest rates under this Agreement.

REVOLVING LOAN AND SECURITY AGREEMENT – Page 10
1932304

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 12 of 112
Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 11
of 49
Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 28 of 309

"Stock" means all shares, options, warrants, general or limited partnership interests, membership interests, or other ownership interests (regardless of how designated) of or in a corporation, partnership, limited liability company, trust, or other entity, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

"Subordinated Debt" means all Liabilities of Borrower to its subordinated creditors that are expressly and validly subordinated to the Indebtedness pursuant to documents in form and substance acceptable to Bank.

"Subsidiary" means, with respect to any Person, any corporation, association, partnership, joint venture, limited liability company or other business entity of which such Person or any Subsidiary of such Person, directly or indirectly, either: (a) in respect of a corporation or limited liability company, owns or controls more than fifty percent (50%) of the outstanding stock or other ownership interests, having ordinary voting power to elect a majority of the board of directors or similar managing body, irrespective of whether or not a class or classes shall or might have voting power by reason of the happening of any contingency; or (b) in respect of an association, partnership, joint venture, or other business entity, is entitled to share in more than fifty percent (50%) of the profits and losses, however determined.

"Swap Obligation" means any Specified Hedge Agreement that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act, as amended from time to time.

"Tangible Net Worth" means, with respect to any Person, net worth plus all Subordinated Debt, *less* (i) any and all loans and other advances to Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (ii) notes, notes receivable, accounts, accounts receivable, inter-company receivable, and other amounts owing from Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (iii) treasury stock, good will, trademarks, trade names, patents, and deferred charges; and (iv) any and all other intangible assets, calculated in accordance with GAAP.

"UCC" means the Texas Business and Commerce Code, *as amended, or, if applicable,* the Uniform Commercial Code, as adopted by any state whose laws govern any aspect of the obligations of the parties hereunder.

"Work in Progress" means further process is required to consider the item a finished good. Work in Progress items are "in between" the raw material and finished goods state.

**1.2    Accounting Terms.** As used in this Agreement, and in the Revolving Note, and in any certificate, report or other document made or delivered *pursuant to this Agreement,* accounting terms not defined in Section 1.1, and accounting terms partly defined in Section 1.1 to the extent not defined, has, as of any date, the respective meanings given to them under GAAP and all references to balance sheets or other financial statements means such statements, prepared in accordance with GAAP as of such date.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 13 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 12
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 29 of 309

**1.3    Rules of Construction.**  When used in this Agreement: (a) "or" is not exclusive; (b) a reference to a law includes any amendment or modification to such law; (c) a reference to a Person includes its permitted successors and permitted assigns; (d) except as provided otherwise, all references to the singular shall include the plural and vice versa; (e) except as provided in this Agreement, a reference to an agreement, instrument or document shall include such agreement, instrument, or document as the same may be amended, modified or supplemented from time to time in accordance with its terms and as permitted by the Security Documents; (f) all references to Sections, Schedules, or Exhibits shall be to Sections, Schedules, or Exhibits of this Agreement, unless otherwise indicated; (g) all Exhibits to this Agreement shall be incorporated into this Agreement; (h) the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation;" and (i) except as otherwise provided herein, in the computation of time from a specified date to a later specified date, the word "from" means "from and including" and words "to" and "until" each mean "to but excluding."

## SECTION 2
## THE REVOLVING LINE

**2.1    Revolving Loan.**  Subject to the terms and conditions of this Agreement, and so long as no Potential Default or Event of Default has occurred and is continuing:

(a)    From the date hereof until the Maturity Date, or such future date to which the Maturity Date may be extended, the Bank agrees to extend to Borrower a revolving credit line in the amount of the Borrowing Base; provided, however, that in no event shall the aggregate sum of all advances made by the Bank to Borrower under the Revolving Loan exceed the Revolving Line Limit. Within such limits, the Borrower may borrow, repay, and reborrow hereunder, from the date of this Agreement until the Maturity Date.

(b)    Each request by a Borrower for an advance under the Revolving Loan shall be received by a duly authorized representative of Bank not later than 11:00 a.m. Texas time, on the date of the requested advance, which shall be on a Business Day. Further, each such request for advance shall be in writing and shall specify: (i) the amount of the requested advance; and (ii) the proposed date of the advance (which shall be a Business Day). Bank, at its option, may accept telephonic requests for advances, provided that such acceptance shall not constitute a waiver of the Bank's right to delivery of a written notice in connection with subsequent advances and further provided that all such telephonic requests are immediately confirmed by the Borrower in writing, whether by facsimile or otherwise. Bank shall make such advances available to the Borrower by depositing the same, in immediately available funds, in an account of Borrower maintained with Bank, or by such other means as is acceptable to Bank and Borrower. A responsible officer of Borrower may call Bank before delivering a request for advance to receive an indication of the interest rates then in effect, but the indicated rates do not bind Bank or affect the interest rate that is actually in effect when Borrower delivers its Notice of Borrowing.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 14 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 13
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 30 of 309

**2.2    Conditions to Each Advance.** The obligation of the Bank to make any advance after the date of this Agreement under the Revolving Loan is subject to the full and complete satisfaction of each of the following conditions precedent as of the date of each advance:

(a)    The representations and warranties set forth in <u>Section 5</u> of this Agreement are true and correct as of the date of the making of such advance to the same extent as if the representation or warranty had been made on the date of each advance;

(b)    No Event of Default has occurred and is continuing, or will result from, the making of such advance; and

(c)    Bank has received such additional approvals or documents as Bank may reasonably request.

**2.3    Borrower's Loan Account.** All borrowings under the Revolving Loan will be evidenced by the Revolving Note and by entering such advances as debits to Borrower's Loan Account. Bank also will record in Borrower's Loan Account other charges, expenses, and items properly chargeable to Borrower hereunder, all payments made by such Borrower on account of its indebtedness hereunder, and other appropriate debits and credits. The debit balance of Borrower's Loan Account will reflect the amount of Borrower's indebtedness under the Revolving Loan from time to time hereunder. Notwithstanding the foregoing, no failure by Bank to properly reflect any advance actually made or any such charge, expense, or item actually incurred in Borrower's Loan Account will relieve Borrower from its true and correct obligations with respect thereto. At least once each month, Bank will render a statement of account for Borrower's Loan Account. Each such statement will be considered correct and be conclusively binding upon Borrower except to the extent that Bank receives a written notice of Borrower's exceptions within thirty (30) days after such statement has been mailed by ordinary mail to Borrower. Terms and conditions with respect repayment of the Revolving Loan are set forth in the Revolving Note.

**2.4    Excess Advances.** In the event the unpaid principal amount of the outstanding balance of Borrower's Loan Account for the Revolving Loan ever exceeds the amount of the Revolving Line Limit, Borrower agrees to pay the excess amount (an "<u>Overline</u>") immediately upon demand by Bank. In the event the unpaid principal amount of the outstanding balance of Borrower's Loan Account for the Revolving Loan ever exceeds the Borrowing Base, Borrower agrees to pay the excess amount (an "<u>Overadvance</u>") immediately upon demand by Bank. Overlines and Overadvances will bear interest at the rate stated in the Revolving Note. If not sooner paid, interest on Overlines and Overadvances will be paid on the last day of each month, until the Revolving Loan Maturity Date. Upon request of Bank, Borrower will execute a promissory note, payable to the order of Bank, to represent the amount of any Overline and any Overadvance; however, Borrower acknowledges and agrees that the records of Bank and this Agreement will constitute conclusive evidence of any Overline or Overadvance and the obligation of Borrower to repay any Overline and Overadvance, with interest. All Overlines and Overadvances for which Bank has not demanded payment earlier, and all unpaid and accrued interest on Overlines and Overadvances not due and payable earlier, will be due and payable on

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 15 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 14
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 31 of 309

the Revolving Loan Maturity Date. Borrower acknowledges and agrees that Bank is not obligated to fund any advance that would create an Overline or an Overadvance.

2.5    **Following Maturity.**  In the event that the availability of advances under the Revolving Line expires by the terms of this Agreement, or by the terms of any agreement extending the expiration date of this Agreement, Bank may, in its sole discretion, make requested advances; however, it is expressly acknowledged and agreed that, in such event, Bank has the right, in its sole discretion, to decline to make any requested advance and may require payment in full of Borrower's Loan Account with respect to the Revolving Loan, and the making of any such advances will not be construed as a waiver of such right by Bank.

2.6    **Increase in Revolving Line Limit.**  Borrower may, at any time prior to the Maturity Date, request in writing that the Revolving Line Limit be increased, subject to the following terms and conditions:

(a)    No Potential Default or Event of Default exists on the effective date of such increase after giving effect to such increase;

(b)    Borrower will deliver, with its written request for an increase, a current Borrowing Base Certificate, which will contain a borrowing base calculation sufficient to justify, in Bank's sole discretion, such increase;

(c)    After giving effect to such increase, the Revolving Line Limit will not exceed Eight Million and No/100 Dollars ($8,000,000.00);

(d)    Borrower may request only one increase in the Revolving Line Limit during the term of this Agreement;

(e)    Borrower will deliver to Bank on or before the effective date of such increase the following documents in form and substance satisfactory to Bank: (1) resolutions of the governing body of Borrower, certified by the Secretary or an Assistant Secretary (or other custodian of records) of such Person, which authorize the increase in the Revolving Line Limit; (2) a certificate, dated as of the effective date of such increase certifying that no Potential Default or Event of Default has occurred and is continuing, and certifying that the representations and warranties made by Borrower herein and in the Security Documents are true and complete in all material respects with the same force and effect as if made on and as of such date (except to the extent any such representation or warranty expressly relates only to any earlier and/or specified date); and (3) such other agreements, instruments and information (including supplements or modifications to this Agreement and/or the Security Documents) executed by Borrower as Bank deems necessary in order to document the increase to the Revolving Line Limit and to protect, preserve and continue the perfection and priority of the liens, security interests, rights and remedies of Bank hereunder and under the Security Documents in light of such increase;

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 16 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 15
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 32 of 309

(f)    Borrower will execute and deliver to Bank a replacement Revolving Note reflecting the new amount of the Revolving Line Limit after giving effect to the increase (and the prior Revolving Note will be deemed to be cancelled); and

(g)    On the effective date of such increase, Borrower will pay all costs and expenses incurred by Bank in connection with the negotiations regarding, and the preparation, negotiation, execution and delivery of all agreements and instruments executed and delivered by Bank or Borrower in connection with such increase (including all fees for any supplemental or additional public filings of any Security Documents necessary to protect, preserve and continue the perfection and priority of the liens, security interests, rights and remedies of Bank  hereunder and under the Security Documents in light of such increase).

**2.7    Purpose.**  All funds borrowed under the Revolving Line will be used to provide additional working capital, for general corporate purposes, and for the acquisition of equipment.

**2.8    Fees.**

(a)    Borrower will pay to Bank an unused line fee at the rate of one quarter of one percent (0.25%) per annum on the average daily Unused Revolving Loan Amount from the date of this Agreement to and including the Maturity Date, due and payable quarterly in arrears on the first day of the month of each quarter and on the Maturity Date.  For the purposes of this Section, "Unused Revolving Loan Amount" means the Revolving Line Limit reduced by the aggregate sum of all outstanding advances made by Bank to Borrower under the Revolving Line.

(b)    Borrower acknowledges that the fees payable hereunder are bona fide fees and are intended as reasonable compensation to Bank for agreeing to make funds available to Borrower as described herein and for no other purposes.

**2.9    Advance Not a Waiver.**  No advance shall constitute a waiver of any of the conditions of Bank's obligations hereunder, nor, in the event Borrower is unable to satisfy any such condition, shall any advance have the effect of precluding Bank from thereafter declaring Event of Default.

## SECTION 3
## COLLATERAL AND GUARANTIES

**3.1    Grant of Security Interest.**  As security for the payment and performance of all Indebtedness, Bank has and is hereby granted a continuing lien on, a security interest in and a right of set-off against the following Collateral:

(a)    all Accounts of Borrower, whether now or hereafter existing, created, arising or acquired;

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 17 of 112

Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 16
of 49

Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 33 of 309

(b)    all Inventory of Borrower, whether now or hereafter existing, created, arising or acquired;

(c)    all Equipment of Borrower, whether now or hereafter existing, created, arising or acquired;

(d)    all General Intangibles of Borrower, whether now or hereafter existing, created, arising, or acquired, including, without limitation, the Intellectual Property;

(e)    without limitation to the foregoing, all contract rights, chattel paper, documents, documents of title, warehouse receipts, bills of lading, notes, and notes receivable instruments of Borrower, whether now or hereafter existing, created, arising, or acquired;

(f)    without limitation to the foregoing, all goods, instruments, notes, notes receivable, documents, documents of title, warehouse receipts, bills of lading, certificates of title, policies and certificates of insurance, securities, chattel paper, deposits, cash and other property now or hereafter owned by Borrower or in which it now or hereafter has an interest, which are now or may hereafter be in the possession of or deposited with Bank, or which are otherwise assigned to Bank, or as to which Bank may now or hereafter control possession by documents of title or otherwise;

(g)    all books and records now owned and hereafter acquired relating to any other Collateral and all files, correspondence, computer programs, tapes, disks and related data processing software owned by Borrower or in which Borrower has an interest that contains information concerning or relating to any of the other Collateral or any item thereof; and

(h)    all Proceeds and products of all of the foregoing, including, without limitation, insurance proceeds.

No submission by Borrower to Bank of any schedule or other particular identification of Collateral will be necessary to vest in Bank a security interest in each and every item of Collateral now existing or hereafter acquired, but rather, such security interest will vest in Bank immediately upon the creation or acquisition of any item of Collateral, without the necessity for any other or further action by Borrower or Bank.

**3.2    Applicable UCC.**  To the extent applicable, the UCC in effect in the State of Texas governs the security interests provided for herein..

**3.3    Perfection and Protection of Liens.**  Borrower hereby irrevocably authorizes Bank to file (and will upon Bank's request execute and deliver to Bank) any financing statements, continuation statements, extension agreements and other documents, properly completed and executed (and acknowledged when required) by Borrower in form and substance reasonably satisfactory to Bank, for the purpose of perfecting, confirming, or protecting Bank's Liens and other rights in the Collateral.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
                         Exhibits 1 -10    Page 18 of 112
    Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 17
                                        of 49
      Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
                           Main Document    Page 34 of 309

## SECTION 4
## CONDITIONS PRECEDENT

The obligation of Bank to make the first advance under the Revolving Loan is subject to the conditions precedent that, on or before the date of such advance or funding, (a) Borrower has paid to Bank (i) all fees to be received by Bank pursuant to this Agreement or any other Security Document, and (ii) an amount equal to the estimated fees and out-of-pocket expenses of Bank's counsel incurred in connection with the preparation, execution, and delivery of the Security Documents and the consummation of the transactions contemplated thereby; (b) Bank has received duly executed copies of (i) a current Borrowing Base Certificate, (ii) a current customer address list, including the names, addresses and telephone numbers of all Account Debtors, and (iii) each of the documents and items listed on Exhibit "C", each dated as of the date of the Revolving Loan, if applicable, and each in form and substance satisfactory to Bank, in its sole discretion; (c) no Event of Default exists; (d) no change that would cause a Material Adverse Effect has occurred since the date of the financial statements referenced in Section 5.7; and (e) the representations and warranties contained in each of the Security Documents will be true and correct in all material respects as though made on the date of the Revolving Loan.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES

To induce Bank to make the Loan hereunder, Borrower represents and warrants to Bank that:

**5.1    Organization and Good Standing.** Borrower is duly organized and in good standing under the laws of the state of its organization, or formation, as the case may be, is duly qualified and in good standing in all states in which it is doing business, has the power and authority to own its properties and assets and to transact the business in which it is engaged in each jurisdiction in which it operates, and is or will be qualified in those states where qualification is required.

**5.2    Authorization and Power.** Borrower has full power and authority to execute, deliver, and perform the Security Documents to be executed by it, all of which has been duly authorized by all proper and necessary action.

**5.3    No Conflicts or Consents.** Neither the execution and delivery of the Security Documents, nor the consummation of any of the transactions therein contemplated, nor compliance with the terms and provisions thereof, will contravene or conflict with any Legal Requirement to which Borrower is subject, any Governmental Authorization applicable to Borrower, any indenture, loan agreement, mortgage, deed of trust, or other material agreement or instrument binding on Borrower, or any Constituent Document of Borrower. No consent, approval, authorization, or order of any court, Governmental Authority, shareholder, director, partner, member, or third party is required in connection with the execution, delivery, or performance by Borrower of any of the Security Documents, except for consents, approvals, authorizations and orders which have been obtained and delivered to Bank.

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 19 of 112

Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 18
of 49

Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 35 of 309

**5.4    Enforceable Obligations.** The Security Documents have been duly executed and delivered by Borrower and are the legal and binding obligations of Borrower, enforceable in accordance with their respective terms, except as limited by Debtor Laws and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.5    Ownership of Collateral.** Except for (a) the security interests granted hereby or by any other document executed in favor of Bank, and (b) Permitted Liens, Borrower is and, as to Accounts, Inventory, and other Collateral arising or to be acquired after the date hereof, will be, the sole and exclusive owner of the Accounts, Inventory, and each and every other item of Collateral, free from any Lien, and Borrower will defend its Accounts, Inventory, and each and every other item of Collateral and all Proceeds and products thereof against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Bank.

**5.6    Offices.** Set forth on Schedule 5.6 is a list of each location of Borrower at which Inventory and other tangible Collateral is located, records of Borrower pertaining to Accounts are kept and of Borrower's chief executive office.

**5.7    Financial Condition.** Borrower has delivered to Bank copies of the financial statements of the Borrower, as of September 30, 2014; such financial statements are true and correct, fairly represent the financial condition of each such Person as of such date and have been prepared in accordance with GAAP; as of the date hereof, there are no obligations or Liabilities (including contingent and indirect Liabilities) of such Person which are material and are not reflected in such financial statements which are otherwise required to be disclosed in accordance with GAAP; and no Material Adverse Effect has occurred since the date of such financial statements.

**5.8    No Default.** No event has occurred and is continuing which constitutes a Potential Default or an Event of Default.

**5.9    No Litigation.** There are no actions, suits or legal, equitable, arbitration or administrative proceedings pending, or to the knowledge of Borrower threatened, against Borrower that could reasonably be expected to, if adversely determined, result in liability in excess of $100,000.00 or otherwise have a Material Adverse Effect, except as described in Schedule 5.9.

**5.10    Use of Proceeds; Margin Stock.** The proceeds of the Revolving Loan will be used by Borrower solely for the purposes specified in Section 2.9. None of such proceeds will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulations T, U, or X of the Board of Governors of the Federal Reserve System or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulations. If requested by Bank, then Borrower will furnish to Bank a statement in conformity with the requirements of the Federal Reserve Form U-1 referred to in said Regulation U to the foregoing effect. No part of the proceeds of the Revolving Loan will be used for any purpose which violates, or is inconsistent with, the provisions of Regulation X.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 20 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 19
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 36 of 309

**5.11    Taxes.** All tax returns required to be filed by Borrower in any jurisdiction have been filed and all taxes shown to be due on such tax returns (including mortgage recording taxes), assessments, fees, and other governmental charges upon Borrower or upon any of its properties, income, or franchises have been paid except for taxes being contested in good faith by appropriate proceedings diligently prosecuted and as to which adequate reserves have been established in accordance with GAAP. To the best of Borrower's knowledge, there is no proposed tax assessment against Borrower and all tax Liabilities of Borrower are adequately provided for. No income tax Liability of Borrower has been asserted by the Internal Revenue Service for taxes in excess of those already paid.

**5.12    Compliance with Law.**

(a)    (i) Borrower is in compliance with its Constituent Documents, and with all Legal Requirements which are applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets; and (ii) Borrower has not received any notice or other communication from any Governmental Authority or other Person of any event or circumstance that could constitute a violation of, or failure to comply with, any material Legal Requirement.

(b)    (i) Borrower is in compliance with all of the terms and requirements of each Governmental Authorization held by it; (ii) Borrower has not received any notice or other communication from any Governmental Authority or other Person of any event or circumstance that could constitute a violation of, or failure to comply with, any term or requirement of any Governmental Authorization, or of any actual or potential revocation, withdrawal, cancellation, or termination of, or material modification to, any Governmental Authorization; and (iii) all applications required to have been filed for the renewal of any required Governmental Authorizations have been duly filed on a timely basis with the appropriate Governmental Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authorities.

**5.13    Subsidiaries and Affiliates.** Borrower has no subsidiaries or Affiliates other than set forth in Schedule 5.13.

**5.14    Sufficiency of Capital.** Borrower is, and after consummation of this Agreement and, after giving effect to all Liabilities incurred in connection herewith, will be solvent.

**5.15    Operation of Business.** Borrower possesses all material licenses, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, necessary to conduct its business substantially as now conducted and as presently proposed to be conducted, and Borrower is not in violation of any valid rights of others with respect to any of the foregoing.

**5.16    Disclosure.** No statement, certificate, information, report, representation, or warranty made by Borrower in this Agreement or in any other Security Document or furnished to Bank in connection with this Agreement or any of the transactions contemplated hereby contains any untrue statement of a material fact. There is no fact known to Borrower that has a Material

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 21 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 20
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 37 of 309

Adverse Effect, or which might in the future reasonably be expected to have a Material Adverse Effect, on the business condition (financial or otherwise), operations, prospects, or properties of Borrower that has not been disclosed in writing to Bank.

### 5.17    Environmental Matters.

(a)    Borrower and all of its respective properties, assets, and operations are in full compliance with all Environmental Laws except where the failure to be in compliance would reasonably be expected not to have a Material Adverse Effect. Borrower is not aware of, nor has Borrower received notice of, any past, present, or future conditions, events, activities, practices, or incidents which may interfere with or prevent the compliance or continued compliance of Borrower with all Environmental Laws;

(b)    Borrower has obtained all permits, licenses, and authorizations that are required under applicable Environmental Laws, and all such permits are in good standing and Borrower is in compliance with all of the terms and conditions of such permits, except where the failure to be in compliance would reasonably be expected not to have a Material Adverse Effect;

(c)    No Hazardous Materials exist on, about, or within or have been used, generated, stored, transported, disposed of on, or released from any of the properties or assets of Borrower. The use which Borrower makes and intends to make of its properties and assets will not result in the use, generation, storage, transportation, accumulation, disposal, or release of any Hazardous Material on, in, or from any of its properties or assets;

(d)    To the knowledge of Borrower, neither Borrower nor any of its respective currently or previously owned or leased properties or operations is subject to any outstanding or threatened order from or agreement with any Governmental Authority or other Person or subject to any judicial or docketed administrative proceeding with respect to (i) failure to comply with Environmental Laws, (ii) remedial action, or (iii) any Liabilities under any Environmental Law arising from a release or threatened release;

(e)    There are to Borrower's knowledge no conditions or circumstances associated with the currently or previously owned or leased properties or operations of Borrower that could reasonably be expected to give rise to any Liabilities under any Environmental Laws;

(f)    Borrower is not a treatment, storage, or disposal facility requiring a permit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., regulations thereunder or any comparable provision of state law. Borrower is in compliance with all applicable financial responsibility requirements of all Environmental Laws;

(g)    Borrower has not filed or failed to file any notice required under applicable Environmental Law reporting a release; and

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 22 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 21
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 38 of 309

(h)    No Lien arising under any Environmental Law has attached to any property or revenues of Borrower.

**5.18    Intellectual Property.**    All material Intellectual Property owned or used by Borrower is listed, together with application or registration numbers, where applicable, in <u>Schedule 5.18</u>.    Borrower owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license could not reasonably be expected to have a Material Adverse Effect. Each Person identified on <u>Schedule 5.18</u> will maintain the patenting and registration of all Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office, or other appropriate Governmental Authority, except with respect to such Intellectual Property such Person determines in its sole but reasonable commercial judgment the patenting or registration need not be maintained.

**5.19    Survival of Representations and Warranties.**    All representations and warranties by Borrower herein will survive delivery of the Revolving Note and the making of the Revolving Loan.

## SECTION 6
## AFFIRMATIVE COVENANTS

Until payment in full of the Indebtedness, Borrower agrees that, unless Bank otherwise consents in writing:

**6.1    Financial Statements, Reports and Documents.**    Borrower will deliver to Bank each of the following:

(a)    As soon as available, and in any event within one hundred twenty (120) days following the end of Borrower's fiscal year, an audited financial statement for Borrower, prepared by an independent certified public accountant acceptable to Bank, showing the financial condition of Borrower and its subsidiaries on a consolidated basis, at the close of such fiscal year and the results of its operations during such fiscal year, which financial statements will be materially complete and correct, prepared in accordance with GAAP, and will include, without limitation, an operating statement, an income statement, a balance sheet, a reconciliation of equity amounts, a source and application of funds report, an annual budget and such other matters as Bank may reasonably request;

(b)    As soon as available, and in any event within forty-five (45) days following the end of each calendar quarter, internally prepared financial statements for Borrower and its subsidiaries on a consolidated basis, signed by a duly authorized representative, and showing the results of its operations during such calendar quarter, which statements will include, without limitation, an income statement, a balance sheet, and such other matters as Bank may reasonably request;

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 23 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 22
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 39 of 309

(c)    As soon as available and in any event within forty-five (45) days from the end of each calendar quarter, a Compliance Certificate for Borrower in the form attached to this Agreement as Exhibit "A" for the fiscal year or calendar month having then ended, as applicable, together with supporting financial statements and reports;

(d)    As soon as available, and in any event within twenty (20) days from the end of each calendar month, a Borrowing Base Certificate prepared by Borrower and signed by a duly authorized representative in form acceptable to Bank, which will contain such supporting information as Bank requests, including, without limitation, an Inventory schedule and a perpetual Inventory listing;

(e)    As soon as available, and in any event within twenty (20) days after the filing thereof, and in any event by October 15 of each year, a copy of the federal income tax returns of Borrower and its subsidiaries and all requests for extensions to the filing thereof;

(f)    As soon as available, and in any event within thirty (30) days following the end of each calendar month, reports including, (i) agings of the Accounts Receivables aged by invoice due date, (ii) Accounts Receivable of Borrower, with foreign accounts and country of origin noted, and a reconciliation report fully reconciled to the general ledger for Accounts Receivable, (iii) detailed Inventory listings segregated by gloves, apparel and promotional items and a reconciliation report fully reconciled to the general ledger as of the last day of the immediately preceding calendar month, (iv) agings of the Accounts payable as of the last day of the immediately preceding calendar month fully reconciled to the general ledger, (v) a general ledger trial balance listing, (vi) a slow-moving Inventory report; (vii) a list of customer deposits and a customer deposit reclassification report; (viii) a rebates report; (ix) schedules of in transit inventory, inventory located outside of the United States, and private label inventory; and (x) a reconciliation report of the Accounts Receivable, Accounts payable and Inventory sub-ledger report totals that are not in direct agreement with the general ledger balances, all in form and substance acceptable to Bank, as of the last day of the immediately preceding calendar month, and the period of time which has elapsed with respect to such Accounts Receivable since the invoice date with respect thereto;

(g)    As soon as available, and in any event within twenty (20) days following the end of Borrower's fiscal year, a complete listing of customers and customer addresses; and

(h)    Such other documents, instruments, data, or information of any type reasonably requested by Bank with respect to the customer list, accounts receivable, collections, remittances, Inventory and any other Collateral.

6.2    **Insurance.**  Borrower will (a) have and maintain at all times general liability insurance and workers' compensation insurance and, with respect to Collateral, equipment, real estate and other substantial assets of Borrower and all facets of Borrower's business, comprehensive and catastrophic insurance, including, without limitation, insurance against risks

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 24 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 23
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 40 of 309

of fire, theft, windstorm, and hail, so-called multi-peril extended hazard coverage, and insurance against other risks customarily insured against by companies engaged in similar business to that of Borrower, containing such terms, and in such form and amount, and for such periods, and written by such companies as may be reasonably satisfactory to Bank; (b) furnish to Bank, upon request, a statement of the insurance coverage; (c) obtain other or additional insurance promptly, upon the reasonable request of Bank, to the extent that such insurance may be available and is customary in Borrower's line of business and geographic region; and (d) cause Bank, P.O. Box 17200, Shreveport, Louisiana 71148, to be named as (i) an additional insured on all of Borrower's liability insurance policies, and (ii) loss payee as to all property constituting Collateral hereunder, pursuant to a mortgagee or loss payable endorsement in form acceptable to Bank. All insurance proceeds, payments and other amounts paid to or received by Bank under or in connection with any and all such policies may be retained by Bank in whole or part as additional Collateral for the Indebtedness and/or, at Bank's option, be applied in whole or part to the payment of such of the Indebtedness as will then be due, and/or, at Bank's option, be held (in a remittance or other special account in which Borrower has no interest) for application to Indebtedness not yet due and be applied to such Indebtedness as and when the same will come due, in such order as Bank may determine in its sole discretion. All insurance policies will provide for a minimum of thirty (30) days' written cancellation notice to Bank and, at Bank's request, all such policies will be delivered to and held by Bank. In the event of failure to provide and maintain insurance required by this Agreement, Bank may, at its option, provide such insurance and charge the costs and expenses incurred to Borrower's Loan Account. Bank is hereby made attorney-in-fact for Borrower to (i) obtain, adjust and settle, in its sole discretion, such insurance, and (ii) endorse any drafts or checks issued in connection with such insurance.

6.3    **Payment of Taxes and Other Liabilities.** Borrower will pay and discharge (a) all taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any property belonging to it, before delinquent, (b) all lawful claims (including claims for labor, materials and supplies), which, if unpaid, might give rise to a Lien upon any of its property, excluding Permitted Liens, and (c) all of its other Liabilities, except as prohibited under the Security Documents; provided, however, that Borrower will not be required to pay any such tax, assessment, charge, or levy if and so long as the amount, applicability or validity thereof is being contested in good faith by appropriate proceedings and appropriate accruals and cash reserves therefor have been established in accordance with GAAP.

6.4    **Depository Accounts**. Borrower shall establish and maintain with Bank its operating and depository accounts, including treasury management ("Depository Accounts"), and Bank, at Bank's option, may make all advances hereunder into Borrower's Depository Accounts, and Borrower expressly agrees that Bank may, at Bank's option, debit against any such Depository Accounts any and all sums, amounts, charges, and payments due under or in connection with the Loan.

6.5    **Operations and Properties.** Borrower will keep and maintain the Equipment and all other tangible Collateral in good operating condition, ordinary wear and tear excepted, and Borrower will provide all maintenance, service and repairs necessary for such purposes. Borrower shall (a) act prudently and in accordance with customary industry standards in managing and operating its assets and properties, and (b) keep in good working order and

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 25 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 24
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 41 of 309

condition, ordinary wear and tear excepted, all of its assets and properties which are necessary to the conduct of its business.

**6.6    Maintenance of Existence and Rights; Conduct of Business.** Borrower and its subsidiaries shall preserve and maintain its corporate existence and all of its rights, privileges, and franchises necessary or desirable in the normal conduct of its business, and conduct its business in an orderly and efficient manner consistent with good business practices and in accordance with all Legal Requirements of any Governmental Authority.

**6.7    Notice of Default; Other Notices.** Borrower shall furnish to Bank, immediately upon becoming aware of the existence of any condition or event which constitutes a Potential Default or an Event of Default, written notice specifying the nature and period of existence thereof and the action which Borrower or any Affiliate is taking or proposes to take with respect thereto. Borrower shall promptly notify Bank of (a) any material adverse change in Borrower's or any of its Affiliates' financial condition or business, (b) any default under any material agreement, contract, or other instrument to which Borrower or any of its Affiliates is a party or by which any of Borrower's or any of its Affiliates' properties are bound, or any acceleration of the maturity of any Liabilities owing by Borrower or any of its Affiliates, (c) the occurrence of any fact or circumstance which would reasonably be expected to cause a Material Adverse Effect against or affecting Borrower or any of its Affiliates, or any of their respective properties, and (d) the commencement of, and any material determination in, any litigation with any third party or any proceeding before any Governmental Authority affecting Borrower or any of its Affiliates.

**6.8    Compliance with Law.** Borrower and its subsidiaries shall comply with all applicable Legal Requirements of any Governmental Authority, a breach of which could have a Material Adverse Effect.

**6.9    Authorizations and Approvals.** Borrower shall promptly obtain, from time to time at its own expense, all Governmental Authorizations as may be required to enable it to comply with its obligations hereunder and under the other Security Documents.

**6.10    Further Assurances.** Borrower shall make, execute, and deliver or file or cause the same to be done, all such notices, additional agreements, mortgages, assignments, financing statements, or other assurances, and take any and all such other action, as Bank may, from time to time, deem reasonably necessary or proper in connection with any of the Security Documents.

**6.11    Indemnity by Borrower.** Borrower shall indemnify, defend, and hold harmless Bank and its directors, officers, agents, attorneys, and employees (individually, an "Indemnitee" and collectively, the "Indemnitees") from and against any and all loss, liability, obligation, damage, penalty, judgment, claim, deficiency, and expense (including interest, penalties, attorneys' fees, and amounts paid in settlement) to which the Indemnitees may become subject arising out of this Agreement and the other Security Documents, other than those which arise by reason of the gross negligence or willful misconduct of Bank, **BUT SPECIFICALLY INCLUDING ANY LOSS, LIABILITY, OBLIGATION, DAMAGE, PENALTY, JUDGMENT, CLAIM, DEFICIENCY, OR EXPENSE ARISING OUT OF THE SOLE OR**

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 26 of 112
Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 25
of 49
Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 42 of 309

**CONCURRENT NEGLIGENCE OF BANK.** Borrower shall also indemnify, protect, and hold each Indemnitee harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, proceedings, costs, expenses (including without limitation all reasonable attorneys' fees and legal expenses whether or not suit is brought), and disbursements of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against such Indemnitee, with respect to or as a direct or indirect result of the violation by Borrower of any Environmental Law; or with respect to or as a direct or indirect result of Borrower's use, generation, manufacture, production, storage, release, threatened release, discharge, disposal, or presence of a Hazardous Material on, under, from, or about real property. The provisions of and undertakings and indemnifications set forth in this Section 6.11 shall survive (a) the satisfaction and payment of the Indebtedness and termination of this Agreement, and (b) the release of any Liens held by Bank on real property or the extinguishment of such Liens by foreclosure or action in lieu thereof.

6.12   **Keepwell.** Borrower and each Guarantor hereby absolutely, unconditionally and irrevocably undertakes that if it is a Qualified ECP Guarantor at the time the guaranty by a Guarantor or other third party that is not then an "eligible contract participant" under the Commodity Exchange Act (each, a "Specified Party"), or the grant of a security interest to Bank by any such Specified Party, in either case, becomes effective with respect to any Hedge Agreement, to provide such funds or other support to such Specified Party that is a corporation, partnership, proprietorship, organization, trust or other entity as may be needed by such Specified Party from time to time to honor all of its obligations in respect of such Hedge Agreement. Borrower and each Guarantor intends this Section 6.12 to constitute, and this Section 6.12 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Party for all purposes of the Commodity Exchange Act.

### SECTION 7
### NEGATIVE COVENANTS

Until payment in full of the Indebtedness, Borrower agrees that (unless Bank otherwise consents in writing):

7.1   **Change of Location.** Borrower will not change (or permit to be changed) any office or location, or move any of the Collateral, except in the ordinary course of business, without (i) at least thirty (30) days prior written notice to Bank, and (ii) prior to making any such change, executing and delivering to Bank any additional financing statements or other documents that Bank may request.

7.2   **Disposition of Assets.** Borrower will not sell, transfer, lease, otherwise dispose of, or permit to be sold, transferred, or leased any of the Accounts, Inventory, Equipment and the other Collateral or any interest therein (or any of the Proceeds thereof, whether money, checks, money orders, drafts, notes, instruments, documents, chattel paper, Accounts, returns, or repossessions) or of any other property of Borrower, except for the sale of Inventory in the ordinary course of business and except for obsolete equipment.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 27 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 26
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 43 of 309

**7.3    Limitations on Liabilities.**  Borrower will not incur, create, issue, assume, guarantee, endorse or permit to exist any Liabilities except:

(a)    Indebtedness to Bank provided for in this Agreement;

(b)    other indebtedness not to exceed $250,000.00 (plus normal trade debt); and

(c)    any Subordinated Debt to which Bank consents in writing, including without limitation, the Subordinated Debt set forth on Schedule 7.3(b) attached hereto.

**7.4    Subordinated Debt.**  Borrower will not make any payment upon any outstanding Subordinated Debt, except as expressly permitted under the terms of a written subordination agreement executed by Bank and the holder of the Subordinated Debt. Notwithstanding the forgoing, Borrower shall not be entitled to make any payment of Subordinated Debt if a Potential Default or an Event of Default is in existence and is continuing or if the making of any such payment would cause a Potential Default or an Event of Default to exist.

**7.5    Negative Pledge.**  Borrower will not create, incur, permit, or suffer to exist any Lien upon their Properties, now owned or hereafter acquired, except for Permitted Liens.

**7.6    Restrictions on Distributions.**  Borrower will not directly or indirectly declare or make, or incur any Liability to make, any Distributions.

**7.7    Limitation on Investments.**  Borrower will not have or make any Investments in any Person.

**7.8    Management.**  Borrower will not change its present management without prior notice to Bank.

**7.9    Issuance of Stock.**  Borrower will not issue, sell, or otherwise dispose of, any of its Stock, or rights, warrants, or options to purchase or acquire any of its Stock, except that Borrower may issue options to employees and consultants under its existing stock option plan, as the same may be amended from time to time, and may issue stock in private placements under Section 4(2) of the Securities Act of 1933 and the regulations thereunder.

**7.10    Liquidation, Mergers, Consolidations and Dispositions of Substantial Assets.**  Borrower will not dissolve or liquidate, or become a party to any merger or consolidation, other than a merger of its subsidiaries into Borrower or acquire by purchase, lease, or otherwise all or substantially all of the Property or Stock of any Person, or sell, transfer, lease, or otherwise dispose of all or any substantial part of its Properties or business, without the prior consent of Bank.

**7.11    Constituent Documents.**  Borrower will not (a) violate the provisions of its Constituent Documents, or (b) modify, repeal, replace, or amend any provision of its Constituent Documents except for non-substantive changes or changes made to comply with applicable laws.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
                Exhibits 1 -10    Page 28 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 27
                of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
                Main Document    Page 44 of 309

**7.12    Accounting Practices.**    Borrower will not materially change accounting practices, methods or standards or the reporting format for any information furnished Bank under the terms and provisions of this Agreement, which accounting practices shall conform with GAAP throughout the term of this Agreement.

**7.13    Prepayment of Debt.**    Borrower will not prepay any Liabilities except the Indebtedness.

**7.14    Nature of Business.**    Borrower will not engage in any business other than the business in which it is engaged as of the date hereof.

**7.15    Financial Covenants.**    Borrower, on a consolidated basis, will not, as of the last day of each calendar quarter, have:

(a)    a Debt Service Coverage Ratio of less than 1.50 to 1.0, calculated on a trailing twelve (12) months basis; and

(b)    a Tangible Net Worth of less than $8,278,000.00, to be increased annually as of the last day of each calendar year, beginning December 31, 2015, by an amount equal to fifty percent (50%) of Borrower's positive net income, if any, for such calendar year, with no regard to losses.

**7.16    Future Subsidiaries.**    With respect to each Person that becomes a domestic Subsidiary of Borrower (directly or indirectly) subsequent to the Effective Date, Borrower will cause such new Subsidiary to execute and deliver to Bank, within thirty (30) days after the date such Person becomes a Subsidiary of Borrower:

(a)    a Guaranty, in form and substance acceptable to Bank, pursuant to which such Subsidiary will guarantee in full the payment of the Indebtedness; and

(b)    a Security Agreement, in form and substance acceptable to Bank, pursuant to which such Subsidiary will grant Bank a valid first priority perfected Lien over its Collateral (as defined herein).

## SECTION 8
## FIELD AUDITS

Borrower shall, as reasonably requested by Bank thereafter (but not more than two times in any twelve-month period unless there is a continuing Event of Default), allow Bank, by or through any of its officers, agents, employees, attorneys, or accountants (i) to examine, copy, or make extracts from Borrower's books, records and documents in the possession of Borrower; (ii) to analyze financial statements; (iii) to arrange for verification of Accounts and other Collateral under reasonable procedures, directly with Account Debtors or by other methods; and (iv) visit each of Borrower's places of business (all the foregoing collectively referred to as "Audits"). Borrower shall maintain complete and accurate books and records of its transactions

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 29 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 28
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 45 of 309

in accordance with good accounting practices. Audits by Bank may be at any time during normal business hours. Borrower shall pay Bank reasonable Audit fees and expenses to compensate Bank for its costs associated with Bank's Audits.

## SECTION 9
## COLLECTION OF ACCOUNTS

**9.1    Lockbox.**

(a)    Borrower will, at the request of Bank, execute a Wholesale Lockbox Service Addendum Agreement ("Lockbox Agreement") in form and substance acceptable to Bank and such other documentation as Bank may reasonably require to establish and maintain the lockbox ("Lockbox") and the remittances account and all other cash management services of Bank and its affiliates provided in connection with this Agreement.

(b)    Upon the occurrence of an Event of Default:

(i)    Borrower will (a) maintain in full force and effect, and comply in all respects with the Lockbox Agreement; (ii) direct all of its Account Debtors to make remittance to the Lockbox; and (iii) deposit directly into the remittances account all Proceeds received by Borrower from Account Debtors and otherwise. Funds received in any Lockbox will be transferred daily by Bank to the applicable Demand Deposit Dominion Account in the name of Borrower (the "Dominion Account") and thereafter credited by Bank first to the Borrower's Loan Account and any other unpaid Indebtedness in such manner as Bank desires. Bank will not be required to credit Borrower's Loan Account with the amount of any check or other instrument constituting provisional payment until the Bank has received final payment thereof at its office in cash or solvent credits accepted by the Bank.

(ii)    Borrower will notify the Bank of such collections as are received directly by Borrower and will hold the proceeds received from such collections in trust for the Bank without commingling the same with other funds of the Borrower and will turn the same over to the Bank immediately upon receipt in the identical form received. Proceeds so transmitted to the Bank may be handled and administered in and through the remittances account.

(iii)    Bank may apply against the outstanding balance of Borrower's Loan Account from time to time any collections on and Proceeds from Accounts Receivable forwarded to Bank and/or in Bank's possession (including, without limitation, any such collections and Proceeds in any Lockbox, remittances account or any operating or other account maintained or to be maintained by or for Borrower at Bank).

(iv)    Borrower will, at the request of the Bank, notify the Account Debtors of the security interest of the Bank in any Account and will instruct

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 30 of 112

Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 29
of 49

Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 46 of 309

Account Debtors to remit payments directly to Bank, and the Bank may itself, at any time, so notify Account Debtors.

(c)    Borrower acknowledges Bank's right of offset and the security interest in Borrower's accounts including the Dominion Account granted to Bank hereunder. Upon the occurrence of an Event of Default, Borrower will relinquish its control of the Dominion Account and in addition to all other rights and remedies available to Bank, Bank will immediately have sole dominion and control over the Lockbox and the Dominion Account.

**9.2    Collection of Accounts by Borrower.** Borrower agrees that no court action or other legal proceeding or garnishment, attachment, repossession of property, or any other attempt to repossess any merchandise covered by an Account will be attempted by the Borrower except by or under the direction of competent legal counsel. BORROWER HEREBY AGREES TO INDEMNIFY AND HOLD THE BANK HARMLESS FOR ANY LOSS OR LIABILITY OF ANY KIND OR CHARACTER WHICH MAY BE ASSERTED AGAINST THE BANK BY VIRTUE OF ANY SUIT FILED, PROCESS ISSUED, OR ANY REPOSSESSION OR ATTEMPTED REPOSSESSION DONE OR ATTEMPTED BY BORROWER OR BY VIRTUE OF ANY OTHER ENDEAVORS WHICH BORROWER MAY MAKE TO COLLECT ANY ACCOUNTS OR REPOSSESS ANY SUCH MERCHANDISE.

## SECTION 10
## EVENTS OF DEFAULT

An "Event of Default" will exist if any one or more of the following events occurs and is continuing:

(a)    Borrower fails to pay within five days of the date when due the Indebtedness or any part thereof; or

(b)    any representation or warranty made under this Agreement, or any of the other Security Documents, proves to be untrue or inaccurate in any material respect as of the date on which such representation or warranty is made or deemed to have been made; or

(c)    Borrower fails to perform any of the covenants or agreements of Borrower contained herein or in any of the other Security Documents and such failure continues for 30 days of the date when such performance was required; or

(d)    Borrower fails to maintain any insurance required hereunder or pay any premium on (i) any insurance policy assigned to Bank, or (ii) any insurance covering any Collateral; or

(e)    INTENTIONALLY DELETED; or

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 31 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 30
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 47 of 309

(f)    any of the Security Documents ceases to be a legal, valid, and binding agreement enforceable against the Person executing the same in accordance with its terms, is terminated, becomes or is declared ineffective or inoperative or ceases to provide the respective liens, rights, remedies, powers, or privileges intended to be provided thereby; or any Person denies that such Person has any further Liability or obligation under any of the Security Documents; or

(g)    Borrower (i) applies for or consents to the appointment of a receiver, trustee, custodian, intervenor, or liquidator of itself or of all or a substantial part of its assets, (ii) files a voluntary petition in bankruptcy, admits in writing that it is unable to pay its debts as they become due, or generally not pay its debts as they become due, (iii) makes a general assignment for the benefit of creditors, (iv) files a petition or answer seeking reorganization of an arrangement with creditors or to take advantage of any bankruptcy or insolvency laws, (v) files an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization, or insolvency proceeding, or (vi) takes corporate action for the purpose of effecting any of the foregoing; or

(h)    an involuntary proceeding is commenced against Borrower seeking bankruptcy or reorganization of Borrower or the appointment of a receiver, custodian, trustee, liquidator, or other similar official of Borrower, or all or substantially all of Borrower's assets, and such proceeding shall not have been dismissed within sixty (60) days of the filing thereof; or an order, order for relief, judgment, or decree is entered by any court of competent jurisdiction or other competent authority approving a petition or complaint seeking reorganization of Borrower, or appointing a receiver, custodian, trustee, liquidator, or other similar official of Borrower, or of all or substantially all of Borrower's assets; or

(i)    any final judgment(s) for the payment of money not paid or fully covered by insurance in excess of the sum of $100,000.00 in the aggregate is rendered against Borrower and such judgment(s) is not satisfied or discharged at least ten (10) days prior to the date on which any of Borrower's assets could be lawfully sold to satisfy such judgment; or

(j)    a Change in Control of Borrower occurs.

## SECTION 11
## REMEDIES

**11.1    Remedies Upon Event of Default.**  If any Event of Default occurs and is continuing, then Bank may, without notice, exercise any one or more of the following rights and remedies, and any other remedies provided in any of the Security Documents, as Bank in its sole discretion may deem necessary or appropriate: (a) declare the Indebtedness or any part thereof to be forthwith due and payable, whereupon the same will become due and payable without presentment, demand, protest, notice of default, notice of acceleration or of intention to accelerate, or other notice of any kind, all of which Borrower hereby expressly waives, anything

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 32 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 31
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 48 of 309

contained herein to the contrary notwithstanding, (b) reduce any claim to judgment, or (c) without notice of default or demand, pursue and enforce any of Bank's rights and remedies under the Security Documents, or otherwise provided under or pursuant to any applicable law or agreement; provided, however, if any Event of Default specified in Sections 10(g) or (h) shall occur, then the Indebtedness will become due and payable concurrently therewith, and Bank's obligation to lend will immediately terminate hereunder, without any further action by Bank and without presentment, demand, protest, notice of default, notice of acceleration or of intention to accelerate, or other notice of any kind, all of which Borrower hereby expressly waives.

11.2   **Remedies.** Upon the occurrence and continuation of any one or more of the above Events of Default and at any time thereafter:

(a)   Bank has, in addition to all other rights and remedies, the remedies of a secured party under the UCC, including, without limitation, the right to take possession of the Collateral, and for that purpose Bank may, so far as Borrower can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom or take possession of same and store same on such premises pending disposition under the terms of this Agreement or applicable law.

(b)   Bank may require Borrower to assemble the Collateral and make it available to Bank at a place designated by Bank which is reasonably convenient to both parties. Unless the Collateral is perishable or threatens to decline speedily in value or is to a type customarily sold on a recognized market, Bank shall give to Borrower at least ten (10) days' written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made, which time period shall be deemed for all purposes to be commercially reasonable.

(c)   Bank may, at any time in its discretion, transfer any securities or other property constituting Collateral into its own name or that of its nominee, and receive the income thereon and hold the same as security for the Indebtedness or apply it on principal or interest due on Indebtedness.

(d)   Insofar as Collateral shall consist of Accounts, insurance policies, instruments, chattel paper, choses in action, or the like, Bank may demand, collect, receipt for, settle, compromise, adjust, sue for, release, extend the time of payment, make allowances and adjustments, foreclose, or realize upon Collateral as Bank may determine, whether or not Indebtedness or Collateral are then due, and for the purpose of realizing Bank's rights therein, Bank may receive, open, and dispose of mail addressed to Borrower and endorse notes, checks, drafts, money orders, documents of title, or other evidences of payment, shipment, or storage or any form of Collateral on behalf of and in the name of Borrower.

11.3   **Rights Not Exclusive.** No right, power, or remedy conferred in this Agreement, the Revolving Note, or any other agreement executed in connection herewith or any other document or agreement to which Borrower and Bank are parties, or now or hereafter existing at law, in equity, or admiralty, by statute or otherwise, shall be exclusive, and each such right,

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 33 of 112
Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 32
of 49
Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 49 of 309

power, or remedy, shall, to the full extent permitted by law, be cumulative and in addition to every other such right, power, or remedy. Bank may resort to any security given by this Agreement or to any other security now existing or hereafter given to secure the payment of Borrower's Indebtedness, in whole or in part, and in such portions and in such order as may seem best to Bank in its sole discretion, and any such action shall not in any way be considered as a waiver of any of the rights, benefits, or security interests evidenced by this Agreement. Bank may, at all times, proceed directly against Borrower to enforce payment of Borrower's Indebtedness and shall not be required first to enforce its rights in the Collateral or any other security granted to it. Bank shall not be required to take any action of any kind to preserve, collect, or protect Borrower's rights in the Collateral or any other security granted to it.

**11.4   Sales of Collateral**. The sale by Bank of less than the whole of the Collateral shall not exhaust the rights of Bank hereunder, and Bank is specifically empowered to make successive sales hereunder until the whole of the Collateral shall be sold. If the Proceeds of any sale of less than the whole of the Collateral shall be less than the aggregate of the Indebtedness, this Agreement and the security interests created hereby shall remain in full force and effect as to the unsold portion of the Collateral just as though no sale had been made; provided however, that Borrower shall never have any right to require sale of less than the whole of the Collateral but Bank has the right, at its sole election, to sell less than the whole of the Collateral.

**11.5   Performance by Bank.** If Borrower fails to perform any covenant, duty, or agreement contained in any of the Security Documents, then Bank may perform or attempt to perform such covenant, duty, or agreement on behalf of Borrower. In such event, Borrower shall, at the request of Bank, promptly pay any amount expended by Bank in such performance or attempted performance to Bank at its principal office in Dallas, Texas together with interest thereon at the Maximum Rate from the date of such expenditure until paid. Notwithstanding the foregoing, it is expressly understood that Bank shall not assume any Liability or responsibility for the performance of any duties of Borrower hereunder or under any of the Security Documents and none of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Bank the right or power to exercise control over the management and affairs of Borrower.

**11.6   Administrative Fees.**   Upon the violation by Borrower of any material representation, warranty or covenant set forth in this Agreement or in any of the Security Documents, Borrower agrees to pay to Bank, upon demand, an administrative fee in an amount determined by Bank from time to time to cover the extra labor and expense involved in addressing and monitoring any such violation; provided however, that should such administrative fee constitute interest under any applicable law, such fee shall not, together with other interest to be paid, charged, contracted for, received, reserved against, or taken on the Indebtedness arising under any of the Security Documents, exceed the Maximum Rate. Borrower acknowledges that any fee due under this Section is a bona fide administrative fee and is intended as reasonable compensation to Bank for labor and expense as described above and for no other purpose. No demand for or acceptance of an administrative fee under this Section by Bank shall be construed as a waiver by Bank of any right or remedy of Bank or of any obligation of Borrower under this Agreement or any of the Security Documents. Bank shall not be deemed to have waived any of its rights or remedies unless such waiver be in writing and signed by Bank.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 34 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 33
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 50 of 309

## SECTION 12
## DEPOSITS

Bank, any participant, and any other holder of all or any part of the Indebtedness are hereby given a continuing lien as additional security for all Indebtedness hereunder upon any and all moneys, securities, and other property of Borrower, and the Proceeds thereof, now or hereafter held or received by or in transit to Bank, such participant, or such holder from or for Borrower, whether for safekeeping, custody, pledge, transmission, collection, or otherwise, and also upon any and all deposit balances (general or special) and credits of Borrower with, and any and all claims of Borrower against Bank, such participant, or such holder at any time existing. Upon the occurrence and continuation of an Event of Default, such participant, or such holder may apply or set off the same against the Indebtedness and indebtedness hereby secured, without notice and without liability.    Borrower agrees that any other person or entity purchasing participation from Bank in the Indebtedness may exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such person or entity was the direct creditor of Borrower in the amount of such participation.

## SECTION 13
## MISCELLANEOUS

**13.1    Accounting Reports.** All financial reports or projections furnished by any Person to Bank pursuant to this Agreement shall be prepared in such form and such detail as shall be reasonably satisfactory to Bank, shall be prepared on the same basis as those prepared by such Person in prior years, and, where applicable, shall be the same financial reports and projections as those furnished to such Person's officers and directors.

**13.2    Waiver.** No failure to exercise, and no delay in exercising, on the part of Bank, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Bank under the Security Documents shall be in addition to all other rights provided by law. No modification or waiver of any provision of any Security Document, nor consent to any departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar, or other instances without such notice or demand.

**13.3    Payment of Expenses.** Borrower agrees to pay Bank on demand all reasonable costs and expenses of Bank, incurred in connection with the preservation and enforcement of Bank's rights under the Security Documents, and all reasonable costs and expenses of Bank (including without limitation the reasonable fees and expenses of Bank's counsel) in connection with the negotiation, preparation, execution, delivery, and administration of the Security Documents. Following notice, Bank may, at its option, debit Borrower's Loan Account or any Depository Account to pay such expenses. Borrower agrees to pay interest on amounts which Borrower fails or refuses to pay, at the Maximum Rate from the date of such expenditure until paid.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 35 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 34
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 51 of 309

**13.4    Notices.** Any communications required or permitted to be given by any of the Security Documents must be (a) in writing and personally delivered or mailed by prepaid certified or registered mail, or (b) made by electronic or facsimile transmission delivered or transmitted, to the party to whom such notice of communication is directed, to the address of such party shown opposite its name on the signature pages hereof. Any such communication shall be deemed to have been given (whether actually received or not) on the day it is personally delivered or three (3) days after deposit if sent by certified or registered mail or, if transmitted by electronic or facsimile transmission, on the day that such communication is transmitted as aforesaid subject to telephone confirmation of receipt, provided that if such notice is delivered or deemed to have been delivered on a day that is not a Business Day or after 5:00 p.m. Central Time, such notice shall be deemed to have been delivered on the following Business Day. Any party may change its address for purposes of this Agreement by giving notice of such change to the other parties pursuant to this Section.

**13.5    Governing Law.** This Agreement has been prepared, is being executed and delivered, and is intended to be performed in the State of Texas and the substantive laws of such state and the applicable federal laws of the United States of America shall govern the validity, construction, enforcement, and interpretation of this Agreement and all of the other Security Documents.

**13.6    Choice of Forum; Consent to Service of Process and Jurisdiction.** Any suit, action, or proceeding against Borrower with respect to this Agreement, the Revolving Note, or other Security Documents, or any judgment entered by any court in respect thereof, may be brought in the courts of the State of Texas, County of Dallas, or in the United States courts located in the State of Texas as Bank in its sole discretion may elect, and Borrower hereby irrevocably submits to the nonexclusive jurisdiction of such courts for the purpose of any such suit, action, or proceeding. Borrower hereby irrevocably consents to the service of process in any suit, action, or proceeding in said court by the mailing thereof by Bank by registered or certified mail, postage prepaid, to Borrower's address shown opposite its name on the signature pages hereof. Nothing herein or in any of the other Security Documents shall affect the right of Bank to serve process in any other manner permitted by law or shall limit the right of Bank to bring any action or proceeding against Borrower or with respect to any of its property in courts in other jurisdiction. Borrower hereby irrevocably waives any objections which it may now or hereafter have to the laying of venue of any suit, action, or proceeding arising out of or relating to this Agreement, the Revolving Note, or any other Security Documents brought in the courts located in the State of Texas, County of Dallas, and hereby further irrevocably waives any claim that any such suit, action, or proceeding brought in any such court has been brought in any inconvenient forum. Any action or proceeding by Borrower against Bank shall be brought only in a court located in Dallas County, Texas.

**13.7    Invalid Provisions.** Any provision of any Security Document held by a court of competent jurisdiction to be illegal, invalid or unenforceable shall not invalidate the remaining provisions of such Security Document which shall remain in full force and the effect thereof shall be confined to the provision held invalid or illegal.

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 36 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 35
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 52 of 309

**13.8    Maximum Interest Rate.** Regardless of any provision contained in any of the Security Documents, Bank shall never be entitled to receive, collect, or apply as interest (whether termed interest herein or deemed to be interest by operation of law or judicial determination) on the Revolving Note any amount in excess of interest calculated at the Maximum Rate, and, in the event that Bank ever receives, collects, or applies as interest any such excess, then the amount which would be excessive interest shall be deemed to be a partial prepayment of principal and treated hereunder as such; and, if the principal amount of the Indebtedness is paid in full, then any remaining excess shall forthwith be paid to Borrower. In determining whether or not the interest paid or payable under any specific contingency exceeds interest calculated at the Maximum Rate, Borrower and Bank shall, to the maximum extent permitted under applicable law:  (a) characterize any non-principal payment as an expense, fee, or premium rather than as interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate, and spread, in equal parts, the total amount of interest throughout the entire contemplated term of the Revolving Note; provided that, if the Revolving Note is paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds interest calculated at the Maximum Rate, then Bank shall refund to Borrower the amount of such excess or credit the amount of such excess against the principal amount of the Revolving Note and, in such event, Bank shall not be subject to any penalties provided by any laws for contracting for, charging, taking, reserving, or receiving interest in excess of interest calculated at the Maximum Rate.

**13.9    Non-Liability of Bank.** The relationship between Borrower and Bank is, and shall at all times remain, solely that of borrower and Bank, and Bank has no fiduciary or other special relationship with Borrower.

**13.10    Successors and Assigns.**  The Security Documents shall be binding upon and inure to the benefit of Borrower and Bank and their respective successors, assigns, and legal representatives; provided, however, that Borrower may not, without the prior written consent of Bank, assign any rights, powers, duties, or obligations thereunder. Bank reserves the right to sell all or a portion of its interest in the Revolving Loan and Bank has the right to disclose any information in its possession regarding Borrower or any assets pledged to Bank in connection herewith to any potential transferee of the Loan or any part thereof.

**13.11    Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Agreement.

**13.12    Survival.** All representations and warranties made by Borrower herein shall survive delivery of the Revolving Note and the making of the Revolving Loan.

**13.13    Participations.** Bank has the right to enter into participation agreements with other banks with respect to the Revolving Note, and grant participations ratably in the other loan documents, but such participation shall not affect the rights and duties of Bank hereunder vis-à-vis Borrower. Each actual or proposed participant shall be entitled to receive all information received by Bank regarding the creditworthiness of Borrower, including, without limitation, information required to be disclosed to a participant pursuant to Banking Circular 181 (Rev.,

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 37 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 36
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 53 of 309

August 2, 1984), issued by the Comptroller of the Currency (whether the actual or proposed participant is subject to the circular or not).

**13.14  No Third Party Beneficiary.** The parties do not intend the benefits of this Agreement to inure to any third party, nor shall any Security Document or any course of conduct by any party hereto be construed to make or render Bank or any of its officers, directors, agents, or employees liable (a) to any materialman, supplier, contractor, subcontractor, purchaser, or lessee of any property owned by Borrower, or (b) for debts or claims accruing to any such Persons against Borrower.

**13.15  Multiple Counterparts.** This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.

**13.16  Cross Pledge and Cross Default.** Borrower hereby acknowledges, confirms and ratifies that all Collateral and /or continuing guaranties being granted or pledged to Bank or in which Bank was granted a security interest to secure any one of or all of Borrower's other obligations to Bank also secures the Indebtedness. Borrower further acknowledges and agrees that any Event of Default under any other note or loan agreement, by Borrower in favor of Bank shall constitute an Event of Default under the Security Documents and any Event of Default hereunder shall constitute an Event of Default under any loan agreement or note by Borrower in favor of Bank.

**13.17  USA Patriot Act.** Bank hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"); it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Bank to identify Borrower in accordance with the Patriot Act, and Borrower hereby agrees to take any action necessary to enable Bank to comply with the requirements of the Patriot Act.

**13.18  Entirety.** THIS AGREEMENT, THE NOTE, AND THE OTHER SECURITY DOCUMENTS REFERRED TO HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO. THE PROVISIONS OF THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS TO WHICH BORROWER IS A PARTY MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE PARTIES HERETO.

**13.19  Waiver of Jury Trial.** BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 38 of 112
Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 37
of 49
Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 54 of 309

ADVICE OF COMPETENT COUNSEL, WAIVE, RELINQUISH AND FOREVER FORGO THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS AGREEMENT OR ANY CONDUCT, ACT OR OMISSION OF LENDER, BORROWER OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTACT, TORT OR OTHERWISE.

**13.20  Errors and Omissions.** If requested by Bank, Borrower shall fully cooperate in the correction of any Security Document so that all Security Documents accurately describe the Loan. In the event that Borrower fails to comply with Bank's requests within thirty (30) days, Borrower agrees to pay all costs and expenses incurred by or on behalf of Bank (including attorneys' fees) in connection with any such correction.

*Signature Pages Follow*

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 39 of 112
Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 38
of 49
Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 55 of 309

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

Address for Notice:

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**BORROWER:**

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation

By:

William M. Aisenberg, Executive Vice President & CFO

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation

By:

William M. Aisenberg, Executive Vice President & CFO

Address for Notice:

600 North Pearl Street
Suite 2500
Dallas, Texas 75201
Attn:  Rick Rodman
E-mail:  rick.rodman@capitalone.com

**BANK:**

**CAPITAL ONE, N.A.**

By:

Rick Rodman, Senior Vice President

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 40 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 39
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 56 of 309

## EXHIBITS

Exhibit "A" – Compliance Certificate
Exhibit "B" – Borrowing Base Report
Exhibit "C" – Closing Documents

## SCHEDULES

Schedule 5.6 – Offices
Schedule 5.9 – Litigation
Schedule 5.13 – Subsidiaries and Affiliates
Schedule 5.18 – Intellectual Property
Schedule 7.3(b) – Subordinated Debt
Schedule 7.5 – Liens

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10   Page 41 of 112
Case 1:17-bk-12409-MB   Claim 7-1 Part 3   Filed 10/20/17   Desc Exhibit 1   Page 40
of 49
Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document   Page 57 of 309

## EXHIBIT "A"

<u>Compliance Certificate</u>

## COMPLIANCE CERTIFICATE

FOR THE QUARTER ENDED _____ (THE "**SUBJECT PERIOD**")

**BANK:**    **CAPITAL ONE, N.A.**

**BORROWER:**    **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation and **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation

This certificate is delivered under the Loan and Security Agreement (the "<u>Agreement</u>") dated as November 28, 2014, between Borrower, Bank and the guarantors named therein. Capitalized terms when used in this certificate shall, unless otherwise indicated, have the meanings set forth in the Agreement. I certify to Bank that, on the date of this certificate, (a) the Financial Statements of Borrower attached to this certificate were prepared in accordance with GAAP, and present fairly the financial condition and results of operations of Borrower as of the end of and for the Subject Period, (b) no Potential Default or Event of Default currently exists or has occurred which has not been cured or waived by Bank, and (c) the status of compliance by Borrower with certain covenants of the Agreement at the end of the Subject Period is set forth below:

|  |  | In Compliance as of End of Subject Period? (Please Indicate) |
|---|---|---|
| 1. | <u>Financial Statements and Reports</u> |  |
| (a) | Provide audited annual financial statements of Borrower within 120 days after the last day of each fiscal year. | Yes   No |
| (b) | Provide annual budget (to include CapEx schedule) of Borrower within 120 days after the last day of each fiscal year. | Yes   No |
| (c) | Provide quarterly financial statements of Borrower within 45 days after the last day of each fiscal quarter. | Yes   No |
| (d) | Provide a Compliance Certificate within 45 days after the last day of each fiscal quarter | Yes   No |
| (e) | Provide a Borrowing Base Certificate within 30 days after the last day of each month. | Yes   No |
| (f) | Provide such reports required in accordance with 6.1(f) | Yes   No |
| (g) | Provide customer listing and customer addresses within 20 days after the last day of each fiscal year. | Yes   No |

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 42 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 41
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 58 of 309

2.    <u>Financial Covenants</u>

    (a)    Minimum Debt Service Coverage Ratio, calculated as of the last day of the calendar quarter in accordance with <u>Section 7.15(a)</u> of the Agreement.

    This calculation is for the preceding twelve month period:

| | | |
|---|---|---|
| (a) | EBITDAS | $_____ |
| (b) | Interest Expense | $_____ |
| (c) | Principal Payments of Debt | $_____ |
| (d) | Lease Payments | $_____ |
| (e) | Distributions | $_____ |
| (f) | [(b) + (c) + (d) + (e)] | $_____ |
| (g) | Debt Service Coverage Ratio [(a) / (f)] | $_____ |

    Line (g) must be equal to or greater than 1.50 to 1.0.

    (b)    Tangible Net Worth*, calculated as of the last day of the calendar quarter in accordance with <u>Section 7.15(b)</u> of the Agreement.    $_____

    [Total Assets – Intangibles – Total Liabilities + Subordinated Debt]

Date: _____ ___, 201__

                        **IRONCLAD PERFORMANCE WEAR
                        CORPORATION**, a California corporation


                        By:_____
                           _____, _____

                        **IRONCLAD PERFORMANCE WEAR
                        CORPORATION**, a Nevada corporation


                        By:_____
                           _____, _____


        *"<u>Tangible Net Worth</u>" means, with respect to any Person, net worth plus all Subordinated Debt, *less* (i) any and all loans and other advances to Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (ii) notes, notes receivable, accounts, accounts receivable, inter-company receivable, and other amounts owing from Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (iii) treasury stock, good will, trademarks, trade names, patents, and deferred charges; and (iv) any and all other intangible assets, calculated in accordance with GAAP.


<u>EXHIBIT "A" TO REVOLVING LOAN AND SECURITY AGREEMENT</u> – Page 2

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 43 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 42
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 59 of 309

## EXHIBIT "B"

### Borrowing Base Certificate

[see attached]

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 44 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 43
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 60 of 309

## EXHIBIT "C"

<u>Closing Documents</u>.

1.  Revolving Line of Credit Note in the original principal amount of $6,000,000.00, executed by Borrower;

2.  Revolving Loan and Security Agreement, executed by Borrower;

3.  Notice of Final Agreement;

4.  Resolutions and Consents for Borrower;

5.  UCC-1 Financing Statement;

6.  Articles of Incorporation and Bylaws of Borrower;

7.  Certificate of Existence and Good Standing issued by applicable governmental authorities;

8.  UCC search;

9.  Post-Closing Letter; and

10. Landlord's Waivers.

Case 1:17-ap-01101-MB   Doc 55-1   Filed 04/26/19   Entered 04/26/19 16:03:45   Desc
Exhibits 1 -10    Page 45 of 112

Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 44
of 49

Case 1:17-bk-12408-MB   Doc 6   Filed 09/11/17   Entered 09/11/17 15:31:11   Desc
Main Document    Page 61 of 309

## SCHEDULE 5.6

### Offices

1.   1920 Hutton Court, Suite 300
     Farmers Branch, Texas 75234 (executive office)

2.   29010 Commerce Center Drive
     Valencia, California, 91355 (location of inventory, pursuant to agreement to provide
     warehousing, assembly, packaging and fulfillment services with AMS Fulfillment, Inc.)

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 46 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 45
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 62 of 309

## SCHEDULE 5.9

Litigation

NONE

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 47 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 46
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 63 of 309

## SCHEDULE 5.13

Subsidiaries and Affiliates

NONE

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 48 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 47
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 64 of 309

## SCHEDULE 5.18

<u>Intellectual Property</u>

[TO BE PROVIDED WITHIN 30 DAYS OF CLOSING BY BORROWER]

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
Exhibits 1 -10    Page 49 of 112
Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 48
of 49
Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
Main Document    Page 65 of 309

## SCHEDULE 7.3(b)

Subordinated Debt

NONE

Case 1:17-ap-01101-MB    Doc 55-1    Filed 04/26/19    Entered 04/26/19 16:03:45    Desc
                Exhibits 1 -10    Page 50 of 112
    Case 1:17-bk-12409-MB    Claim 7-1 Part 3    Filed 10/20/17    Desc Exhibit 1    Page 49
                            of 49
    Case 1:17-bk-12408-MB    Doc 6    Filed 09/11/17    Entered 09/11/17 15:31:11    Desc
                Main Document    Page 66 of 309

## SCHEDULE 7.5

<u>Liens</u>

NONE

# EXHIBIT 2

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

## FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report:

(Date of earliest event reported)

### June 29, 2017

---

**Ironclad Performance Wear Corporation**

(Exact name of registrant as specified in charter)

**Nevada**

(State or other Jurisdiction of Incorporation or Organization)

| | |
|---|---|
| **0-51365** | **98-0434104** |
| (Commission File Number) | (IRS Employer Identification No.) |

**1920 Hutton Court, Suite 300**
**Farmers Branch, TX 75234**
(Address of Principal Executive Offices and zip code)

**(972) 996-5664**
(Registrant's telephone
number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of registrant under any of the following provisions:

[ ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ]  Soliciting material pursuant to Rule 14a-12(b) under the Exchange Act (17 CFR 240.14a-12(b))

[ ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).

Emerging growth company [ ]

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ ]



EXHIBIT
14  Tutor
11/20/17

**Item 4.02**        Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

June 29, 2017, the Audit Committee of the Registrant's Board of Directors (the "Audit Committee") concluded that disclosure should be made and action taken to prevent further reliance on the Registrant's financial statements as of and for the fiscal years ended December 31, 2016 and 2015, and as of and for the fiscal quarters ended March 31, 2017 and March 31, June 30 and September 30, 2016.

During the second quarter of fiscal 2017, the Registrant received anonymous reports regarding potential accounting irregularities relating to certain sale transactions (the "Subject Transactions"). The Registrant has subsequently determined that the Subject Transactions affect the periods as of and for the fiscal years ended December 31, 2016 and 2015, and as of and for the fiscal quarters ended March 31 and June 30, 2016 (collectively, the "Subject Periods"), and that the corresponding roll-over effect of these misstatements resulting from the Subject Transactions in the Subject Periods also affect the Registrant's financial statements as of and for the fiscal quarters ended September 30, 2016 and March 31, 2017. The Audit Committee promptly directed its regular outside general counsel, Stubbs Alderton & Markiles, LLP, to conduct an investigation with the assistance of Resources Global Professionals, a global accounting services firm (the "Consultant"), into the alleged irregularities, along with a review of relevant accounting and sales records for the Subject Periods. Later, a committee of the Registrant's independent directors retained an outside law firm, Skadden, Arps, Slate, Meagher & Flom LLP, to help oversee the investigation and provide direction and guidance to the Consultant. The Audit Committee informed BDO USA, LLP ("BDO"), the Registrant's independent registered public accounting firm, of the anonymous reports and on-going investigation on June 12, 2017.

Over the course of approximately 6 weeks, the Consultant, working under the direction and guidance of outside counsel and on behalf of the Audit Committee, identified previously undisclosed information pertaining to certain recorded sales that preliminarily indicate that the Subject Transactions should not have been recorded in the Subject Periods. Based upon the review conducted by the Consultant and the Audit Committee, which are not yet complete or definitive, the Audit Committee believes the items in question improperly (increased) reduced, for the quarter ended March 31, 2017 and the years ended December 31, 2016 and '15, revenues by approximately $292,000 (or approximately 6.6%), ($844,000) (or approximately -3.4%) and ($1,390,000) approximately -5.9%), gross profit by approximately $86,000 (or approximately 5.5%), ($322,000) (or approximately -3.6%) and ($402,000) (or approximately -4.9%), and operating loss and net loss by approximately ($86,000), $6,000 and $402,000, respectively. However, the investigation is not final and the ultimate amounts may differ from the aforementioned amounts. Therefore, on June 29, 2017, the Audit Committee concluded that the Registrant's financial statements as of and for the fiscal years ended December 31, 2016 and 2015, and as of and for the fiscal quarters ended March 31, 2017 and March 31, June 30 and September 30, 2016 should no longer be relied upon due to the misstatements resulting from the Subject Transactions in the Subject Periods and the corresponding roll-over effect of these misstatements outside the Subject Periods. Although the Registrant cannot yet estimate when it will complete the restatement of its financial statements for such periods and file applicable amended reports, it is diligently pursuing completion of such restatements and intends to file applicable amended reports as soon as reasonably practicable.

BDO concurred with the Audit Committee's conclusions that the Registrant's financial statements as of and for the fiscal years ended December 31, 2016 and 2015, and the fiscal quarters as of and for the periods ended March 31, 2017 and March 31, June 30 and September 30, 2016 required restatement. The Audit Committee discussed with BDO the matters described in this current report on Form 8-K.

Item 5.02    Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

On July 4, 2017, Jeffrey Cordes, the Registrant's Chief Executive Officer, and William Aisenberg, the Registrant's Executive Vice President, Chief Financial Officer and Secretary, resigned from their respective positions as officers (and in the case of Mr. Cordes, as a director) of the Corporation.

Effective July 6, 2017, the Registrant appointed L. Geoffrey Greulich, age 56, as the Registrant's Chief Executive Officer. Mr. Greulich will receive $35,000 per month while he serves in such position.

Mr. Greulich serves as a Senior Advisor, Operations at Corridor Capital, LLC. He joined Corridor Capital in 2013 and leads the Operations team across due diligence and portfolio company engagement in efforts to transform lower middle market businesses into institutional enterprises. Mr. Greulich brings a wealth of portfolio operating experience with him from 5 years spent at Oaktree Capital Management, where he founded and headed the U.S. operations team for Oaktree's $6.7 billion Global Principal group. Mr. Greulich has experience working in both operational and commercial roles across a variety of industries including manufacturing, healthcare, financial services and media. He was previously the Chief Executive Officer of Levlad LLC, a sponsor-owned manufacturer of natural and traditional health and beauty products. Before that, he served as Senior Vice President and Chief Financial Officer at Silgan Containers where he was responsible for finance, information technology, strategy and corporate development. Over his more than 25-year career, he also has had experiences in marketing, business development and operations management positions at American Business Products, Tenneco Packaging and GE Capital. Mr. Greulich currently serves on the boards of Wetmore Tool & Engineering, Inc., US Industrial Tool & Supply, Inc., and Arvan, Inc. He received an M.B.A. in Strategy and Operations from the University of Chicago and B.S. and B.A. degrees in Engineering and Economics from Vanderbilt University.

Effective July 6, 2017, the Registrant also appointed James McAlister, age 60, as the Registrant's Chief Financial Officer and Secretary. Mr. McAlister is employed by the Consultant who will be paid $185 per hour for Mr. McAlister's time while he serves in such positions.

Mr. McAlister has 25 years of business experience as a strategic and financial leader in organizations ranging in size from early stage start-ups to Fortune 500 conglomerates. Mr. McAlister's broad experience includes domestic and international industries in distribution, retail, real estate, manufacturing, healthcare, high tech and service. Since 2001 Mr. McAlister has served as a Project/Interim CFO, Controller and Senior Analyst for a variety of business enterprises. As an SEC compliance consultant, Mr. McAlister has assisted registrants in establishing proper public company reporting practices. He has also introduced financial controls and procedures for organizations to comply with Sarbanes-Oxley requirements. Mr. McAlister holds a Bachelor of Business Administration in Accounting from the University of Iowa and is a licensed Certified Public Accountant in the state of Texas. Mr. McAlister is active in Dallas area non-profit professional and fine-arts boards, serving as Treasurer for the D/FW SEC Reporting Group and The Repertory Company Theatre. He is a member of the American Institute of Certified Public Accountants.

Item 8.01    Other Events.

Separately, during the second quarter of fiscal 2017 the Registrant received, and has been considering, indications of interest with respect to potential strategic transactions, and on June 2, 2017 the Registrant engaged Craig-Hallum Capital Group LLC ("Craig-Hallum") as its financial advisor to explore and evaluate potential strategic alternatives focused on maximizing stockholder value. These alternatives could include, among other transactions, the sale of part or all of the Registrant's assets, a merger with another party or an alternative strategic transaction.

July 5, 2017, in consideration of the aforementioned developments relating to accounting for the Subject Transactions and the restatement of the Registrant's financial statements for the Subject Periods the Registrant's Board of Directors (the "Board") approved the continuation and expansion of the strategic alternatives process by Craig-Hallum.

The Board has not set a timetable for this process nor has it made decisions related to any particular transaction at this time. The

Registrant does not intend to provide updates or make any further comment regarding the evaluation of strategic alternatives, unless a specific transaction is recommended by the Board, or the process is concluded.

## SIGNATURE

rsuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**IRONCLAD PEFORMANCE WEAR CORPORATION**

Date: July 6, 2017
By:  /s/ Michael DiGregorio
Michael DiGregorio
Authorized Signatory

# EXHIBIT 3

| | |
|---|---|
| **From:** | Mike Tutor |
| **To:** | "Ronald L Chez" |
| **Subject:** | FW: Ironclad |
| **Date:** | Tuesday, July 11, 2017 2:15:33 PM |

*Mike Tutor*

5305 Distriplex Farms
Memphis Tennessee 38141
Office direct - 901 266 2520

**From:** Mike Tutor
**Sent:** Monday, July 10, 2017 9:27 AM
**To:** 'Vane Clayton' <vaneclayton@gmail.com>
**Subject:** Ironclad

Mr. Clayton,

I wanted to take a moment and write to you one on one with the assurance this email will never be publicized by me.

Last Thursdays announcement caught us totally by surprise. As I had disclosed to you we had prepared a tender offer. It was our intent to release that offer last Friday. Several of your larger shareholders have endorsed our efforts and assured us of their support. I had numerous calls over the weekend encouraging me to move forward with a tender.

But I also respect and understand there are several reasons that led to your retaining the investment bankers. From the potential for shareholder actions to driving for maximum shareholder value I am reminded why we have remained a privately held business. I cannot imagine how challenging this has been for you and your board.

I am writing to ask if there is a value that would allow us to move forward in a negotiated deal that could have board support. Our goal is to get this resolved in a much more timely fashion. We would be willing to consider increasing our offer to make that happen if we could do this with a mutual agreement and not as a tender. And we would not have to wait on the restatements of the numbers to get this underway. Our

**005267**

financing is already in place and not contingent on Ironclads financials.

Today our major concerns are around customer retention, employee retention, and the upcoming cash challenges that could lead to inventory issues.  The last one is especially important in light of the decreasing bank line on October 1st and the current ability of the company to obtain bank financing.

We believe we could have a LOI in place in place prior to the upcoming shareholders meeting if we got underway this week.  To that end we are prepared to immediately meet regarding the above.

Thank you for your consideration.

Sincerely,

*Mike Tutor*

5305 Distriplex Farms
Memphis Tennessee 38141
Office direct - 901 266 2520

005268

# EXHIBIT 4

**From:**   Mike Tutor <mst@radians.com>
**Sent:**   Friday, July 7, 2017 4:31 PM
**To:**   rick.rodman@capitalone.com
**Cc:**   Jackson, Mary Ann <mjackson@bakerdonelson.com>
**Subject:**   Ironclad

*Rick,*

*My name is Mike Tutor and I am the CEO of Radians Inc.  Radians is a privately held $100M + manufacturer of safety products based in Memphis Tennessee.*

*As was disclosed recently, we have been trying to meet with the Ironclad Board to discuss a possible acquisition of the company.  As we have had no replies from Ironclad, we had prepared a tender offer at .275 cents per share that was going to be announced today.  We have held that back in light of yesterday resignations of the officers.*

*This morning we spoke with the investment bankers they have hired to explore strategic alternatives for the company.  That call provided little insight but did raise concerns about a potential reorganization of the company in light of the cash concerns and current issues.  The same concern has been voiced in our calls with major shareholders and customers.*

*Our understanding is you are or were the banker for Ironclad.  We wanted to reach out to see if the bank had any interest in selling the current loan.  We have available funds on hand and could close the transaction as quickly as the documentation and filings can be completed.*

*We would welcome the opportunity to discuss this further.  My contact information is listed below and I have copied our attorney, Mary Ann Jackson, who would represent us in any purchase.*

*Sincerely,*

*Mike Tutor*
*CEO*

RADIANS
5305 Distriplex Farms
Memphis Tennessee 38141
Office direct - 901 266 2520
Cell – 901 262 2552



# EXHIBIT 5

| From: | Diffenderffer, R.B. |
|---|---|
| To: | Mike Tutor |
| Cc: | Johnson, Robert (BANK) |
| Subject: | RE: Ironclad |
| Date: | Wednesday, July 12, 2017 1:43:50 PM |

We are working on the draft LSA now. We can crank the rest of the loan transfer docs out pretty quickly. It really gets to how much negotiation of the docs there will be. Assuming we get all the docs out this week, and we can agree on docs no later than early next week, we can close as early as mid-next week. There is one issue we need to discuss with respect to Treasury Management agreements that are in place and would be terminated with the loan sale. You and I should get on the phone with Robert Johnson and discuss. I am copying him on this reply. Please note that Robert is taking the proposed sale to credit committee so language below still applies.

***Please be advised, the Bank has not made a decision to sell the subject commercial loan. We are reaching out to prospective investors to obtain price discovery and market color only. These discussions are not to be considered offers to sell and are not binding on the Bank. Any decision to sell will have to be approved by the appropriate Bank credit committee and evidenced by a fully executed loan sale agreement.***

**From:** Mike Tutor [mailto:mst@radians.com]
**Sent:** Wednesday, July 12, 2017 2:25 PM
**To:** Diffenderffer, R.B. <RB.Diffenderffer@capitalone.com>
**Subject:** Re: Ironclad

Assuming the attorneys can get the paperwork completed what time frame would you see completing the purchase?

Mike Tutor

Sent from my iPhone

On Jul 12, 2017, at 10:01 AM, Diffenderffer, R.B. <RB.Diffenderffer@capitalone.com> wrote:

Will do. Drafting in process.

Sent with Good (www.good.com)

**From:** Jackson, Mary Ann <mjackson@bakerdonelson.com>
**Sent:** Wednesday, July 12, 2017 10:26:47 AM
**To:** Diffenderffer, R.B.; Mike Tutor
**Cc:** Rosenberg, Judy; Ruth Tutor; Angela Hall; Bill England; Childress, Frank



**Subject:** RE: Ironclad

RB,

Frank Childress (copied here) and I represent Safety Supply.  When you have a draft of
the purchase agreement, please include us on the email with the draft.

Many thanks
Mary Ann


Mary Ann Jackson
Chair of Corporate Finance/Securities Practice Group
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
165 Madison Avenue, Suite 2000
Memphis, TN  38103
Direct:  901-577-8113
Cell:  901-628-7347
Fax:  901-577-0740


**From:** Diffenderffer, R.B. [mailto:RB.Diffenderffer@capitalone.com]
**Sent:** Tuesday, July 11, 2017 11:53 AM
**To:** Mike Tutor
**Cc:** Rosenberg, Judy; Ruth Tutor; Angela Hall; Bill England; Jackson, Mary Ann;
Childress, Frank
**Subject:** RE: Ironclad

Mike – I have forwarded to the relationship manager. We will both call you
shortly. RB

**R.B. Diffenderffer, Jr.**
**Senior Vice President**
**Asset Disposition Group**
**1954 Greenspring Drive**
**Suite 560**
**Timonium, MD 21093**
410.560.4618 (office)
240.565.2648 (cell)
rb.diffenderffer@capitalone.com



**From:** Mike Tutor [mailto:mst@radians.com]

**Sent:** Tuesday, July 11, 2017 12:28 PM
**To:** Diffenderffer, R.B. <RB.Diffenderffer@capitalone.com>
**Cc:** Rosenberg, Judy <Judith.Rosenberg@capitalone.com>; Ruth Tutor
<rtutor@radians.com>; Angela Hall <ahall@radians.com>; Bill England
<bengland@radians.com>; Jackson, Mary Ann
<mjackson@bakerdonelson.com>; Childress, Frank
<fchildress@bakerdonelson.com>
**Subject:** RE: Ironclad

Our attorneys questions are attached.  Please feel free to call me to
discuss.

Sincerely,

*Mike Tutor*

5305 Distriplex Farms
Memphis Tennessee 38141
Office direct - 901 266 2520

**From:** Diffenderffer, R.B. [mailto:RB.Diffenderffer@capitalone.com]
**Sent:** Tuesday, July 11, 2017 8:07 AM
**To:** Mike Tutor <mst@radians.com>
**Cc:** Rosenberg, Judy <Judith.Rosenberg@capitalone.com>
**Subject:** RE: Ironclad

Mike – when do you anticipate confirming your interest and potentially
submitting an offer? RB

*Please be advised, the Bank has not made a decision to sell the subject
commercial loan. We are reaching out to prospective investors to obtain
price discovery and market color only. These discussions are not to be
considered offers to sell and are not binding on the Bank. Any decision to sell
will have to be approved by the appropriate Bank credit committee and
evidenced by a fully executed loan sale agreement.*

**From:** Mike Tutor [mailto:mst@radians.com]
**Sent:** Tuesday, July 11, 2017 9:03 AM
**To:** Diffenderffer, R.B. <RB.Diffenderffer@capitalone.com>
**Subject:** RE: Ironclad

Thanks – just needed to confirm.

*Mike Tutor*

5305 Distriplex Farms
Memphis Tennessee 38141
Office direct - 901 266 2520

**From:** Diffenderffer, R.B. [mailto:RB.Diffenderffer@capitalone.com]
**Sent:** Tuesday, July 11, 2017 8:00 AM
**To:** Mike Tutor <mst@radians.com>
**Cc:** Rosenberg, Judy <Judith.Rosenberg@capitalone.com>
**Subject:** RE: Ironclad

Yes we have a lockbox.  All A/R runs through a lockbox, but we do not sweep
and have not opted to implement springing dominion of the funds.  But the A/R
is remitted to a Capital One lockbox account

**From:** Mike Tutor [mailto:mst@radians.com]
**Sent:** Tuesday, July 11, 2017 8:44 AM
**To:** Diffenderffer, R.B. <RB.Diffenderffer@capitalone.com>
**Cc:** Rosenberg, Judy <Judith.Rosenberg@capitalone.com>
**Subject:** RE: Ironclad

Can you confirm whether the loan is currently being serviced through a
lockbox or just an ordinary sweep?

*Mike Tutor*

5305 Distriplex Farms
Memphis Tennessee 38141
Office direct - 901 266 2520

**From:** Diffenderffer, R.B. [mailto:RB.Diffenderffer@capitalone.com]
**Sent:** Monday, July 10, 2017 11:28 AM
**To:** Mike Tutor <mst@radians.com>
**Cc:** Rosenberg, Judy <Judith.Rosenberg@capitalone.com>
**Subject:** RE: Ironclad

Thanks -- Judy will arrange your access to the data room. Any questions please
let me know.

*Please be advised, the Bank has not made a decision to sell the subject
commercial loan. We are reaching out to you as a prospective investor to
obtain price discovery and market color only. These discussions are not to be*

*considered offers to sell and are not binding on the Bank. Any decision to sell
will have to be approved by the appropriate Bank credit committee and
evidenced by a fully executed loan sale agreement.*

**From:** Mike Tutor [mailto:mst@radians.com]
**Sent:** Monday, July 10, 2017 12:12 PM
**To:** Diffenderffer, R.B. <RB.Diffenderffer@capitalone.com>
**Subject:** RE: Ironclad

We have received it and it has been returned to your office.  See signed
document attached.

## Mike Tutor

5305 Distriplex Farms
Memphis Tennessee 38141
Office direct - 901 266 2520

**From:** Diffenderffer, R.B. [mailto:RB.Diffenderffer@capitalone.com]
**Sent:** Monday, July 10, 2017 11:10 AM
**To:** Mike Tutor <mst@radians.com>
**Subject:** RE: Ironclad

Mike – Judy Rosenberg in my office should have reached out to you for
information in order to prepare an NDA to send to you.  As soon as she
receives the information she can get the NDA out. RB

**From:** Mike Tutor [mailto:mst@radians.com]
**Sent:** Sunday, July 09, 2017 12:00 PM
**To:** Diffenderffer, R.B. <RB.Diffenderffer@capitalone.com>
**Subject:** Re: Ironclad

Thanks. I look forward to your call

Mike

Sent from my iPhone

On Jul 9, 2017, at 10:59 AM, Diffenderffer, R.B.
<RB.Diffenderffer@capitalone.com> wrote:

    1 pm edt is good

Sent with Good (www.good.com)

**From:** Mike Tutor <mst@radians.com>
**Sent:** Saturday, July 8, 2017 9:19:55 PM
**To:** Diffenderfffer, R.B.
**Subject:** Re: Ironclad

Could we do 11 or 1 edt?  I am on central time and have a
previous engagement at 10:30 central.

Mike

Sent from my iPhone

On Jul 8, 2017, at 6:56 PM, Diffenderfffer, R.B.
<RB.Diffenderfffer@capitalone.com> wrote:

> How about I call you on your cell tomorrow at
> noon EDT.
>
>
>
> Sent with Good (www.good.com)
>
> **From:** Mike Tutor <mst@radians.com>
> **Sent:** Saturday, July 8, 2017 7:53:56 PM
> **To:** Diffenderffer, R.B.
> **Subject:** Re: Ironclad
>
> Let me know what time is best for you.  I am
> available anytime tonight, tomorrow or Monday
> till 11 but have to go to Atlanta Monday
> afternoon.
>
> My cell is 9012622552.
>
> Mike Tutor
>
> Sent from my iPhone
>
> On Jul 8, 2017, at 6:48 PM, Diffenderffer, R.B.
> <RB.Diffenderffer@capitalone.com> wrote:
>
>> Hello - I was given your name by
>> Rick Rodman. I manage the loan
>> sale platform for Capital One Bank.
>> Please give me a call and we can
>> discuss.

RB Diffenderffer
Senior Vice President
Capital One Bank
410-560-4618 office
240-575-2648 cell

Sent with Good (www.good.com)

The information contained in this e-mail is
confidential and/or proprietary to Capital One
and/or its affiliates and may only be used solely
in performance of work or services for Capital
One. The information transmitted herewith is
intended only for use by the individual or entity
to which it is addressed. If the reader of this
message is not the intended recipient, you are
hereby notified that any review, retransmission,
dissemination, distribution, copying or other use
of, or taking of any action in reliance upon this
information is strictly prohibited. If you have
received this communication in error, please
contact the sender and delete the material from
your computer.

The information contained in this e-mail is confidential and/or
proprietary to Capital One and/or its affiliates and may only be
used solely in performance of work or services for Capital One.
The information transmitted herewith is intended only for use by
the individual or entity to which it is addressed. If the reader of
this message is not the intended recipient, you are hereby
notified that any review, retransmission, dissemination,
distribution, copying or other use of, or taking of any action in
reliance upon this information is strictly prohibited. If you have
received this communication in error, please contact the sender
and delete the material from your computer.

The information contained in this e-mail is confidential and/or proprietary to
Capital One and/or its affiliates and may only be used solely in performance of
work or services for Capital One. The information transmitted herewith is
intended only for use by the individual or entity to which it is addressed. If the
reader of this message is not the intended recipient, you are hereby notified that
any review, retransmission, dissemination, distribution, copying or other use of,
or taking of any action in reliance upon this information is strictly prohibited. If
you have received this communication in error, please contact the sender and
delete the material from your computer.

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or
its affiliates and may only be used solely in performance of work or services for Capital One. The

information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the

reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

# EXHIBIT 6

| | |
|---|---|
| **From:** | Johnson, Robert (BANK) |
| **To:** | Ruth Tutor |
| **Cc:** | Diffenderffer, R.B.; Spielman, Stewart |
| **Subject:** | FW: Ironclad Line of Credit Advance |
| **Date:** | Tuesday, July 25, 2017 3:58:59 PM |

Please see below

**From:** Jim McAlister [mailto:jimm@ironclad.com]
**Sent:** Tuesday, July 25, 2017 2:49 PM
**To:** Johnson, Robert (BANK) <robert.johnson@capitalone.com>
**Cc:** Rodman, Rick (BANK) <Rick.Rodman@capitalone.com>; Haas, Analicia (BANK)
<analicia.haas@capitalone.com>; Rosenberg, Judy <Judith.Rosenberg@capitalone.com>;
Diffenderffer, R.B. <RB.Diffenderffer@capitalone.com>
**Subject:** Ironclad Line of Credit Advance

We need to draw $200,000 on Ironclad Performance Wear Corporation's line of credit today.
Thanks,
James McAlister
Ironclad CFO
972 824-9005

**From:** Johnson, Robert (BANK) [mailto:robert.johnson@capitalone.com]
**Sent:** Thursday, July 20, 2017 2:13 PM
**To:** Jim McAlister
**Cc:** Rodman, Rick (BANK); Haas, Analicia (BANK); Rosenberg, Judy; Diffenderffer, R.B.
**Subject:** RE: Loan Sweep Termination
**Importance:** High

Analicia,

Are you processing this? Please ask Loan ops to process it today asap. And confirm when done
please!

Please use this email and Special Assets Approval for the $250,000.00 Ironclad RLOC advance
below.   I approve.

Thank you!

**From:** Jim McAlister [mailto:jimm@ironclad.com]
**Sent:** Thursday, July 20, 2017 1:45 PM
**To:** Johnson, Robert (BANK) <robert.johnson@capitalone.com>
**Cc:** Rodman, Rick (BANK) <Rick.Rodman@capitalone.com>; Haas, Analicia (BANK)
<analicia.haas@capitalone.com>
**Subject:** RE: Loan Sweep Termination

Please fund $250,000 for bi-weekly payroll and outstanding AP checks.



Thanks, Jim

**From:** Johnson, Robert (BANK) [mailto:robert.johnson@capitalone.com]
**Sent:** Thursday, July 20, 2017 1:21 PM
**To:** Jim McAlister
**Cc:** Rodman, Rick (BANK); Haas, Analicia (BANK)
**Subject:** RE: Loan Sweep Termination

Just send us an email with the amount you would like us to advance. Maybe some extra too for other clearings. Thank you

Sent with Good (www.good.com)

**From:** Jim McAlister <jimm@ironclad.com>
**Sent:** Thursday, July 20, 2017 1:16:34 PM
**To:** Johnson, Robert (BANK)
**Cc:** Rodman, Rick (BANK); Haas, Analicia (BANK)
**Subject:** RE: Loan Sweep Termination

Do we have a form to submit and how do I find out the amount to fund?

**From:** Johnson, Robert (BANK) [mailto:robert.johnson@capitalone.com]
**Sent:** Thursday, July 20, 2017 12:59 PM
**To:** Jim McAlister
**Cc:** Rodman, Rick (BANK); Haas, Analicia (BANK)
**Subject:** RE: Loan Sweep Termination

Jim,

I just received confirmation that the loan sweep is now off. Can you please submit an advance request ASAP to us today via email, and we will get the account funded. Please advance to cover all potential clearings.

Thank you and take care,

Robert Johnson

Sent with Good (www.good.com)

**From:** Jim McAlister <jimm@ironclad.com>
**Sent:** Wednesday, July 19, 2017 10:39:48 AM
**To:** Johnson, Robert (BANK)
**Cc:** Rodman, Rick (BANK); Haas, Analicia (BANK)
**Subject:** RE: Loan Sweep Termination

Robert,
Confirmed. Please allow time for me to have and understand the form for making the transfers prior

to the switch.

Regards,

Jim

**From:** Johnson, Robert (BANK) [mailto:robert.johnson@capitalone.com]
**Sent:** Wednesday, July 19, 2017 10:16 AM
**To:** Jim McAlister
**Cc:** Rodman, Rick (BANK); Haas, Analicia (BANK)
**Subject:** Loan Sweep Termination

Jim,

Thank you for calling me. Per our conversation, I would like to confirm that in the next few days we will terminate the loan sweep product.   For advances, you will send an email request to Rick, Analicia, (cc'd above) and myself.  Please send advance requests prior to 3pm Central time each day.

Thank you,

Robert


**Robert Johnson**
**Vice President**
**Special Assets**
**201 St Charles Avenue,  26th Floor**
**New Orleans, LA  70170**
**504.533.7523 (office)**
**504.232.2163 (cell)**
**robert.johnson@capitalone.com**



---

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

---

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

---

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for

use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

The information contained in this e-mail is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

# EXHIBIT 7

**Childress, Frank**

---

| | |
|---|---|
| **From:** | Childress, Frank |
| **Sent:** | Wednesday, July 26, 2017 11:16 AM |
| **To:** | geoffg@ironclad.com; jimm@ironclad.com |
| **Subject:** | Notice of Default |
| **Attachments:** | Ironclad Performance Wear Corporation.pdf |

Gentlemen,
Please see attached letter. Do not hesitate to contact me if you have questions.
Thank you for your attention to this matter.
Frank

**E. Franklin Childress, Jr.**
Shareholder
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
165 Madison Avenue
Suite 2000
Memphis, Tennessee  38103
Direct:  901.577.2147
Fax:  901.577.0845
Mobile:  901.340.5505
E-mail:  fchildress@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC represents clients across the U.S. and abroad from offices
in Alabama, Florida, Georgia, Louisiana, Maryland, Mississippi, South Carolina, Tennessee, Texas, Virginia, and Washington, D.C.

**Baker Donelson - One of FORTUNE Magazine's "100 Best Companies to Work For®" for Seven Years in a
Row!**



EXHIBIT
Tutor
27
11/20/17

1

003380

# BAKER DONELSON
## BEARMAN, CALDWELL & BERKOWITZ, PC

2000 FIRST TENNESSEE
BUILDING
165 MADISON AVENUE
MEMPHIS, TENNESSEE 38103

PHONE:   901.526.2000
FAX:        901.577.2303

www.bakerdonelson.com

E. FRANKLIN CHILDRESS, JR
Direct Dial: 901.577.2147
Direct Fax: 901.577.0845
E-Mail Address: fchildress@bakerdonelson.com

July 26, 2017

**VIA: E-Mail**

Ironclad Performance Wear Corporation
1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn: L. Geoffrey Greulich, CEO
    geoffg@ironclad.com

Ironclad Performance Wear Corporation
1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn: James McAlister, CFO
    jimm@ironclad.com

### *NOTICE OF DEFAULT, ACCELERATION OF INDEBTEDNESS & DEMAND FOR PAYMENT OF OUTSTANDING INDEBTEDNESS OWED*

Re:    Revolving Loan and Security Agreement dated November 28, 2014, executed by
Ironclad Performance Wear Corporation, a California corporation, and Ironclad
Performance Wear Corporation, a Nevada corporation (the "Borrowers") in favor
of Capital One, National Association, as modified by that certain First
Modification Agreement dated June 15, 2015, that certain Second Modification
Agreement dated March 16, 2016, that certain Third Modification Agreement
dated November 28, 2016, that certain Waiver and Fourth Modification
Agreement dated February 23, 2017, that certain Limited Waiver and Fifth
Modification Agreement dated April 11, 2017, and that certain Sixth Modification
Agreement dated May 10, 2017 (the "Loan Agreement"); the Second Amended
and Restated Revolving Line of Credit Note dated April 11, 2017, in the principal
amount of $8,000,000.00 (the "Note") evidencing the loan to Borrowers (the
"Loan"); the Warehouse Waiver and Consent dated March 31, 2015, executed by

4848-6896-3404 v1
2921440-000019 07/26/2017

ALABAMA      FLORIDA      GEORGIA      LOUISIANA      MISSISSIPPI      TENNESSEE      TEXAS      WASHINGTON, D.C.

003381

July 26, 2017
Page 2

Advantage Media Services, Inc. in favor of Capital One, National Association (the "Warehouse Waiver"); and the Landlord Waiver and Consent dated April 2, 2015, executed by Erwin & Essie Appel Trust in favor of Capital One, National Association (the "Landlord Waiver", together with the Loan Agreement, the Note and the Warehouse Waiver and all other documents executed in connection therewith, are collectively referred to herein as the "Loan Documents").

Dear Borrowers:

This firm has the pleasure of representing Radians Wareham Holding, Inc. ("Radians"). We have been retained by Radians to proceed with collection efforts against you as to the above referenced Loan.  Pursuant to agreement with Capital One, National Association, Radians is the owner and holder of the following Loan Documents relating to the Loan:

1.  That certain Revolving Loan and Security Agreement dated November 28, 2014, executed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, as borrowers, in favor of Capital One, National Association, as lender, as modified by the First Modification Agreement dated June 15, 2015, the Second Modification Agreement dated March 16, 2016, the Third Modification Agreement dated November 28, 2016, the Waiver and Fourth Modification Agreement dated February 23, 2017, the Limited Waiver and Fifth Modification Agreement dated April 11, 2017, and the Sixth Modification Agreement dated May 10, 2017.

2.  That certain Second Amended and Restated Revolving Line of Credit Note dated April 11, 2017, in the principal amount of $8,000,000.00.

3.  That certain UCC-1 Financing Statement filed by Capital One, National Association with the California Secretary of State on December 18, 2014, under Document No. 14-7441632305 affecting the Collateral more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No. 62925880003.

4.  That certain UCC-1 Financing Statement filed by Capital One, National Association with the Nevada Secretary of State on December 12, 2014, under Document No. 2014031733-1 affecting the Collateral more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No.2017020461-7.

5.  That certain Warehouse Waiver and Consent dated March 31, 2015, executed by Advantage Media Services, Inc. in favor of Capital One, National Association.

6.  That certain Landlord Waiver and Consent dated April 2, 2015, executed by Erwin & Essie Appel Trust in favor of Capital One, National Association.

7.  That certain Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement dated March 7, 2015 with accompanying exhibits referenced therein.

July 26, 2017
Page 3

8. That certain General Assignment and Assumption of Loan Documents.

9. That certain Assignment and Assumption of Assignment Agreement for Proceeds of Credit
   Approved Receivables Purchase Agreement.

Terms used herein but which are not otherwise defined herein, shall have the meanings
ascribed thereto as set forth in the Loan Documents.

Events of Default have occurred and are continuing under the Loan Documents as more
particularly described herein.   On July 6, 2017, the Borrower, Ironclad Performance Wear
Corporation, a Nevada corporation, filed a Form 8-K with the Securities and Exchange
Commission for the period ending June 29, 2017 (the "Form 8-K").  The Form 8-K discloses that
the Audit Committee of the Borrower's Board of Directors (the "Audit Committee") has called
into doubt the reliance on the Borrower's financial statements as of and for the fiscal years ended
December 31, 2016, and 2015, and as of and for the fiscal quarters ended March 31, 2017 and
March 31, June 30 and September 30, 2016.

The Form 8-K provided the following information:

A review of the Borrower's financial statements began when, during the second quarter
of fiscal 2017, the Borrower received anonymous reports regarding potential accounting
irregularities relating to certain sale transactions (the "Subject Transactions"). The Borrower has
subsequently determined that the Subject Transactions affect the periods as of and for the fiscal
years ended December 31, 2016, and 2015, and as of and for the fiscal quarters ended March 31,
and June 30, 2016 (collectively, the "Subject Periods"), and that the corresponding roll-over
effect of these misstatements resulting from the Subject Transactions in the Subject Periods also
affect the Borrower's financial statements as of and for the fiscal quarters ended September 30,
2016 and March 31, 2017. The Audit Committee promptly directed its regular outside general
counsel, Stubbs Alderton & Markiles, LLP, to conduct an investigation with the assistance of
Resources Global Professionals, a global accounting services firm (the "Consultant"), into the
alleged irregularities, along with a review of relevant accounting and sales records for the
Subject Periods. Later, a committee of the Borrower's independent directors retained an outside
law firm, Skadden, Arps, Slate, Meagher & Flom LLP, to help oversee the investigation and
provide direction and guidance to the Consultant. The Audit Committee informed BDO USA,
LLP ("BDO"), the Borrower's independent registered public accounting firm, of the anonymous
reports and on-going investigation on June 12, 2017.

Over the course of approximately 6 weeks, the Consultant, working under the direction
and guidance of outside counsel and on behalf of the Audit Committee, identified previously
undisclosed information pertaining to certain recorded sales that preliminarily indicate that the
Subject Transactions should not have been recorded in the Subject Periods. Based upon the
review conducted by the Consultant and the Audit Committee, which are not yet complete or
definitive, the Audit Committee believes the items in question improperly (increased) reduced,
for the quarter ended March 31, 2017, and the years ended December 31, 2016, and 2015,
revenues by approximately $292,000 (or approximately 6.6%), ($844,000) (or approximately -

July 26, 2017
Page 4

3.4%) and ($1,390,000) (or approximately -5.9%), gross profit by approximately $86,000 (or approximately 5.5%), ($322,000) (or approximately -3.6%) and ($402,000) (or approximately -4.9%), and operating loss and net loss by approximately ($86,000), $6,000 and $402,000, respectively. However, the investigation is not final and the ultimate amounts may differ from the aforementioned amounts. Therefore, on June 29, 2017, the Audit Committee concluded that the Borrower's financial statements as of and for the fiscal years ended December 31, 2016, and 2015, and as of and for the fiscal quarters ended March 31, 2017, and March 31, June 30 and September 30, 2016, should no longer be relied upon due to the misstatements resulting from the Subject Transactions in the Subject Periods and the corresponding roll-over effect of these misstatements outside the Subject Periods. Although the Borrower cannot yet estimate when it will complete the restatement of its financial statements for such periods and file applicable amended reports, it is diligently pursuing completion of such restatements and intends to file applicable amended reports as soon as reasonably practicable. BDO concurred with the Audit Committee's conclusions that the Borrower's financial statements as of and for the fiscal years ended December 31, 2016, and 2015, and the fiscal quarters as of and for the periods ended March 31, 2017, and March 31, June 30 and September 30, 2016, required restatement.

Section 6 of the Loan Agreement requires, and Borrowers agree, that until payment in full of the Indebtedness, Borrowers will provide the lender with financial statements for stated time periods that will be "materially complete and correct". The Form 8-K filed indicates that the Borrowers have failed to comply with the requirements of the Loan Agreement in this regard.

In accordance with Sections 10(b) and (c) of the Loan Agreement, an Event of Default has occurred for failure to provide materially complete and correct financial statements provided in accordance with the Loan Agreement for fiscal years ended December 31, 2016, and 2015, and the fiscal quarters as of and for the periods ended March 31, 2017, and March 31, June 30 and September 30, 2016.

As provided under Section 11 of the Loan Agreement, as an Event of Default currently exists, Radians hereby accelerates and declares due and immediately payable the entire outstanding principal balance of the Note, together with all accrued and unpaid interest, and all other amounts due and owing under the Note, and any other Loan Documents.

Demand is hereby made for the immediate payment of the sum of **$3,688,195.22** (the "Current Demand Amount") due under the Loan Documents calculated as follows:

| | |
|---|---|
| Outstanding Principal Balance on Loan: | $3,678,332.60 |
| Accrued Unpaid Interest as of July 25, 2017: | $9,862.62 |
| Current Demand Amount: | **$3,688,195.22** |

Interest shall continue to accrue on the outstanding principal balance of the Loan from and after the date hereof as provided under the terms of the Note until payment in full is received by Radians in good and immediately available funds.

4848-6896-3404 v1
2921440-000019 07/26/2017

July 26, 2017
Page 5

Likewise, under the terms of the Loan Documents, attorneys' fees and expenses shall continue to accrue and be due and payable by Borrowers in order to satisfy the obligations under the Note.

**In accordance with Section 2.2 of the Loan Agreement, as an Event of Default has occurred and is continuing, Radians is not required to make further advances under the Loan.**

All of Radians' claims, demands and accruals regarding the above-described Loan, whenever made, whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with applicable usury laws, and are accordingly limited so that applicable usury laws are not violated.

If the outstanding indebtedness owed to Radians is not paid immediately, Borrowers are hereby advised that Radians intends to exercise its remedies available under the Loan Documents or otherwise at law, or in equity, and furthermore, additional attorneys' fees and other costs of collection incurred by the Lender shall accrue for which Borrowers are liable under the Loan Documents.

Radians reserves the right to exercise, in such order as Radians elects, any one or more of the remedies available to Radians under the Loan Documents or otherwise at law or in equity, including without limitation, the remedies of a secured party under the UCC, including, without limitation the right to take possession of the Collateral securing the Loan and sell the Collateral in accordance with the provisions of the Loan Agreement and the UCC, and nothing contained in this letter shall constitute a waiver of any rights of Radians to pursue such rights and remedies. Please be further advised that no past or future delay or omission in the exercise of any right or remedy accruing to Radians as a result of any Event of Default is intended to constitute a waiver of any right or remedy accruing to Radians as a result of that Event of Default or any other Event of Default.

**Borrowers are further advised that pursuant to the terms of the Loan Agreement, Borrowers are required to notify Radians of any collections received directly by Borrowers from the sale or disposition of any Collateral, and Borrowers are required to hold the proceeds received from such collections in trust for Radians without commingling the same with other funds of Borrowers and agree to turn the same over to Radians immediately upon receipt in identical form received.**

Payment to Radians in an amount less than the Current Demand Amount, together with all interest accrued thereon after the date of this letter, should not be construed as an accord and satisfaction or as Radians' agreement to accept a lesser amount as payment in full of the Loan. Radians' acceptance of any endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction, and is not and shall not be deemed to be binding upon Radians. Radians may accept any such payment or check without prejudice to its rights to receive the balance of all amounts due under the Loan Documents or to pursue its remedies.

4848-6896-3404 v1
2921440-000019 07/26/2017

July 26, 2017
Page 6

Please note that we have no obligation or duty to inform Borrowers of Radians' intention to exercise its rights and remedies. We are, however, doing so in this letter as an accommodation to Borrowers. Borrowers shall not be entitled to expect notice in the future of Radians' elections or specifications of Borrowers' obligations under any of the Loan Documents by reason of Radians' election to provide the notices and specifications set forth in this letter.

Neither this letter nor any statement by or on behalf of Radians as to the amount due and owing under any of the Loan Documents: (i) shall constitute a waiver of any rights of Radians to collect any additional amounts to which Radians may be lawfully entitled pursuant to the terms of the Loan Documents, or otherwise at law or in equity or (ii) shall constitute an offer to settle or waive any rights of Radians under any of the Loan Documents.

You are hereby notified that Radians shall strictly enforce the Loan Documents in accordance with their respective terms. Please govern yourself accordingly. Your immediate attention is requested.

**THIS FIRM AND RADIANS ARE ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE NOTE AND/OR SECURED BY THE LIENS, SECURITY INTERESTS, TERMS AND PROVISIONS CONTAINED WITHIN THE LOAN DOCUMENTS AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

To the extent your obligations have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)(11), if applicable.

Sincerely,

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC

E. Franklin Childress, Jr.

EFC:lmr

4848-6896-3404 v1
2921440-000019 07/26/2017

# EXHIBIT 8

| | |
|---|---|
| **From:** | Ruth Tutor |
| **To:** | Geoff Greulich; Jim McAllister |
| **Cc:** | Mike Tutor; Angela Hall; Frank Childress |
| **Subject:** | Ironclad Note |
| **Date:** | Wednesday, July 26, 2017 4:45:43 PM |
| **Attachments:** | IC Treasury Forms.xlsx |

Geoff and Jim,

Thanks for the call regarding the Ironclad note.

In order to be in a position to fund any requests, we will need to get your bank details on the attached form. There is also a tab on the attached for funding requests which should be emailed to me or to Angela Hall, who is copied on this email. Per your instructions, we will only communicate with the two of you at Ironclad.

We are also preparing a Deposit Account Control Agreement (DACA) which we will require to be signed should we decide to fund any amounts under the defaulted loan. In order to complete this, I need the address of the current lockbox and any pertinent information related to it.

Please let me know if you need anything additional from me to have Radians Wareham Holding, Inc., named as loss payee on the liability and property policies. I would like to have the certificates in hand in the morning if possible.

I appreciate the cooperation.

Best regards,

Ruth

Ruth Tutor
Radians, Inc. | 5305 Distriplex Farms Dr | Memphis TN 38141
Direct 901.266.2522 | Mobile 901.828.3757 | Toll Free 877.723.4267
rtutor@radians.com | www.radians.com

E-MAIL CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it.



EXHIBIT
Tutor
28
11/20/17

# EXHIBIT 9

| | |
|---|---|
| **From:** | Ruth Tutor |
| **To:** | Geoff Greulich; Jim McAlister |
| **Cc:** | Angela Hall |
| **Subject:** | RE: Emailing - IC Funding Request (072717).pdf |
| **Date:** | Thursday, July 27, 2017 2:43:26 PM |

Geoff,

In response to your question, Radians will not be able to advance any funds today under the Loan and Security Agreement due to the existence of an Event of Default as more particularly set forth in the letter from our counsel of yesterday.  In order to consider any additional advance, we would need to discuss the specific funds needed on an immediate basis and the terms of a Modification Agreement which would allow such an advance.  Please let me know if you would like to set a time to discuss.

Ruth

Ruth Tutor
Radians, Inc.


**From:** Geoff Greulich [mailto:geoffg@ironclad.com]
**Sent:** Thursday, July 27, 2017 1:12 PM
**To:** Ruth Tutor <rtutor@radians.com>; Jim McAlister <jimm@ironclad.com>
**Cc:** Angela Hall <ahall@radians.com>
**Subject:** RE: Emailing - IC Funding Request (072717).pdf

Hi Ruth-

We had made some commitments to our suppliers this week which need to go today.  I understand from Jim we the Insurance paperwork is on its way shortly.  Will we receive the funds today?

Please let us know.

Thanks,

Geoff

**From:** Ruth Tutor [mailto:rtutor@radians.com]
**Sent:** Thursday, July 27, 2017 11:16 AM
**To:** Jim McAlister <jimm@ironclad.com>
**Cc:** Geoff Greulich <geoffg@ironclad.com>; Angela Hall <ahall@radians.com>
**Subject:** RE: Emailing - IC Funding Request (072717).pdf

Jim,

I am in the process of getting the DACA form for your signature. Do you have the insurance certificates with Radians Wareham Holding named as loss payee?

Ruth

Ruth Tutor
Radians, Inc.

**From:** Jim McAlister [mailto:jimm@ironclad.com]
**Sent:** Thursday, July 27, 2017 9:41 AM
**To:** Ruth Tutor <rtutor@radians.com>; Angela Hall <ahall@radians.com>
**Cc:** Geoff Greulich <geoffg@ironclad.com>
**Subject:** Emailing - IC Funding Request (072717).pdf

Ruth,
We enjoyed talking to you yesterday about the funding request mechanics for future draws. Please find attached our bank payment information and our first request for $400,000 on the line of credit. I would appreciate a confirmation number once it has been wired. Let me know if you have any questions.
Regards,
Jim
972 824-9005 cell
972 996-5664 ext. 130 office

007698

# EXHIBIT 10

**Childress, Frank**

| | |
|---|---|
| From: | Ruth Tutor <rtutor@radians.com> |
| Sent: | Friday, July 28, 2017 11:38 AM |
| To: | Geoff Greulich (geoffg@ironclad.com); Jim McAlister (jimm@ironclad.com) |
| Cc: | Mike Tutor; Childress, Frank |
| Subject: | Forbearance Agreement and Deposit Account Control Agreement |
| Attachments: | Ironclad Forbearance Agreement.pdf; Deposit Account ControlAgreement.pdf |

Geoff, Jim,

Attached are the draft agreements to be executed. The Deposit Account Control Agreement is the standard form we received from Capital One. Most of the variables have been added, but we will need the lock box address filled in.

Once the documents are executed, we will countersign and fund the $250,000.00 per the Agreement. We are prepared to complete all today.

Please feel free to call me if you have any questions.

Regards,

Ruth

Ruth Tutor
Radians, Inc. | 5305 Distriplex Farms Dr | Memphis TN 38141
Direct 901.266.2522 | Mobile 901.828.3757 | Toll Free 877.723.4267
rtutor@radians.com | www.radians.com

E-MAIL CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it.

003172

## FORBEARANCE AGREEMENT

THIS **FORBEARANCE AGREEMENT** ("Agreement") is made and entered into as of the 28h day of July, 2017 (the "Effective Date"), by and among **RADIANS WAREHAM HOLDING, INC.**, a Nevada corporation (the "Lender" or "Radians"), and **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California") and **IRONCLAD PERFORMANCE WEAR CORPORATION,** a Nevada corporation ("Ironclad Nevada" individually, collectively, and interchangeably with Ironclad California, the "Borrowers") The Borrowers, together with Radians are collectively referred to as the "Parties".

## RECITALS

A. On or about November 28, 2014, Capital One, National Association, a National Banking Association, provided Borrowers with a with a revolving credit facility (the "Revolving Loan"). Pursuant to agreement with Capital One, National Association, Radians is the owner and holder of the Loan Documents[1] relating to the Revolving Loan.

B. The Revolving Loan is evidenced by the following described documentataion:

    i. That certain Revolving Loan and Security Agreement dated November 28, 2014, executed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, as borrowers, in favor of Capital One, National Association, as lender, as modified by the First Modification Agreement dated June 15, 2015, the Second Modification Agreement dated March 16, 2016, the Third Modification Agreement dated November 28, 2016, the Waiver and Fourth Modification Agreement dated February 23, 2017, the Limited Waiver and Fifth Modification Agreement dated April 11, 2017, and the Sixth Modification Agreement dated May 10, 2017 ("the Loan Agreement").

    ii. That certain Second Amended and Restated Revolving Line of Credit Note dated April 11, 2017, in the principal amount of $8,000,000.00 (the "Note").

    iii. That certain UCC-1 Financing Statement filed by Capital One, National Association with the California Secretary of State on December 18, 2014, under Document No. 14-7441632305 affecting the Collateral[2] more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No. 62925880003.

    iv. That certain UCC-1 Financing Statement filed by Capital One, National Association with the Nevada Secretary of State on December 12, 2014, under Document No. 2014031733-1 affecting the Collateral more particularly described on Exhibit A

---

[1] As defined below.

[2] As defined in the Loan Agreement.

*Page 1 of 9*

**003173**

attached thereto as assigned to Radians by UCC-3 filed under Document No.2017020461-7.

v.   That certain Warehouse Waiver and Consent dated March 31, 2015, executed by Advantage Media Services, Inc. in favor of Capital One, National Association.

vi.   That certain Landlord Waiver and Consent dated April 2, 2015, executed by Erwin & Essie Appel Trust in favor of Capital One, National Association.

vii.   That certain Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement dated March 7, 2015 with accompanying exhibits referenced therein.

viii.   That certain General Assignment and Assumption of Loan Documents.

ix.   That certain Assignment and Assumption of Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement.

C.   The Note, Loan Agreement, together with all documents evidencing, or referring, or relating to the Revolving Loan are hereinafter collectively referred to as the "Loan Documents".

D.   The balance owing on the Note as of July 26, 2017, is an amount of $3,688,195.22 (the "Obligations"). Interest continues to accrue on the Obligations from and after July 26, 2017, as provided in the Note.

E.   By letter of July 26, 2017, Borrowers were notified by Radians of the occurrence of Events of Default under the terms of the Loan Documents and as a result thereof acceleration and demand for immediate payment of the Obligations.

F.   As a result of the occurrence of Events of Default, Lender has certain rights and remedies under the Loan Documents. Borrowers have requested that Lender forbear in the exercise of its remedies under the Loan Documents for a period of time specified herein to satisfy the Obligations in full and for Lender to advance additional funds under the Note.

G.   Lender is willing to forbear from the exercise of its rights and remedies under the Loan Documents as a result of the occurrence of Events of Default and to advance additional funds under the Note, but only on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing recitals, the covenants herein set forth and confirmed, the mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are herein acknowledged, Borrowers and Lender agree as of the Effective Date as follows:

1.   **Acknowledgement of Recitals**.   Borrowers and Lender acknowledge and agree that the foregoing "Recitals" are true, correct, and complete.

*Page 2 of 9*

4852-9783-6364 v1
2921440-000019 07/28/2017

2. **Acknowledgement of Obligations by Borrowers**.  Borrowers acknowledge and agree that Borrowers are indebted to Lender for repayment of the Obligations, including all accrued interest accrued thereon.  Borrowers further acknowledge that they are responsible for all fees, expenses and charges as allowed under the Loan Documents.  Borrowers hereby reaffirm and ratify the terms of the Loan Documents, as amended herein, and acknowledge that they are enforceable in accordance with their terms.

3. **Acknowledgement of Security Interests**.  Borrowers acknowledge the validity and enforceability of the security interests in the Collateral granted in favor of Lender under the Loan Documents executed by Borrowers.

4. **Acknowledgement of Event of Default**.  Borrowers acknowledge that in accordance with Sections 10(b) and (c) of the Loan Agreement, an Event of Default has occurred for failure to provide materially complete and correct financial statements provided in accordance with the Loan Agreement for fiscal years ended December 31, 2016, and 2015, and the fiscal quarters as of and for the periods ended March 31, 2017, and March 31, June 30 and September 30, 2016.

5. **Acknowledgement of Termination of Requirement to Make Further Advances Under the Note**.  Borrowers acknowledge that in accordance with Section 2.2 of the Loan Agreement, as an Event of Default has occurred and is continuing, Radians is not required to make further advances under the Loan.

6. **Acknowledgement of Lack of Defenses**.  Borrowers acknowledge that as of the Effective Date each has no defense, counterclaim, offset, cross complaint, claim or demand of any kind or nature whatsoever (collectively, the "Claims") that can be asserted to reduce or eliminate all or any part of its liability to repay any of the Obligations to Lender or seek affirmative relief for damages of any kind or nature from Lender, which Claims arise out of or are related to the Loan Documents or, more generally, Borrowers' relationship with Lender.  To the extent that any such Claims exist as of the Effective Date, Borrowers acknowledge and agree that they have been fully, forever and irrevocably released pursuant to Paragraph 13 hereto.

7. **Forbearance**.

(a)    Lender will forbear from exercising any remedies available to it under the Loan Documents from the Effective Date through and including the Forbearance Termination Date, as further defined below, (the "Forbearance Period") and will not seek collection of the Obligations from Obligors, except as set forth herein; provided, however, that the Forbearance Period shall terminate and Lender shall be permitted to enforce or exercise any remedies available to it under the Loan Documents if an event of default occurs, which is broadly defined to include the following:  (i) Borrowers materially breach, default, or fail to perform any obligation or agreement contained in this Agreement; (ii) any case or other proceeding is instituted by or against the Borrowers under any state or federal law relating to the bankruptcy of debtors, including without limitation, the United States Bankruptcy Code, 11 U.S.C. § 101, et seq.; (iii) any material and substantial default or event of default other than any existing Default occurs under any of the Loan Documents as modified by this Agreement and all of the other documents executed in connection herewith;   (iv)  Borrowers fail to meet any deadline established under this Agreement for providing required payment, confirmation or

*Page 3 of 9*

003175

documentation; or (v) any of the acknowledgments, warranties or representations of the Borrowers set forth herein shall be untrue or inaccurate in any material respect as of the date made. Each of the foregoing events is hereinafter referred to as a "Terminable Event." Upon the occurrence of a Terminable Event, Lender may exercise any and all rights and remedies available to Lender provided in the Loan Documents or this Agreement.

(b)    Subject to the termination set forth in Paragraph 7(a), and unless otherwise agreed to in writing by Lender, the Forbearance Period will terminate at 5:00 p.m. on **July 31, 2017** (the "Forbearance Termination Date").

8. **Advance Under the Note**.    Upon compliance with the Conditions Precedent and execution of this Agreement, Radians shall advance an additional sum of $250,000.00 under the Note to Borrowers which shall become a component of the Obligations.

9. **Required Payment on Forbearance Termination Date.**    On the Forbearance Termination Date, the Obligations shall be due and owing in full.  Borrower shall make a final lump sum payment for the entire principal balance, accrued interest, and any other amounts owed, including any collection costs, expenses, fees or other charges then due and owing on the Note.

10. **Adequate Consideration**.  Obligors each hereby acknowledge and agree that Lender's agreed forbearance, advancement of additional funds under the Note, and extended time for repayment of the Obligations constitutes full and adequate consideration for the execution and delivery by Borrowers of this Agreement.  Borrowers materially benefit by the forbearance, modification, and agreements of Lender contained in this Agreement.  Borrower stipulates that it has the authority and authorization to execute this Agreement.

11. **Liens Unaffected**.    Nothing in this Agreement shall adversely affect, invalidate, discharge, release, or impair any security or the Collateral (including, without limitation, the liens and security interests granted in the Loan Documents held by the Lender or the indebtedness secured thereby or the priority of the security interests of such security, which priority of the security interests shall remain unaffected and unimpaired.

12. **Conditions Precedent**.    As conditions precedent to Lender's obligation to forbear hereunder, Borrower agree as follows:

(a)    To comply with the provisions and conditions of this Agreement;

(b)    Borrowers shall execute this Agreement, and any and all additional documents as Lender may reasonably require to effect the terms and conditions of this Agreement;

(c)    Obligors shall provide to Lender any and all documents reasonably requested by Lender relating to the operation of Borrowers' business; and

*Page 4 of 9*

**003176**

(d)    Borrowers shall continue to use the Lockbox as required under the Loan Agreement and shall execute the Deposit Account Control Agreement attached hereto as Exhibit A.

13. **Release of Lender**.

(a)    Except with respect to Lender's obligations set forth in this Agreement, in consideration of the agreements of Lender contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrowers, and each of its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender, and its successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (Lender and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which such Obligors or any of their respective heirs, successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with any of the Loan Documents or transactions thereunder or related thereto.

(b)    Obligors understand, acknowledge and agree that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)    Obligors agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

(d)    Upon full payment and satisfaction of the Obligations, Obligors shall thereupon automatically be fully, finally and forever released and discharged from any further claim, liability, or obligation in connection with the Revolving Loan and this Agreement, and Lender shall return and mark the Note as "Paid in Full" and release any and all security with respect to the Obligations.  This Paragraph 13 shall survive termination of this Agreement.

14. **Remedies Cumulative; No Waiver**.  The execution, delivery and performance of this Agreement by Lender and the acceptance by Lender of the performance of Borrowers hereunder (a) shall not constitute a waiver or release by Lender of any Event of Default that may now or hereafter exist, (b) shall not constitute a novation of any of the Loan Documents, as amended, and, (c) except as expressly provided in this Agreement, shall be without prejudice to, and is not

*Page 5 of 9*

a waiver or release of, Lender's rights at any time in the future to exercise any and all rights conferred upon Lender by any of the Loan Documents or otherwise at law or in equity, including but not limited to the right to institute collection proceedings against Borrowers and/or to exercise any right against any other person or entity not a party to this Agreement.

15. **Cooperation Upon Default**.  Upon the expiration of the Forbearance Period including any mutually agreed upon extensions thereof without Borrowers having made a lump sum payment to Lender in order to satisfy in full the Obligations due and owing to Lender or the occurrence of a Terminable Event, Borrowers also shall, if requested by Lender, assist Lender in the orderly liquidation of the Collateral securing the Obligations (the "Turnover of Assets").  In implementing the Turnover of Assets, Borrowers agree as follows:

(a)    Borrowers will cooperate with Lender in the consensual and orderly liquidation of the Collateral securing any of the Obligations.

(b)    Borrowers acknowledge that they have received commercially reasonable, timely, and accurate notice of an Event of Default, and Borrowers agree that such notice satisfies all requirements of notice under the Loan Documents and applicable law.

16. **Representations and Warranties**.  To induce Lender to enter into this Agreement and as partial consideration for the terms and conditions contained herein, Borrowers represent and warrant, each and all of which shall survive the execution and delivery of this Agreement and all of the other documents executed in connection herewith, that all actions required to be taken by Borrowers for the authorization, execution, delivery and performance of this Agreement and any other documents contemplated hereby have been taken.  This Agreement is, and any documents executed pursuant hereto will be legal, valid, and binding obligations of the party or parties thereto, enforceable against each such party in accordance with their respective terms, subject only to bankruptcy, insolvency, reorganization, moratorium and other laws or equitable principles affecting creditors' rights generally.

17. **Counsel.**  Borrowers acknowledge that they have read and understand this Agreement, that they have had the ability to consult with an attorney of their own choosing before signing this Agreement, have been afforded an opportunity to deliberate as to whether to enter into this Agreement, that they understand the terms and effects of this Agreement, and that they execute this Agreement voluntarily.

18. **Construction.**  This Agreement shall be liberally construed in order to effectuate the rights, benefits, and remedies of each party, as expressed herein, and neither the express language herein nor any principles of interpretation shall be impaired or adversely affected by the language of any prior discussion, form or draft of this Agreement.  This Agreement has been the subject of negotiations by the parties, and this Agreement shall not be construed against any party merely because of such party's involvement in its initial preparation and negotiation. Except as modified by this Agreement, the Loan Documents shall remain in full force and effect.

*Page 6 of 9*

003178

19. **Governing Law.**  This Agreement is governed by the laws of the State of Texas.

20. **Counterparts, Facsimile.**  This Agreement may be executed and delivered (including by facsimile or Portable Document Format (pdf) transmission) in one or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. Facsimile or pdf transmission of any signed original document or retransmission of any signed facsimile or pdf transmission will be deemed the same as delivery of an original.  At the request of any party, the other parties will confirm facsimile or pdf transmission by signing a duplicate original document.

　　　　**IN WITNESS WHEREOF,** the Parties have executed this Agreement to be effective as of the Effective Date.

**BORROWER:**

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

By: _____
　　　L. Geoffrey Greulich, CEO

**BORROWER:**

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation**

By: _____
　　　L. Geoffrey Greulich, CEO

**RADIANS WAREHAM HOLDING, INC., a Nevada corporation**

By: _____
　　　Ruth Tutor, CFO

*Page 7 of 9*

4852-9783-6364 v1
2921440-000019 07/28/2017

003179

STATE OF TEXAS
COUNTY OF _____

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **L. Geoffrey Greulich**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the Chief Executive Officer of **IRONCLAD PERFORMANCE WEAR CORPORATION**, the within named bargainor, a California corporation, and that he as such Chief Executive Officer, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such Chief Executive Officer.

WITNESS my hand and seal at office, on this the __th day of July, 2017.

_____
Notary Public

My Commission Expires:

_____

STATE OF TEXAS
COUNTY OF _____

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **L. Geoffrey Greulich**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the Chief Executive Officer of **IRONCLAD PERFORMANCE WEAR CORPORATION**, the within named bargainor, a Nevada corporation, and that he as such Chief Executive Officer, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such Chief Executive Officer.

WITNESS my hand and seal at office, on this the __th day of July, 2017.

_____
Notary Public

My Commission Expires:

_____

*Page 8 of 9*

003180

STATE OF TENNESSEE
COUNTY OF SHELBY

     Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **Ruth Tutor**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the _____r of **RADIANS WAREHAM HOLDING, INC.,** the within named bargainor, a Nevada corporation, and that she as such _____, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such _____.

     WITNESS my hand and seal at office, on this the \_\_th day of July, 2017.

_____
Notary Public

My Commission Expires:

_____

*Page 9 of 9*

**003181**

## DEPOSIT ACCOUNT CONTROL AGREEMENT
(Springing - Lockbox)

This **DEPOSIT ACCOUNT CONTROL AGREEMENT** (the "*Agreement*") dated as of July 28, 2017, by and among **CAPITAL ONE, NATIONAL ASSOCIATION,** having an address at 5718 Westheimer, Suite 600, Houston, Texas 77057 ("*Bank*"), **IRONCLAD PERFORMANCE WEAR CORPORATION,** a California corporation and **IRONCLAD PERFORMANCE WEAR CORPORATION,** a Nevada corporation, having an address at 1920 Hutton Court, Suite 300, Farmers Branch, Texas, 75234 (collectively, "*Debtor*"), and **RADIANS WAREHAM HOLDING, INC.,** a Nevada corporation, having an address at 5305 Distriplex Farms Dr., Memphis, Tennessee 38141 (together with its successors and assigns, hereinafter referred to as "*Secured Party*").

W I T N E S S E T H :

A.    Secured Party is making loans, advances and other extensions of credit from time to time to Debtor pursuant to that certain Revolving Loan and Security Agreement dated November 28, 2014, executed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, as borrowers, in favor of Capital One, National Association, as lender, as modified by the First Modification Agreement dated June 15, 2015, the Second Modification Agreement dated March 16, 2016, the Third Modification Agreement dated November 28, 2016, the Waiver and Fourth Modification Agreement dated February 23, 2017, the Limited Waiver and Fifth Modification Agreement dated April 11, 2017, and the Sixth Modification Agreement dated May 10, 2017 by and between Secured Party and Debtor (as amended and otherwise in effect from time to time, the "*Loan Agreement*").

B.    All capitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Loan Agreement.

C.    Bank acknowledges that, as of the date hereof, it maintains, in the name of Debtor, the deposit account identified in Section 1(a) of this Agreement (the "*Account*"). The Account is a "deposit account" as defined in Section 9-102 of the Uniform Commercial Code of the State of New York (the "*UCC*"). In addition to the terms and conditions of this Agreement, the Account is governed by the terms and conditions of any deposit account agreements and other related agreements that Debtor has with Bank, including without limitation all agreements concerning banking products and services, treasury management documentation, account booklets containing the terms and conditions of the Account, signature cards, fee schedules, disclosures, specification sheets and change of terms notices (collectively, with all applicable services descriptions and/or agreements, the "*Deposit Agreements*"). The provisions of this Agreement shall supersede the provisions of the Deposit Agreements only to the extent the provisions herein are inconsistent with the Deposit Agreements, and in all other respects, the Deposit Agreements shall remain in full force and effect.

D.    As security for the payment and performance of the Indebteness under the Loan Agreement, Debtor hereby confirms to Bank that Debtor has granted to Secured Party a security interest pursuant to the Loan Agreement in the following (collectively, the *"Account Collateral"*):  (a) the Account, and (b) the Items.  The term *"Items"* means, collectively, all checks, drafts, instruments, certificates of deposit, cash and other items at any time received for deposit in the Account (subject to specific instructions in effect for processing items), wire transfers of funds, automated clearing house (*"ACH"*) entries, credits from merchant card transactions and other electronic funds transfers or other funds deposited in, credited to, or held for deposit in or credit to, the Account.

E.    The parties desire to enter into this Agreement in order (i) to establish "control" (as defined in Section 9-104 of the UCC) in the Account, (ii) to set forth their relative rights and duties with respect to the Account Collateral and (iii) to set forth the services that Bank will provide with respect to the Account.

NOW THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

Section 1.    <u>Duties of Bank</u>.  (a) <u>The Account</u>.  Bank has established and maintains the Account entitled as follows:

> Name: Ironclad Performance Wear Corporation
> Account No.: 4670100567
> ABA No.: 111901014

Bank shall receive and process any Items presented by Debtor or any of its respective agents pursuant to the next paragraph in accordance with the terms of this Agreement.  Bank shall also receive and process all items sent directly to the Bank at United States P.O. Box _____, (the "Lockbox"), or via wire transfer to ABA#111901014 by purchasers of the Inventory (as defined in the Loan Agreement) made payable to the Debtor or some such similar designation as Bank in its sole discretion may determine.

Debtor hereby agrees to deposit with the Bank within one (1) Business Day of receipt, all Items received directly by Debtor which are not otherwise forwarded to Bank.

(b)    <u>Control</u>.  Bank will comply with withdrawal and entitlement orders originated by Debtor concerning the Account until such time as Secured Party delivers a written notice to Bank (in the form of attached Exhibit A) that Secured Party is thereby exercising exclusive control over the Account (such notice, a *"Notice of Exclusive Control"*).  After Bank receives a Notice of Exclusive Control and has had a reasonable period of time to act upon it (but in any event not to exceed two (2) Business Days after receipt thereof as described in Section 8), it will cease complying with withdrawal or entitlement orders and all other directions concerning the Account originated by Debtor.

*Springing Deposit Account Control Agreement*

003183

(c)    <u>No Debtor Rights</u>.  Debtor agrees that it shall have no right to issue withdrawal, payment, transfer, delivery, disposition or other instructions or any other right or ability to control, access, pick up, withdraw or transfer, deliver or dispose of Items or funds from the Account without Secured Party's prior written consent with respect thereto from and after the receipt by Bank of a Notice of Exclusive Control.  From and after the time that Bank receives a Notice of Exclusive Control and has had a reasonable period of time to act upon it (but in any event not to exceed two (2) Business Days after receipt thereof as described in Section 8), Bank will comply with any instructions from Secured Party directing the disposition of funds in the Account without the need for any further authorization of Debtor.

(d)    <u>Amendment and Termination of Instructions</u>.  After Bank receives a Notice of Exclusive Control and has had a reasonable period of time to act upon it (but in any event not to exceed two (2) Business Days after receipt thereof as described in Section 8), only the Secured Party (without the need for any further authorization for Debtor) may amend or terminate the authorizations and instructions set forth above by written notice to Bank, and Bank shall not honor any amendments or other changes to the instructions set forth herein with respect to the Account received from Debtor.

(e)    <u>Security Interest in Items</u>.  Debtor and Bank hereby agree that all proceeds of all Items deposited in the Account from time to time, together with all other funds received by Bank in the Account via wire transfer, ACH, merchant card transactions and other electronic funds transfers, or otherwise, shall be held for the benefit of and subject to the security interest granted to Secured Party by Debtor.

(f)    <u>Returned Items</u>.  Bank hereby waives any and all rights it may have at law or otherwise to set off, or make any claim, against the Account, except Bank expressly reserves all of Bank's present and future rights (whether described as rights of setoff, banker's lien, chargeback or otherwise, and whether available to Bank under law or any other agreement between Bank and Debtor concerning the Account or otherwise) with respect to (i) any item deposited to the Account and returned unpaid, or with respect to which Bank fails to receive final settlement, whether for insufficient funds or for any other reason, including but not limited to the claim of a forged instrument; (ii) any item subject to a claim against Bank of breach of transfer or presentment warranty under the UCC; (iii) any ACH entry credited to the Account and returned unpaid or subject to an adjustment entry under applicable clearing house rules, whether for insufficient funds or for any other reason; (iv) any credit to the Account from a merchant card transaction, against which a contractual demand for chargeback has been made; (v) any credit to the Account made in error; and (vi) Bank's usual and customary charges for services rendered in connection with the Account including the payment of Bank's fees and expenses for maintenance of the Account.  Items, entries, and transactions described in clauses (i) through (v) of this subsection (f) are hereinafter collectively referred to as ***Returned Items.***  Returned Items will be re-deposited the first time and if any Returned Items are returned unpaid a second time for whatever reason such Returned Items shall be debited to the Account under advice and returned to Debtor.

003184

(g)     Available Funds. Debtor agrees that withdrawals or transfers from the Account will not at any time exceed the available funds in the Account, as determined by Bank's current availability schedule and subject to Bank's right to place holds for uncollected funds pursuant to Federal Reserve Regulation CC. In all instances, Debtor shall remain liable to Bank for all Returned Items.

(h)     Monthly Report; System Access. Debtor authorizes Bank, and Bank agrees (without requiring Debtor's further authorization or instruction), to send or make available via Bank's internet banking system or otherwise, at least a monthly report to Debtor and Secured Party containing information specifying the amount deposited into the Account for the previous month.

Section 2.     Fees and Charges. (a) To compensate Bank for performing the herein-described services, Debtor agrees to pay the fees owed to Bank. Bank shall debit the Account under advice on a monthly basis for its reasonable and customary fees and charges relating to the Account and shall include its fees in the monthly report required pursuant to Section 1(h). Debtor agrees to pay Bank, upon demand, all costs and expenses, including reasonable attorneys' fees and disbursements, incurred by Bank in the preparation, negotiation and administration of this Agreement (including any amendments hereto or additional instruments or agreements required hereunder); and Debtor authorizes Bank to charge the Account for such costs and expenses.

(b)     Debtor agrees to pay Bank for all Returned Items and for all service charges, returned check fees and any other charges to which Bank may be entitled for servicing and maintaining the Account (collectively with Returned Items, the "*Charges*") and authorizes Bank to charge other accounts maintained with Bank by Debtor for such Charges. In the event that there are insufficient collected funds on deposit in such other accounts to pay the Charges, Debtor and Secured Party agree that Bank may debit the Account the amount of such Charges. With respect to any Returned Item, if Debtor fails to repay Bank in accordance with this section, then Secured Party shall repay Bank the amount of such Returned Item within ten (10) Business Days of receipt of written demand for such payment, provided that (i) such demand is received within ninety (90) days of the date such Returned Item was credited to the Account, and (ii) Secured Party or its designee received the proceeds of such Returned Item.

Section 3.     Indemnification. Bank shall not be liable for any claims, suits, actions, costs, damages, liabilities or expenses ("*Liabilities*") in connection with the subject matter of this Agreement other than Liabilities caused by the gross negligence or willful misconduct of Bank, and Debtor and Secured Party and their respective successors and assigns hereby agree to indemnify and hold harmless Bank and the directors, officers, employees and agents of Bank and the successors and assigns of Bank from and against any and all Liabilities, legal fees, law suits or legal proceedings, including, without limitation, reasonable fees and disbursements of legal counsel incurred by Bank in any action or proceeding between Debtor or Secured Party and Bank or between Bank and any third party or otherwise, without regard to the merit or lack of merit thereof, arising from or in connection with any acts or omissions taken by Bank or any director, officer, employee or agent of any of them, as applicable, in connection with this Agreement. Notwithstanding

*Springing Deposit Account Control Agreement*

- 4 -

003185

anything to the contrary contained herein, Bank shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that Bank's gross negligence or willful misconduct was the primary cause of any loss to Debtor or Secured Party. Bank may execute any of its powers or perform any of its duties hereunder directly or through agents or attorneys and may consult with counsel, accountants and other skilled persons to be selected and retained by it at the cost and expense of Debtor. Nothing contained herein shall be deemed to prohibit Bank from complying with its customary procedures in the event that it is served with any legal process with respect to the Account.

The parties hereto agree that Bank's sole responsibility to Secured Party, Debtor or any third party for errors made by Bank in processing any Deposits shall be to process a correcting entry in the next regularly scheduled processing of the work after receipt of notification from Secured Party, Debtor or any third party of such error or after discovery of such error by Bank, as the case may be, unless such error was due to Bank's gross negligence or willful misconduct. Bank shall not be liable for any damage or loss resulting from any delay or failure of performance arising out of the acts or omissions of any third parties, including, but not limited to, various communication services, courier services, the Federal Reserve System, any other bank or any third party who may be affected by funds transactions, fire, mechanical, computer or electrical failures or other unforeseen contingencies, strikes or other causes beyond the reasonable control of Bank. In no event shall Bank be liable for lost profits or consequential, special, direct (except for those direct damages attributable to Bank's gross negligence or willful misconduct), indirect or punitive damages, even if Bank has been advised of the possibility of the foregoing.

Section 4.    Successors and Assigns; Assignments.    (a) This Agreement shall bind and inure to the benefit of and be enforceable by Bank, Debtor and Secured Party and their respective successors and assigns.

(b)    Any corporation into which Bank in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which Bank in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of Bank in its individual capacity may be transferred, shall be "*Bank*" under this Agreement without further act.

Section 5.    Termination.    This Agreement shall continue in effect until Secured Party has notified Bank in writing that this Agreement, or its security interest in the Account Collateral, is terminated. Upon receipt of such notice, the obligations of Bank hereunder with respect to the operation and maintenance of the Account after the receipt of such notice shall terminate. Bank reserves the right, unilaterally, to terminate this Agreement, such termination to be effective upon thirty (30) Business Days' written notice to Secured Party and Debtor.

Section 6.    Complete Agreement. This Agreement and the instructions and notices required or permitted to be executed and delivered hereunder set forth the entire agreement of the parties with respect to the subject matter hereof, and, subject to Section 7

*Springing Deposit Account Control Agreement*

003186

below, supersede any prior agreement and contemporaneous oral agreements of the parties concerning its subject matter.

Section 7.    <u>Amendments; Other Agreements</u>.    This Agreement may be amended from time to time in writing by all parties hereto.  This Agreement is supplemented by the terms and conditions of the Deposit Agreements, and to the extent the terms of such Deposit Agreements conflict with this Agreement, the specific terms of this Agreement shall control; <u>provided, however</u>, that this Agreement shall not alter or affect any mandatory arbitration provision currently in effect between Bank and Debtor pursuant to the Deposit Agreements.

Section 8.    <u>Notices</u>.  All notices and requests required or permitted under this Agreement (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party):

If to Bank:

**Capital One, National Association**
**Deposit Control Agreements**
**Commercial Service Gateway**
**275 Broadhollow Rd**
**Melville, NY 11747**

With a copy to:

**Capital One, National Association**
**265 Broadhollow Road**
**Melville, NY  11747**
**Attn: Legal Dept.**

If to Debtor:
**IRONCLAD PERFORMANCE WEAR CORPORATION**
**1920 Hutton Court, Suite 300**
**Farmers Branch, Texas  75234**
**Attn:  James McAlister, CFO**

If to Secured Party:
**RADIANS WAREHAM HOLDING, INC.**
**5305 Distriplex Farms Dr.**
**Memphis, Tennessee  38141**
**Attn:  Ruth Tutor, CFO**

A Notice shall be deemed to have been given: (i) if sent by hand delivery, upon delivery, (ii) if sent by facsimile, upon receipt, or (iii) if sent by overnight courier, upon receipt.

*Springing Deposit Account Control Agreement*

- 6 -

**003187**

For general inquiries of Bank, please contact the Capital One Control Services unit at 1-855-675-1212 or via e-mail at depositcontrol@capitalone.com.

Section 9.    Governing Law and Venue.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  Any action or proceeding arising out of or concerning this Agreement shall be heard by a judge sitting without a jury and shall be heard exclusively in state court of the State of New York.  Bank, Debtor and Secured Party hereby submit to the exclusive jurisdiction of the state courts of the State of New York for the purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby.  Bank, Debtor, and Secured Party irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  New York shall be deemed to be Bank's "jurisdiction" within the meaning of Section 9-304 of the UCC.

Section 10.    Certain Matters Affecting Bank.  Bank may rely and shall be protected in acting or refraining from acting upon any notice (including but not limited to electronically confirmed facsimiles of such notice) believed by it to be genuine and to have been signed or presented by the proper party or parties.  The duties and obligations of Bank set forth in this Agreement shall be determined solely by the express provisions of this Agreement, Bank shall not be liable except for the performance of such party's duties and obligations as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against Bank.

Section 11.    Interpleader.  If at any time Bank, in good faith, is in doubt as to the action it should take under this Agreement, Bank shall have the right to commence an interpleader action at Debtor's sole cost and expense and to take no further action except in accordance with joint instructions from Secured Party and Debtor or in accordance with the final order of the court in such action.

Section 12.    No Precedent in Negotiation. Each of Secured Party and Debtor respectively agrees that it shall not cite or refer to this Agreement as a precedent in any negotiation of any other account agreement to which Secured Party, Debtor or any of their respective affiliates and Bank shall be party.

Section 13.    Headings.  The section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 14.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile machine, portable document format ("*PDF*") or other electronic means shall be as effective as delivery of a manually executed counterpart of this Agreement.  The effectiveness of any such documents and signatures shall, subject to Applicable Laws, have the same force and effect as manually signed originals and shall be binding on Debtor, Bank and Secured Party.  Secured Party may also require that any

*Springing Deposit Account Control Agreement*

003188

such documents and signatures be confirmed by a manually signed original thereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature. No party may raise the use of a telecopier, facsimile machine, PDF or other electronic means, or the fact that any signature was transmitted through the use of a telecopier, facsimile machine, PDF or other electronic means, as a defense to the enforcement of this Agreement.

*(remainder of page intentionally left blank; signature page follows)*

*Springing Deposit Account Control Agreement*

003189

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in several counterparts (each of which shall be deemed an original) as from the date first above written.

**BANK:**

**CAPITAL ONE, NATIONAL ASSOCIATION**

By: _____
Name:
Title:

*-Signature page to*

S-1        *Springing Deposit Account Control Agreement-*

DEBTOR:

IRONCLAD PERFORMANCE WEAR
CORPORATION, a California
corporation

By: _____
           L. Geoffrey Greulich, CEO

IRONCLAD PERFORMANCE WEAR
CORPORATION, a Nevada corporation

By: _____
           L. Geoffrey Greulich, CEO

*-Signature page to*

003191

SECURED PARTY:

RADIANS WAREHAM HOLDING,
INC., a Nevada corporation

By: _____
  Ruth Tutor, CFO

*-Signature page to*

S-3        *Springing Deposit Account Control Agreement-*

**EXHIBIT A**

Secured Party's Letterhead

To:   **Capital One, National Association**
       **Deposit Control Agreements**
       **Commercial Service Gateway**
       **275 Broadhollow Rd**
       **Melville, NY 11747**

Re:    Account No _____ - Notice of Exclusive Control

Attention:  Cash Management Manager

      Reference is made to the Deposit Account Control Agreement dated as of _____ __, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement") by and among _____ ("Debtor"), the undersigned Secured Party and you regarding the above-described account (the "Account"). In accordance with Section 1 of the Agreement, we hereby give you notice of our exercise of control of the Account and we hereby instruct you to transfer daily all funds in the Account as permitted under the Agreement to our account as follows:

      Secured Party's Name:
      Secured Party's Address:

      ABA No.:
      Account Name:
      Account No.:
      Reference:

**SECURED PARTY:**

By: _____
Name:
Title: